James P. Bonner (JB-0629)
Shalov Stone & Bonner LLP
485 Seventh Avenue
Suite 1000
New York, New York 10018
(212) 239-4340


UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

| | |
|---|---|
| MICHAEL BENNETT and LINDA BENNETT, | : **CIVIL ACTION** |
| Individually and as Legal Representatives of the Estate of | : |
| MARLA ANN BENNETT, Deceased, | : **CASE NO.** |
| AND LISA LYN NIES | : **CV-05-3183(NG)(VVP)** |
| | : |
| PLAINTIFFS, | : |
| | : |
| -against- | : **SECOND AMENDED** |
| | : **COMPLAINT** |
| ARAB BANK, PLC, | : |
| | : |
| DEFENDANT. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs Michael Bennett and Linda Bennett, individually and as the legal representatives of the Estate of Marla Ann Bennett, deceased, and Lisa Lyn Nies and each of them, through their attorneys, file this Second Amended Complaint pursuant to Rule 15(a) before a responsive pleading has been served to their First Amended Complaint and allege the following upon information and belief:


## NATURE OF THE ACTION

1.      On July 31, 2002, 24 year old United States national Marla Ann Bennett was murdered by a Palestinian terrorist attack, planned and carried out by a HAMAS terror cell, at the Frank Sinatra Cafeteria at the campus of Hebrew University in Jerusalem, Israel.  For two years or more prior to this terror attack, Defendant Arab Bank aided, abetted and substantially

assisted HAMAS with general awareness of its role as part of an overall illegal activity. It also knowingly provided material support to HAMAS for many years. Arab Bank's assistance and support of HAMAS constitutes a violation of US law and makes Arab Bank liable to Plaintiffs for the damages they have suffered by reason of HAMAS' terrorist act that killed Marla Bennett.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States, their survivors and heirs who have been killed or injured by reason of acts of international terrorism.  This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391(d).

4.      Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 301 because, among other things, it continuously and systematically does business in the State of New York.  Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank: (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from

international commerce.  Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C.

§ 2334(a).

## THE BENNETT FAMILY

5.      On the afternoon of July 31, 2002, approximately 100 people were eating lunch in

the Frank Sinatra cafeteria on the Hebrew University Mount Scopus campus in Jerusalem, Israel.

A bomb planted inside the cafeteria exploded, killing nine people and injuring as many as 85

others.  Five Americans were killed in the attack, including Marla Ann Bennett, by reason of this

act of international terrorism.  HAMAS claimed responsibility for the attack and was in fact

responsible for it.

6.      Mohammed Odeh, a resident of Silwan, carried out the attack at Hebrew

University where he worked for an Israeli contractor as a painter.  Israeli authorities have

arrested and convicted Odeh and others involved in committing this heinous act of terrorism.

7.      On the night before the attack, Odeh jumped over a fence on the campus and hid

the explosives under a bush. The next morning, he walked through the main gate using his

employee permit, picked up the bomb and planted it in the cafeteria.  He then remotely detonated

the explosives with a cell phone.

8.      Familiar with the university, Odeh chose the Frank Sinatra Cafeteria as the site for

the bombing knowing that few Arabs frequented the cafeteria and that foreign students

frequently dined there.  Odeh received the explosives from accomplices in the West Bank town

of Ramallah, where the HAMAS cell command that planned the terror act was located.  Odeh

was part of a Hamas terror cell based in Jerusalem that was led by Wa'al Kassam of Ras El

Amud.  Odeh and Kassam were arrested in late August, 2002 by Israeli authorities.  An Israeli

Court convicted and sentenced Odeh, Kassam and other members of the HAMAS terror cell for

the Hebrew University bombing that killed Marla and others.  Other members of the HAMAS terror cell were Wisam Abassi and Aladin Abassi, residents of Silwan, and Mohammed Hassan Arman.

9.      Marla Bennett was a U.S. citizen and a graduate of the University of California at Berkeley. At the time of her death, Marla was a graduate student working on her master's degree in Jewish Studies.  On the day of her death, Marla was eating lunch in the Hebrew University cafeteria with two of her friends, just before a final exam, and was scheduled to fly back home to San Diego, California within two days.

10.      Michael and Linda Bennett heard about the terrorist attack at their daughter's school and became concerned when they did not receive a prompt phone call from Marla to report she was safe (her usual practice after a terror attack).  The absence of any communication following the terror attack heightened the Bennett's' fear that something horrific had occurred and intensified their suffering.

11.      The Bennett's contacted the United States Department of State, the Israeli consulate in Los Angeles and several hospitals in Jerusalem looking for their daughter, while Marla's boyfriend, Michael Simon, was searching for Marla in Jerusalem.  At approximately 2:30 p.m. Pacific daylight time on July 31, 2002, the Bennetts were contacted by the United States State Department.  At that time, the State Department requested that Marla's dental record be sent to Israel.  With the assistance of the FBI, the records were transmitted as requested, and the Bennetts continued waiting for confirmation of their daughter's identification.  At 10:15 p.m. Pacific daylight time on July 31, 2002, they received the horrifying news from the L. Greenberg Institute of Forensic Medicine and the Israeli National Police that their daughter was among those who suffered fatal injuries in the bombing in the cafeteria.

12.     Marla's body was flown from Israel to Los Angeles on Sunday, August 4, 2002, after many scheduling difficulties, further increasing the Bennetts' mourning and pain.  Friends of Marla took turns watching over her coffin until the funeral the next day.  Plaintiffs' friends and community arranged for the funeral to be held at the Tifereth Israel Synagogue because a large crowd was anticipated.  Marla had many friends and colleagues throughout the United States as well as abroad.  Marla's death evoked media attention that interfered with the Bennetts' ability to grieve.

13.     Michael and Linda Bennett are Marla Ann Bennett's parents and the legal representative of the Estate of Marla Ann Bennett. Michael and Linda Bennett are survivors and heirs of Marla Ann Bennett.   Lisa Lyn Nies is Marla's sister who is a "survivior and/or heir of Marla Ann Bennett."  They are all U.S. citizens. Michael and Linda Bennett reside in California and Lisa Nies lives in South Dakota.

## DEFENDANT ARAB BANK

14.     Defendant Arab Bank, PLC is a Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution, herein and hereinafter "Arab Bank".  Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York. The Bank does business in the United States and approximately 30 other countries on five continents and has over 7,000 employees.  Arab Bank's affiliate, Arab National

Bank ("ANB"), has over 100 branches in Saudi Arabia. Arab Bank is a 40% shareholder of ANB.

15.     Beginning in approximately 1982, Arab Bank operated a federally chartered branch in New York which is regulated by the United States of America and by the State of New York. The New York branch was designated as a wholesale bank, and among the banking and financial services that it conducted in New York were the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks. The New York branch has approximately 50 employees working in or for the New York City operation. The New York Branch of Arab Bank clears all of the worldwide branches' dollar transactions in New York, New York, which includes the many transactions described below.

16.     On or about February 25, 2005, the U.S. Office of the Comptroller of the Currency ("OCC"), which regulates the Arab Bank's New York branch, announced drastic restrictions on Arab Bank's New York operations. The OCC determined that the branch "had internal control weaknesses, particularly with regard to its international funds transfer activities." The OCC also found that "the inadequacy of the Branch's controls over its funds transfer business is especially serious in light of the high risk characteristics of many of the transactions." www.occ.treas.gov/ftp/eas/ea2005-14.pdf. During an investigative audit by the OCC of Arab Bank in late 2004 and early 2005, U.S. officials discovered, among other things, that Arab Bank had as customers 40-60 supported terrorists and terrorist groups with alleged connections to such foreign terrorist organizations as Al Qaeda, HAMAS, and Hezbollah. The investigative audit also revealed that Arab Bank knowingly and illegally allowed such groups to transfer money through Arab Bank's New York branch in violation of the laws of the United States. The Arab

Bank has entered into a Consent Decree with the OCC regarding restrictions on its operations, and, in August, 2005, Arab Bank was forced to pay a $24 million fine to the United States for its failure to comply with OCC regulations.

17.     The Shoman Family founded the bank in Jerusalem in 1930 and have played key roles in the management of the Bank ever since.  Until his recent death in 2005, Abdul Majeed A.H. Shoman was the Chairman of Arab Bank and Arab Bank Group.  His son, Abdel Hamid A.M. Shoman, was Deputy Chairman and Chief Executive Officer of Arab Bank and Arab Bank Group until his father's death.  He assumed his father's job titles and positions shortly after his father's death.

18.     The Bank's current Chief Banking Officer is Shukry Bishara who was responsible for the opening of the Bank's offices in New York in 1982 and who then moved to Ramallah in the West Bank, following the Oslo Accords, in approximately 1994 to oversee the Bank's operation in the West Bank and Gaza.  He was promoted to Chief Banking Officer and moved to Amman, Jordan in February 2002.

19.     Arab Bank has consolidated assets of US$32 billion. Arab Bank has approximately 22 branches operating in Gaza and the West Bank, the first of which was opened in late 1994 in Nablus.  Since 1996, when the Israeli Central Banking Authority's supervisory role over Arab Bank's conduct in Gaza and the West Bank ended, the Palestinian Monetary Authority has had the duty to regulate the bank's branches in the Palestinian territories.

## FACTUAL ALLEGATIONS

## I.     The Campaign of Terror by HAMAS

20.     HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, which was founded in December 1987 as an outgrowth of the Muslim

Brotherhood.  It is a terrorist organization that has intentionally killed hundreds of innocent civilians, including Marla Ann Bennett.

21.     HAMAS is a radical Islamisc terrorist organization committed to the globalization of Islam through violent "Jihad" or holy war.  HAMAS is formally committed to the destruction of the State of Israel, is extremely anti-American and is committed to achieving its objectives by violent means, including acts of terrorism.  The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout the area known as Palestine and further including all of the area within the borders of the democratic State of Israel by eliminating the State of Israel through violent jihad.  Since the September 11th World Trade Center attacks HAMAS has often praised and glorified Osama bin Laden and his supporters engaged in global jihad.

22.     HAMAS, directly and through its network of "charitable" front organizations, has engaged in a campaign of hate and virulent anti-Semitism designed to indoctrinate the Palestinian population, including young kindergarten children, to hate Jews and Israelis and to incite violence against them.  These include but are not limited to such organizations as the Al-Ansar Charity Association, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamiya Al-Islamiya, Nablus Charitable Committee, Jenin Charitable Committee and the Islamic Charity Society of Hebron. These "charitable committees" are in reality agents of HAMAS.

23.     HAMAS is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade.  Although these two components have separate responsibilities, the organization operates seamlessly, with each component

working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.  These wings recruit cells to commit the violent attacks HAMAS believes will help it achieve its political and religious objectives.

24.     HAMAS' social services are, in large part, administered by local "zakat" committees and other "charitable organizations" ("Zakat" means charity in Arabic).  These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees, a fact well known to Arab Bank.

25.     Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of money collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, and are used to free up other funds for specific terrorists' acts.  HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safe-houses, and salaries for its terrorist operatives and for terrorist recruiters.

26.     Since September 2000, HAMAS has launched hundreds of attacks within the State of Israel and in the West Bank and Gaza, targeting innocent civilians that have resulted in the deaths and injury of more than a thousand individuals, including over twenty (20) mass murders that have killed more than three hundred (300) civilians.  The victims of those attacks include numerous American, British and Israeli citizens.

27.     HAMAS was designated as a Specially Designated Terrorist Entity by the United States as far back as January 25, 1995.  On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA"). The

formal designation has been renewed every two years since 1997, including a renewal in October 2005.  The Government of Israel and other countries have also declared HAMAS an unlawful organization which engages in terrorism.

## II.      The Al Aqsa Intifada or Intifada Al Quds

28.      Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, HAMAS and other Palestinian terror organizations launched a broad-based terror campaign against the State of Israel, marked from the outset by numerous acts of extreme violence, including multiple murders of civilians.

29.      This explosion of violence was widely termed the so-called Al Aqsa Intifada or Intifada Al Quds or, in western parlance, the Second Intifada (to distinguish it from an earlier period of violence in the 1980s). Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 23,000 attacks, which have  claimed more than 8,000 casualties, including about 900 civilian deaths.  These indiscriminate acts of violence have likewise resulted in the deaths of more than 30 U.S. citizens and caused serious bodily injury to scores of others.

30.      HAMAS often uses explosive devices to kill and maim people in its terror campaign.  The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries.  This was the case with the bomb planted by the HAMAS operative at the Frank Sinatra Cafeteria at Hebrew University.  HAMAS has even used or at least discussed using rat poison or AIDS infected fluids to enhance the destruction, death and devastation.

31.     The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government and the United States government by attempting to compel Israel to withdraw from territory presently within the borders of Israel and other territory in the West Bank and, until recently, in Gaza which it presently controls or administers

32.     The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

   A. The Intifada, from its inception, was marked by a massive escalation of violence that quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

   B. The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

   C. The main rival terrorist groups, including but not limited to HAMAS, Palestinian Islamic Jihad ("PIJ"), Popular Front for the Liberation of Palestine ("PFLP") and The Popular Resistance Committees, began cooperating and coordinating their activities.

   D. Saudi financial support for the terrorist groups coalesced into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds, which not only raised money to support the Intifada, but which caused said monies to be transferred into the hands of terrorists in the Palestinian territories, through such banking institutions as the Arab Bank, for delivery to terrorists and their families as incentives and rewards for the murder and maiming of Israeli citizens, visitors, workers, students and others.

### III.     Arab Bank's Conspiracy to Finance Palestinian Terrorism

33.     In the fall of 2000, Arab Bank knowingly and intentionally agreed to provide financial services to HAMAS which it knew to be a terrorist organization. The attack that killed Marla Bennett was one of the overt acts of that conspiracy and it was done in furtherance of the common scheme under which Arab Bank would supply necessary financial services to HAMAS,

its agents and other terrorist organizations, pursuant to which HAMAS and its operatives would perform the violent acts, or would receive rewards or compensation for having performed acts of terrorism..

34.     One reason for Arab Bank's support of HAMAS and the Second Intifada was the ideology of the Bank's founders. In 1984, the Shoman family published a biography of Mr. Abdulhameed Shoman (the bank's founder) entitled The Indomitable Arab in which he consistently set forth his antipathy towards Jews, Zionists and the State of Israel. He also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel. He is quoted as saying that within a few years Zionism will have grown strong enough to control the entire economy. "I believe that all business dealings with the Jews — buying, selling or banking transactions — are damaging to our country's best interests."

35.     In his final speech before four hundred employees of Arab Bank, Mr. Shoman also explained his hatred for Americans that had developed over the years:

36.     I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

37.     Mr. Shoman's son, Abdul Majeed Shoman, the recently deceased chairman of the Arab Bank, was a vocal supporter of the First and Second Intifada. He often made public remarks demonstrating his extremist anti-Israeli views.

38.     He was, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada, which was established during the first Intifada in 1987-1988. The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or

approximately $11,000,000, for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence.  From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the families of martyrs of the first Intifada.

39.     On November 22, 2000, Arab businessmen held a meeting with Yasser Arafat, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

40.     Defendant Arab Bank pledged $2,000,000.00.

41.     Mr. Shoman pledged $500,000.00, personally.

42.     The Shoman family's support of the terrorist Intifada continued in June of 2001 when the Cultural Center of the Abdul Hamid Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada."  The express purpose of the exhibit was to "honor the martyrs of the blessed al-Aqsa intifada" by means of conveying the human and spirited image of their lives.  The exhibit featured presentations of the martyrs' personal belongings, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom'.

43.     Accordingly, the Bank's financial and ideological support for the terrorist Intifada is a matter of public record and its assistance to HAMAS is knowing and deliberate.  Defendant Arab Bank has knowingly, willingly and substantially assisted in the transfer of monies to terrorists and their families, as incentives and rewards for their acts of murder and maiming. Moreover, by providing these financial incentives and rewards, Arab Bank has actively assisted in the recruitment of terrorists and murderers for HAMAS and other terrorist organizations that have been operating, and continue to operate, in the area.

**The Formation of the Saudi Committee for the Support of the Intifada**

44.     A meeting of the Arab League was held in Cairo, Egypt in October of 2000.  At that meeting, it was agreed, with the knowledge and participation of Defendant Arab Bank that a financing distribution network or mechanism needed to be put in place to fund and fuel Palestinian terrorism to achieve various political and nationalistic goals. It was believed that millions and millions of dollars would be necessary to support the wave of terrorism which was planned to continue for months or even years, until the accomplishment of the goals of the Intifada.  The plan included making substantial payments to those engaged in the violent intifada: "the martyrs, the wounded and the prisoners."

45.     On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as the "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia in furtherance of this plan to provide funds to the terrorists and their families.

46.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."  The suicide bomber is regarded by HAMAS, the Saudi Committee and even by the Palestinian Authority ("PA") as a "martyr" (or "Shahid" in Arabic).

47.     The Saudi Committee decided to bestow financial support upon the martyrs' families and to even call upon the Jordanian government to make the donations tax-exempt. Abdul Majeed Shoman, the Chairman of the Arab Bank, opened a meeting to support the Intifada by saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it.  There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman].  The Welfare Association received donations and it has funds.  I received phone calls and donations from

benevolent people and the Arab Bank's board and the bank's employees decided
to donate 5% from October's salaries [for the Intifada].  In spite of the fact that
donations were collected and are available, nothing was transferred to anybody. It
is our duty to act and therefore I summoned this meeting to hear from you.

48.     Mr. Shoman determined not to locate the Committee's office in Arab Bank's
Amman headquarters building but he left open the possibility of "loaning" an accountant to the
committee.

49.     Ultimately, it was decided that the committee's office would be located in the
Amman Chamber of Industry headquarters, where it in fact opened in Amman, Jordan on
November 1, 2000.

50.     As referenced by Mr. Shoman in his speech, on or about October 7, 2000, Arab
Bank announced that it would make financial donations to Palestinians injured during the
Intifada.  With the encouragement and urging of Arab Bank, its employees donated 5% of their
monthly salary to the Palestinian cause.

51.     The Saudi Committee constitutes a professional fundraising apparatus designed
and intended to finance the Intifada Al Quds, i.e., to subsidize the Palestinian terror campaign
and to bankroll HAMAS and other terrorist organizations and their related charitable front
organizations in the West Bank and Gaza.  Those facts were known to Defendant Arab Bank,
which knowingly and willfully joined with the Saudi Committee to fulfill the goals of providing
monies to terrorist operatives and organizations. ANB, Arab Bank's Saudi affiliate, provided
bank accounts to the Saudi Committee and helped it collect funds to support the Intifada. Arab
Bank conducted fund transfers and provided other services for and on behalf of the Saudi
Committee using many of its worldwide branches, affiliates and subsidiaries, including its
operations in the United States.

**Incentivizing Suicide Bombers With Cash Rewards**

52.    The first way in which Arab Bank and its co-conspirators have sought to accomplish their common scheme and goals is to provide a comprehensive "insurance death benefit" of 20,000 Saudi Riyals (the equivalent of about USD $5,316.06) to the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed.  The lump sum initial payment is often followed with lesser monthly payments. These are not, however, legitimate life insurance payments but "cash rewards" for committing crimes.

53.    Monies constituting other "Benefits" (less than if a terrorist is killed) are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

54.    The Saudi Committee, through Defendant Arab Bank, has provided millions of dollars in benefits to the families of the so-called "martyrs," including the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians wounded during violent confrontations with Israel's security forces, as well as to terrorist operatives held in Israeli custody.  This type of support is critical to terror organizations' efforts to win the hearts and minds of the Palestinian people, to recruit terrorist operatives and to create an infrastructure capable of solidifying the positions of the terrorist organizations within Palestinian society.

55.    The "insurance benefit" or reward not only provides money for specific members of preferred terrorist organizations such as HAMAS, but is intended as "universal coverage" available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Gaza, the West Bank, in Israel and elsewhere, and

eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

56.    Defendant Arab Bank knowingly and willfully administers this comprehensive terrorist "insurance scheme" by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."  This financial support is a key inducement to terror.  It has encouraged, incited and made possible the terror attacks of the Second Intifada, including but not limited to the attack at Hebrew University that killed Marla Bennett.

57.    Arab Bank actively and knowingly participates in a formalized and extensive process that requires the families of so-called martyrs to obtain an official certification of their deceased relative's status as a bona fide martyr, replete with an individualized identification number.

58.    Arab Bank, in turn, is provided relatively detailed lists by the Saudi Committee and representatives of the leading terrorist groups through their "charitable" front organizations consisting of the names of the martyrs, certain of their personal information and details concerning the date and manner of death or injury.

59.    Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS and other terror groups, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account, or makes dollar funds available to, each beneficiary.  Every Palestinian family eligible under this universal coverage plan is encouraged or contacted to collect the terrorism benefits through a local branch of Arab Bank in the West Bank or Gaza.

60.      To collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

61.      If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit.  For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS.  He was designated Palestinian Authority Martyr No. 449.  His father, Hussien Mohamed Favah Tawil, presented the "official" certification to Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

62.      According to April 20, 2005 edition of The Wall Street Journal, citing account data, the New York branch of Arab Bank was involved in the transfer of more than $20 million to or from more than 45 supported terrorists or terrorist groups.

63.      A recent report from the web site of the Saudi Committee describes the mechanism of the donations and the scheme and system for the transfer of the money to families of the terrorist operatives:

The Mechanism of delivering relief:

1.   Assessment study of the Aids-relief inside Palestine
2.   Choosing the Programs that help in achieving the Aims and goals of the Committee
3.   Exploring How to deliver Aids-relief to beneficiaries
4.   Choosing some recommended Palestinian personalities for Follow-up
5.   Setting a Coordination council in Gaza and West Bank
6.   Listing names of beneficiaries of Committee programs and completing and revising the information
7.   Studying names of beneficiaries and opening files for them for taking the needed procedures later
8.   Sending Name-lists of beneficiaries to his Highness, the General Supervisor for taking the needed procedures
9.   **Opening accounts for each beneficiary in the branches of Arab Bank in Palestine**

10.     Transferring Money for each beneficiary and notifying them

(http://www.alquds-saudi.org/static/mechanism.htm):

64.     The Arab Bank itself, and employees of the Arab Bank in the Palestinian territories, knew then and know today the role of each of the terrorist operatives who, directly or through other representatives, receive money in furtherance of this plan.

65.     According to a sworn declaration of the Chief Banking Officer of Arab Bank made on November 11, 2004, "beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000."    This astounding sum of money and individual payment disbursements, constitute substantial and direct material support for, and financial services to, terrorists and their organizations, which could not have been accomplished without the active, integral involvement and participation of Defendant Arab Bank.

66.     The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to, and did, provide substantial material support to Palestinian terrorist organizations, especially including but not limited to the largest Islamic terror organization, HAMAS, and to provide a meaningful incentive and rewards both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."    Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto was and is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities, in furtherance of the plan, scheme and design to fund terrorist activities as an illegal means to accomplish political objectives.

67.     The Defendant was and is aware of the methods and means by which the terrorist organizations seek to carry out their objectives.  In fact, Arab Bank's own financial, verbal and active support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's former Chairman, Abdul Majeed Shoman, who, according to published reports in Al Bayan (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the Al Aqsa Intifada.

68.     In a published report in July 2000 in the Jordanian daily newspaper Addustour, Abdul Majeed Shoman, then Chairman of the Arab Bank, is publicly described as favoring the destruction of the State of Israel.

69.     A published report in an October 2000 issue of the Jordanian daily newspaper Addustour stated that both the management and employees of Arab Bank were donating funds to support the Intifada, which was well known to include terrorist attacks.

70.     In addition, the website section describing the Arab Bank Palestine branch reflects certain direct financial donations of Arab Bank for "Palestinian community projects."  These payments further reveal the Arab Bank's clear and active role, not only as a financial institution, but also as an active conspirator in supporting the terrorist violence against civilians.  Among the donations listed are:

- 17/8/2004 - Mandella Organization/ Donating School Bags to Prisoners' Children

- Arab Bank offered prisoners' children with school bags as well as stationery, aiming to help and support them and their children with their suffering

- 2/5/2004 - Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University

- Arab Bank offered donations to Abu Jihad's Center for Prisoner Movement in Jerusalem University.  The donations were given through buying books about Palestinian Prisoners' lives, thus supporting the Prisoner's Movement in Palestine

- 21/3/2003 - Arab Bank sponsors the Event of Recognizing Mothers of Martyrs and Prisoners

- Arab Bank sponsored the event of recognizing the mothers of Martyrs and Prisoners in Al Amari refugee camp. The event was organized by the Women Center in the refugee camp.

(http://www.arabbank.ps/english/inner.asp?item=3&mtitle=4&stitle=1)

71.     Accordingly, neither the ideology nor the actual conduct of the Arab Bank is passive or indifferent to the goals of, and means employed by, HAMAS and other Palestinian terror groups; rather, the Arab Bank is a knowing, willful and material participant in the providing of material support for terrorist activities.

72.     With the support of the Arab Bank, any person who chooses to participate in a terrorist attack does so secure in the knowledge that, if he or she is killed or captured in the attack, the financial needs of his or her family will be met for some time.  Such persons are virtually assured of receiving a substantial stipend if they are injured or detained.

73.     One fifteen (15) year old boy captured by Israeli soldiers before he was able to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether he was promised anything in return for carrying out the attack.  The boy responded: "Of course they did.  They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money." It was well known to the HAMAS operatives in the period of 2000-2004 that the Arab Bank was acting as the "professional and reliable" financial institution that would disburse funds to martyrs, prisoners and their families as the funds distribution and record keeping administrator of these terrorist benefits for the participants and members and terrorist operatives of HAMAS and the Saudi Committee.

74.     In hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.

75.     Former Secretary of State Colin L. Powell, Defense Secretary Donald H. Rumsfeld and his former deputy, Paul D. Wolfowitz, have all stated that cash rewards for suicide bombers encourage suicide bombing attacks. In July 2004, Vice President Cheney criticized Saddam Hussein's supply of cash to suicide bombers' families, identifying the payments as "financial rewards."

76.     A November 2001 Federal Bureau of Investigation memorandum explored the effect of these cash awards for suicide bombings: "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populace…"

77.     Through the program, accounts and activities performed, provided and administered by Arab Bank, the Saudi Committee paid death benefits to at least 200 "martyrs" in the first year of its existence alone. As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries in Palestinian territories. The disbursement of these funds emboldened and encouraged the terrorists, their families, and others to become suicide bombers and terrorist operatives. After only 18 months, the Saudi Committee had raised over $57,000,000. In one widely publicized telethon, the Saudi Committee raised over $100,000,000 in just a few days!

78.     The Saudi Committee's web site at one time disclosed thousands of payments it had made to martyrs.  A Congressional Research Service ("CRS")1 report reveals that the Saudi Committee did not treat the identity of the beneficiaries of its funds as confidential or private, but rather published this information on its web site.  According to this Report to Congress, the Saudi Committee web site contained over 40,000 transaction records that "feature the names of individuals who received money" from the Saudi Committee.  This enabled the Congressional analysts to compare those names with those of known and confirmed "suicide bombers."  The Saudi Committee web site records reflect it paid money to over 60 known Palestinian militants from October 2000 to March 2002, including suicide bombers.  A "sample of five names of beneficiaries on the Committee website matched those of":

  -**Said Hassan Hussein Hotari,** who blew himself up in Tel Aviv on June 1, 2001, killing dozens of teenagers at the Dolphinarium nightclub;

  -**Izzedin Shahil Ahmed Masri,** who blew himself up in Jerusalem on August 9, 2001, killing 15 people at Sbarro Pizza;

  -**Maher Muhiaddin Kamel Habeishi,** who blew himself up on a Haifa bus on December 2, 2001;

  -**Wa'fa Ali Khalil Idris,** who blew herself up in Jerusalem in January 2002;

  -**Mohammed Ahmed Abdel-Rahman Daraghmeh,** who blew himself up in a neighborhood of  Jerusalem.

Each of these suicide bombers murdered or maimed innocent civilians.

The Congressional Report cited lists of the Saudi Committee which were on its web site that showed the recipient of the funds had died in a *"amaliya istishadiya,"* i.e., a "martyrdom operation."  On information and belief, Arab Bank made numerous other transfers for the Saudi Committee to pay other terrorists or their families their rewards.  Some of these additional

---

1 CRS is a research arm of the U.S. Congress within the Library of Congress.  It works exclusively for members of

transfers include, but are not limited to, transfers made to the families of the following terrorists:

a.   **Osama Muhammad `Eid Bahr**, ID no. 944791169, killed on December 1, 2001 in the Ben-Yehuda attack in Jerusalem.  His family received 20,000 SR.

b.   **Atef Ahmad Salem `Abayat,** ID no. 911665107, killed on October 18, 2001. His family received 20,000 SR.

79.     In the annual report issued by the Saudi Committee and published in the Saudi newspaper Al-Jazira on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs."  Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.  For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv, is listed as an illustrative martyr.

80.     Accordingly, there can be no confusion as to whether the Arab Bank handling and disbursing funds under the "insurance plan" includes the families of known suicide bombers and other terrorist operatives; and there is no question that defendant Arab Bank possesses knowledge of these facts.

81.     Arab Bank substantially assists its co-conspirators in advancing their unlawful objectives by allowing those terrorists access to Arab Bank' computer system, the ability to make wire transfers, and to exchange foreign currency into US dollars through the Arab Bank's membership in SWIFT; further, the Arab Bank provided its personnel, accounting services, worldwide offices and other resources. Arab Bank provides a convenient means for distributing both this universal coverage death and dismemberment benefit, and other monies in the form of incentives and rewards to terrorist operatives and their families, through Arab Bank activities conducted across Palestinian-controlled territories. But for the activities and integral involvement of the Arab Bank, it would have been far more difficult to get money into the hands, or accounts,

---

Congress, their committees and staff.

of terrorist and their families if attempted by other means, such as delivering money in suitcases by illegal couriers.  As Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another, courier movement of cash is risky and difficult, thereby requiring a the aid and involvement of a financial institution in order to move significant sums of money into the Palestinian territories.

82.     Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.  Arab Bank knowingly allows the terrorist groups to use the speed and efficiencies of the international banking system, including the SWIFT system of wire transfers, to further their terrorism agenda.  It also made its facilities and staff available to its co-conspirators to facilitate the financial services it provides terrorist groups.

83.     The Saudi Committee and local HAMAS "charitable" front organizations have publicly and repeatedly advertised their unlawful purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website.  In certain ads, and internet announcements, the identity of Arab Bank accounts is prominent and publicly disclosed.  It was well known within the terrorist community that monies would be disbursed to terrorists, prisoners and their families through and from the Arab Bank. Terrorist organizations received their funds from or through the Arab Bank.  Arab Bank was certainly aware of the unlawful acts and objectives of these front organizations and terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals

who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 …."

84.     Since the Saudi Committee raises its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds were primarily routed through the Arab Bank banking system and converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank.  Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in at least two (2) important respects.

85.     Firstly, Arab Bank provides both professionalism and transparency to the process, thereby ostensibly reassuring wealthy Saudi and Gulf State donors that the money they are contributing will not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.  The willingness of a major institution in the Middle East to perform services for the terrorists helps to legitimize terrorism and, in that way as well, further assists the terrorists.

86.     Secondly, Arab Bank, through its extensive network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the terrorists and the families of the terrorists, who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier, and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

**Arab Bank Provides Material Support to Foreign Terrorist**
**Organizations At All Levels of Their Global Financial Network**

87.     In addition to providing the comprehensive universal "insurance coverage" described above, Arab Bank provides other financial services and material support to HAMAS. HAMAS has created a global financial network to support its campaign of violent jihad through terrorism for the establishment of an Islamic State in Palestine.  At the base level where it raises and collects funds worldwide for this purpose, it has created and/or taken control over various alleged "charities" to raise money in certain parts of the world.  For example, HAMAS raises funds through such organizations as: the "International Relief Fund for the Afflicted and Needy" ("IRFAN") in Canada; the Holy Land Foundation ("HLF") in the United States; the Palestinian Relief and Development Fund ("INTERPAL") in the United Kingdom; the Commite de Bienfaisance et de Secours aux Palestiniens ("CBSP") in France; the Al Aqsa Foundation or Fund in Germany; the Palestinian Association in Austria ("PVOE") in Austria; the Association de Secours Palestinien ("ASP"), which is a subsidiary of CBSP, in Switzerland; the Sanbal Al Aqsa in Sweden; the Sanibil Association for Relief and Development in Lebanon; and the Saudi Committee in Saudi Arabia and the surrounding Persian Gulf region.  HAMAS also has organizations in Qatar and Dubai that collect funds for HAMAS in those regions.  The leaders of these organizations are often well known HAMAS leaders.  These HAMAS entities also have substantial interconnections.  For example, Sanibil represents INTERPAL in Lebanon.

88.     Following the outbreak of the Second Intifada, in October, 2000, the "Union of Good" ("UG") or in Arabic, 'l'tilaf al-Khayr, was created as part of the conspiracy and scheme to raise funds worldwide for terrorist activity.  The UG was established to serve as an umbrella organization for global fundraising for Palestinian jihad.  The UG is headed by Dr. Yussuf al-Qardawi, who has issued a fatwa authorizing suicide bombing attacks against Israel. The UG is

run by 'Essam Yussuf, a leading figure in INTERPAL.  The PA considers UG to be a body supporting HAMAS.  Arab Bank has provided financial services to UG and has allowed it to solicit funds to support terrorism. UG directed donors "to transfer money to Arab Bank accounts all over the world."  Arab Bank has also transferred funds for UG to the Nablus based Al-Tadhamun which were then distributed to shaheed families, including those who committed suicide bombing attacks in Israel.

89.     Arab Bank has illegally provided financial services to most, if not all, of the HAMAS fundraising entities described in the preceding paragraphs.  Arab Bank has done this with actual awareness of the unlawful nature and purpose of the activities of these organizations. In May 1997, the Government of Israel additionally declared four of these organizations -- HLF, INTERPAL, Al AQSA FUND and CBSP -- unlawful because of their association, support and control by HAMAS.  Despite this and other means by which Arab Bank knew of the unlawful activities of these organizations, it has nevertheless continued to actively encourage and allow the use of its worldwide banking branches to assist HAMAS with its unlawful purposes.  For example, Arab Bank branches in London, Paris, Frankfurt, Geneva, New York, and Rome have been used to transfer funds for these HAMAS entities.  In August 2003, the United States designated CBSP, ASP, INTERPAL, PVOE, and SANABIL as Specially Designated Global Terrorists ("SDGTs") because they were controlled by HAMAS.  The US designated Al Aqsa Foundation as a SDGT in May, 2003.

90.     After HAMAS raises funds through these organizations and others to support their terrorist acts, it transfers the funds downstream. The funds are often directed toward HAMAS operatives who plan and carry out terror attacks.  These payments are often sent through "charitable" front organizations which HAMAS controls.

91.     HAMAS also uses funds to finance an educational and social services network through which they indoctrinate the Palestinian population with a hatred for Israel, Jews, Americans and other non-radical Islamists, while glorifying acts of violence by "shaheeds" And by compensating prisoners, and their families, for their acts of terrorism. HAMAS engages in these "educational" activities so that they will have a Palestinian population ready and willing to engage in terrorism.   Palestinian textbooks, in schools, and literature distributed in the Palestinian refugee camps, are full of hate towards the Jewish people, towards Israel, toward Zionists of all religions, and against America and her allies, known as the "infidels".   The services provided by the Arab Bank has long fueled and fostered this hatred, has incited violence, and has established a climate of terrorism, murder and maiming as acceptable norms among Palestinian children and their families.

92.     Arab Bank not only provides financial services at the base level to the organizations which raise and collect the funds, but it also knowingly provides banking services to the "charitable" committees that are the vehicles used to distribute the funds downstream. Arab Bank does not merely provide routine banking services to these groups.   Rather, throughout the Second Intifada, Arab Bank has knowingly assisted HAMAS and other terrorist organizations and its agents by providing them with bank accounts and financial services in order to facilitate their collection and distribution of funds. Arab Bank has even provided such services in connection with public fundraising efforts conducted by terrorist organizations through radio, TV, and Internet solicitations.

93.     For example, Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut, which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by

HAMAS, which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

94.     The United States Department of Justice has identified the website: www.palestine-info.com as one of the "official" websites of HAMAS.  The website solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

95.     This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and that HAMAS controls and maintains directly.  Arab Bank has also maintained accounts for individual terrorist operatives, including but not limited to a Hamas operative from Qalqiliya.  It also knowingly provides financial services directly to the families of suicide bombers and other terrorists, many of whom are prisoners today but whose families continue to receive funds as incentives and rewards for terrorist activities.

96.     To assist it in carrying out its terrorist activities and to conceal its unlawful conduct, HAMAS has established or taken over numerous "charitable organizations," including but not limited to:

      i.        Al-Ansar Charity;

      ii.       Ramallah Charitable Committee or Society;

      iii.      Tulkarem Charitable Committee;

      iv.      the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

      v.       Al Mujama Al-Islami;

      vi.      Nablus Charitable Committee;

      vii.       Jenin Charitable Committee or Society;

      viii.     Islamic Charitable Society of Hebron aka Al-Jamiyah Al-Khiriah Al-Islamiyah;

      ix.      Bethlehem Orphan Care Society aka jami'yya ri'aya al-yatim; and

      x.       Al-Tadhamun Charitable Society.

97.     Arab Bank provides financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee. It also provides financial services to the Union of Good, which transfers funds to many of these "charitable societies."

98.     The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by the United States Department of Justice as HAMAS front organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

99.     The Tulkarem, Ramallah and Jenin Charitable Committees, the Islamic Charity Society of Hebron and Al-Tadhamun were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but for its willful blindness would have been known to Defendant Arab Bank. The PA closed many of these organizations from time to time because of their ties to HAMAS. For example, the PA closed Al-Tadhamun in December 2001.

**Hamas Alter Egos**

100.     Plaintiffs allege that the following entities are fronts, agents, instrumentalities or alter egos of Hamas:

      a.      Islamic Charity Association aka Islamic Charitable Society in Hebron;

      b.      Charity Committee in Ramallah aka Ramallah Zakat Committee;

      c.      Jenin Zakat Committee aka The Charity Association in Jenin;

      d.      Nablus Zakat Committee;

      e.      Tulkarem aka Tulkarm Zakat Committee;

      f.      Orphan Care Association (Bethlehem);

      g.      Qalqulia, aka Qalqiliyah Zakat committee;

      h.      Hebron Zakat Committee aka Hebron Tithing And Alms Committee;

      i.      Halhul Zakat Committee;

      j.      Al Aslah Association in el Bireh; and

      *k.*      Al-Tadhamun Charitable Society (*jam'iyyat al-tadhamun al-khayriyyah al-islamiyyah)*

      *l.*      Al-Ansar Charity Association.

101.    Plaintiffs will show that these entities are the alter ego of HAMAS and knowingly act as agents for HAMAS, all of which is well known to Arab Bank because, among other things:

      a.   leaders of the committees are HAMAS operatives;

      b.   the Committees are connected to HAMAS military operations;

      c.   The PA has treated the entities as HAMAS' entities;

      d.   The Palestinian population considers the committees "to be HAMAS."

102.    Arab Bank has also knowingly served as a conduit for transferring money from Iran and Syria and its agents and instrumentalities to persons and organizations in Gaza and the West Bank who use such funds to engage in terrorism and incite violence.

103.   The HAMAS charitable front, Al-Ansar Charity, maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

104.   The website further boasts that it has given money to Palestinians who were wounded, incarcerated or killed during the Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, and injured more than one hundred people at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

105.   The website of Al-Ansar shows the vital role of Arab Bank:

> The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

106.   Al-Ansar maintains an account with Arab Bank in Gaza.

107.   Defendant Arab Bank has also knowingly laundered funds for the Holy Land Foundation for Relief and Development ("HLF"), a Texas based "charity" which has raised funds in the United States for HAMAS for more than a decade.  Arab Bank, in turn, channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah Charitable Committee, an agent of HAMAS.

108.   HLF and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) – including for specific transactions involving payments made

by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and the Islamic Charity Society of Hebron.

109.    The indictment specifies particular financial transactions initiated by HLF that resulted in monetary transfers to the Ramallah Charitable Committee, which violate 18 U.S.C. §2339B. HLF has been adjudicated liable for violating the ATA in the recent summary judgment order in the case of *Boim v. Quranic Literacy Institute*, et al., 2004 WL 2554446, __F. Supp. 2d__(N. D. Ill. Nov. 10, 2004).

110.    Over 7 years ago, on May 6, 1997, the government of Israel designated HLF as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

111.    Nonetheless, Arab Bank continued to illegally provide financial services to HLF and its New York branch and continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

112.    On January 10, 2001 a federal district court in Illinois rendered a decision declining to grant a motion to dismiss in a civil case initiated by the parents of David Boim, who was killed by a HAMAS terrorist in 1997.  The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

113.    Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the Boim case placed Arab Bank on further notice of HLF's criminal activities.

114.    Similarly, the New York branch of Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee, despite the fact that in some cases both the

"donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.

115.    Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS.

116.    One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association, who was a signatory on the infamous Fatwa – or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law.  Mr. Badawi is a leading figure in HAMAS.

117.    Arab Bank has also knowingly laundered funds for INTERPAL, a London based "charity" that has raised funds in Europe for HAMAS for more than a decade.  Arab Bank, in turn, channeled tens of thousands of dollars for INTERPAL through its New York branch to various HAMAS zakat committees. Arab Bank has also knowingly laundered and permitted PIJ to solicit funds on its website (www.Palestineway.com or www.abrarway.com) for its terrorist activities by sending money to various accounts maintained by Arab Bank.  Often, the account designated is one of the "charitable" front organizations to try to mask the true nature of the money.  It is clear from the solicitation that money is being sought for military uses and jihad and not humanitarian uses.  Arab Bank knows of these solicitations or is willfully blind to them, and knows that it is providing essential financial services to terrorist organizations, terrorists, prisoners and their families.

118.    Arab Bank also provides financial services and material support to individual terrorists and their families by making accounts and other banking services available to them despite actual general or specific awareness that they are engaged in unlawful terror activities.

119.    By knowingly providing banking and administrative services to "charitable" front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.   This wrongful conduct was encouraged, assisted, approved and ratified by senior executives of the bank and by management level employees of Arab Bank who were included on correspondence in which the Bank was instructed to send payments to the families of suicide bombers, and who actually caused the delivery of funds to terrorist organizations, terrorists, prisoners and their families.

120.    In particular, Arab Bank knowingly maintained accounts for organizations affiliated with terrorist organizations, including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|---|---|---|---|
| Jenin | 581345 | Jenin Charitable Society | HAMAS |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | HAMAS |
| Nablus | 400336 | Nablus Islamic Aid Committee | HAMAS |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalgiliya | HAMAS |
| Tulkarem | 500010 | Tulkarem Charitable Society | HAMAS |
| Tulkarem | 503375 | Tulkarem Charitable Society | HAMAS |
| Nablus | 445444 | Al-Lod Charitable Society | HAMAS |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building | HAMAS |

| | | Charitable Society | |
|---|---|---|---|
| Qalgiliya | 540939 | Qalgiliya Charitable Society | HAMAS |
| Nablus | 400739 | Tubas Charitable Society | HAMAS |
| Ramallah | 666473 | Jama'ah al-lslamiya | HAMAS |
| Al-Manara-Qalgiliya | 610686 | Ramallah Charitable Society | HAMAS |
| Al-Bireh | 649611 | A1-Bireh Al-Islah Society | HAMAS |
| Bethlehem | 717520 | Bethlehem Elehssan Society | HAMAS |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |
| Hebron | 760376 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 750049 | Hebron Young Muslims' Society | HAMAS |
| Hebron | 751100 | Hebron Young Muslims' Society | HAMAS |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | HAMAS |
| Hebron | 751542 | Hebron Elehssan Society | HAMAS |
| Bethlehem | 711161 | Al-Islah Charitable Society | HAMAS |
| Al-Bireh | *609509* | Al-Huda Society — Ramallah | HAMAS |
| Gaza | 124109 | Central Islamic Society — Gaza Strip | HAMAS |
| Ramal | 100208 | Charitable and Children's Mercy Society — Gaza Strip | HAMAS |
| Gaza | 10188 | House of the Qur'an and Sunnah Society | HAMAS |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | HAMAS |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | HAMAS |
| Gaza | 365459 | The Al-Nur Prisoner Society | HAMAS |
| Khan Yunis | 2001438 | Khan Ynnis Charity and Mercy Society | HAMAS |
| Gaza | 5858 | Nusseirat Islamic Society | HAMAS |
| Gaza | 150/3 | Khan Yunis Charitable Society | HAMAS |
| Gaza | 35287 | Gaza Charitable Society for the Sick | HAMAS |
| Gaza | 3155 | The Islamic University — Gaza | HAMAS |
| Khan Yunis | 200139 | Qararab Islamic Society | HAMAS |
| Gaza | 15115 | Jabalia Islamic Society | HAMAS |
| Rafah | 2036 | Rafah Islamic Society | HAMAS |
| Azariya | 302656 | Azariya Society for the Fostering of Women | HAMAS |
| Gaza | 39435 | Nur Al-Ma'rifah Society | HAMAS |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islmaic Jihad |

121.    On October 3, 2000, during the early days of the Intifada, Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former HAMAS leader who was killed on March 22, 2004, were interviewed on 'Ala al-Hawaa' ["On the air"], a program that appears on Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia). The program showed a slide specifying the following Arab Bank accounts where donations could be deposited for the Palestinians participating in the violent confrontation with Israel: Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510.

122.    The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served HAMAS) posted an announcement on May 3, 2004, condemning the Israeli Air Force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

123.    A HAMAS-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through terrorist organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP. The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon. Furthermore, the 101 Days Campaign published a request on its official website that visitors to its website donate to the organization through its accounts in any branch of the Arab Bank.

124.    On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a Jerusalem Post news account on September 28, 1997.

125.    Nonetheless, Arab Bank continued to provide financial services to HLF and its New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's behest.

126.    Indeed, had the doors of Arab Bank not been opened to HAMAS and other terrorist organizations during the past five years, the leaders of these terrorist organizations would have had to make far more onerous arrangements to transfer, route and launder monies and contributions to terrorist organizations, terrorists, prisoners and their families within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.  By acting in the manner described herein, Arab Bank has provided essential financial services to terrorist organizations and terrorists and has facilitated the increase in terrorist attacks and incentivized the conduct of the suicide bombers, murderers and other terrorist acts which have taken lives, maimed, injured and destroyed families.

127.    A bank that knowingly provides material support of this kind, directly or indirectly, to international terror organizations such as HAMAS and other terrorist organizations is liable for all of the foreseeable acts committed by the terror organization.

## ARAB BANK'S FRAUDULENT
## CONCEALMENT OF ITS ILLICIT CONDUCT

128.    Throughout the course of the Second Intifada, Arab Bank has made substantial efforts to conceal its participation in the illicit financing of terrorism and other misconduct alleged by Plaintiffs.  Those efforts at concealing the Bank's participation in terrorism financing were necessitated by the fact that the Bank is a highly regulated financial institution with substantial assets and worldwide operations.  Thus, it was necessary for Arab Bank to conceal its

misconduct both from potential claimants and the government bodies that regulate the Bank's conduct.

129.    For example, while Arab Bank has made numerous transfers from various Arab Bank accounts to accounts controlled by terrorist fronts, Arab Bank has not reported those transfers to banking or criminal authorities, as was required by law at the time those transfers were made.  Nor has the Bank made public its support of terrorist front organizations.

130.    Arab Bank has also attempted to conceal its participation in the financing of terrorism by refusing to allow the Saudi Committee and other sponsors of terrorism to locate their offices at Arab Bank facilities although the Bank has supplied material support for those organizations.  Arab Bank has also, from time to time, caused its name to be omitted from various Web site solicitations for funds to finance terrorism in the Middle East.

131.    Plaintiffs made reasonable efforts to determine the identities of those involved in the attacks that injured them.  Until recently, however, it was impossible for Plaintiffs to determine that Arab Bank had actively and intentionally participated in the wrongdoing alleged herein.

132.    Indeed, until recently, Arab Bank's illicit conduct remained unknown even to American banking regulators, although those regulators had unfettered access to Arab Bank's records.  Upon recently learning of the Arab Bank's illegal conduct, the United States government has now issued one of the largest fines in history against a banking institution, and has taken other steps, including entering into a Consent Decree, restricting the activities of the Arab Bank in the United States.

133.    Furthermore, much of the information upon which Plaintiffs' claims are based was uncovered only in connection with the seizure of records belonging to Arab Bank and others

by Israeli defense forces.  Only upon the disclosure of such records, and their translation from Arabic to English has essential information about the illegal conduct of the Arab Bank become known.  It was not possible for Plaintiffs to uncover that information until shortly before they asserted their claims in the within action.

134.    Thus, Plaintiffs undertook reasonable efforts to discover their claims against Arab Bank but were prevented from doing so until shortly before they initiated this action.  But for the fraudulent concealment by the Arab Bank of their illegal activities in furtherance of the described conspiracy, and their providing of essential and illegal financial services to terrorist organizations, terrorists, prisoners and their families, bank regulators and the Plaintiffs would have known long ago of the activities of the Arab Bank and would have taken steps to stop their support of the described terrorist activities, including the murder and maiming of Marla Bennett and other victims of Arab Bank supported terrorist activities.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c)**

135.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

136.    Plaintiffs were injured by reason of acts committed by HAMAS that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens, as set forth in 18 U.S.C. § 2332.

137.    The acts of the Palestinian terrorists in killing Marla Bennett and other persons as described herein were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel and of the United States by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.  Arab Bank could reasonably foresee such acts would occur as a result of the Bank's provision of material support to HAMAS, its agents and alter egos from at least since the fall of 2000.

138.    Arab Bank has provided extraordinary aid, encouragement, support, financial and administrative services to HAMAS, which is responsible for the attack that killed Marla Ann Bennett.  Arab Bank provides substantial assistance to and helps HAMAS to recruit and to incentivize and reward terrorist organizations, terrorists, prisoners and their families.  The Bank also provides financial services to HAMAS' charitable fronts who play a major role in raising funds for HAMAS.  Because money is fungible, Arab Bank's actions have also freed up funds for use in terrorist operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused the death of Marla Bennett and injuries to the Plaintiffs.

139.    Arab Bank knows, or is willfully blind to the fact, that it is and has been providing material support for acts of international terrorism by HAMAS and other terrorist organizations and theirs agents, as is evidenced by its close contact with the Saudi Committee, its coordination of the payment schedules and lists of martyrs, and prisoners, and the repeated public advertisement of the activities of the Saudi Committee and other organizations raising funds to support terrorist activities  in various Palestinian newspapers, as set forth above.  Arab Bank knew about HAMAS' and other terrorist organizations illegal activities, desired to help those

activities succeed, and took affirmative steps to encourage, support, aid and assist the accomplishment of those objectives.  The death of Marla Ann Bennett, and the death and injuries suffered by scores of other HAMAS and other terrorist organizations terror victims since at least October 2000, were the reasonably foreseeable consequences of Arab Bank's conspiracy with and knowing provision of material assistance to HAMAS, other terrorist organizations and terrorists operating within the Palestinian territories and the Saudi Committee.

140.   Because it has aided and abetted violations of 18 U.S.C. § 2332 and substantially assisted HAMAS and the charities that were fronts for HAMAS, and other terrorist organizations, Arab Bank is liable pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs sustained.

## COUNT TWO

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

141.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

142.   Plaintiffs have been injured in their person by reason of acts committed by Palestinian terrorists that involved murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens set forth in 18 U.S.C. § 2332.

143.   The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel and of the United States, (b) to influence the policy of the government of Israel and of the United States by intimidation or coercion, and (c) to affect the conduct of the government of Israel and of the United States by mass destruction and murder.

144.     The act of terrorism that is the subject of this action was extreme and outrageous and was committed with the intention to cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

145.     Arab Bank knowingly joined and actively participated in a conspiracy and agreed to combine with other persons to act unlawfully in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy.   Plaintiffs have suffered harm by reason of such conspiracy.

146.     Pursuant to a common scheme to encourage, support, aid, incentivize and reward acts of terrorism, Arab Bank knowingly and purposefully agreed to provide support for terrorism and to perform extraordinary banking and administrative services for the Saudi Committee, HAMAS and other terrorist organizations and terrorists knowing and intending that such services would facilitate the activities of those organizations and support terrorist activities.  Arab Bank's actions, in fact, facilitated the conspiratorial scheme because, as set forth more fully above, but for the actions of Arab Bank, the funding of the universal coverage death and dismemberment benefit plans, and the providing of other financial services for terrorist organizations, for terrorists, for prisoners and their families constituted material support for terrorism but for which it would have been substantially more difficult, if not impossible, to implement the plan, scheme and design to commit terrorist activities upon innocent civilians, including Marla Ann Bennett. Arab Bank has acted in concert with others, as described herein, to commit illegal acts as part of its agreement and in furtherance of the conspiracy.

147.     Arab Bank is therefore secondarily liable for the wrongful death of Marla Ann Bennett.  That murder was committed by HAMAS because of and with the encouragement,

support, aid and assistance of the Arab Bank pursuant to the Bank's persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Marla's murder by HAMAS on July 31, 2002.

148.    By conspiring to act with the Saudi Committee, HAMAS, other terrorist organizations, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured the Plaintiffs, Arab Bank is liable to Plaintiffs pursuant to 18 U.S.C. § 2333 for the damages that Plaintiffs have sustained.

## COUNT THREE

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A

149.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

150.    By serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists and performing the other extraordinary financial and administrative services that Arab Bank knowingly provided to HAMAS, HAMAS terrorists, their families, and HAMAS alter egos and other terrorist organizations (including "charitable organizations" affiliated with and controlled by HAMAS), Arab Bank has provided material support to the preparation and carrying out of numerous acts of international terrorism that have caused injury to the Plaintiffs.

151.    A bank that knowingly provides material support of this kind, directly or indirectly, to a designated international terror organization such as HAMAS is secondarily liable for all of the foreseeable acts committed by the terror organization.  Arab Bank is therefore vicariously liable for the murder of Marla Ann Bennett.  That murder was committed by

HAMAS because of the Bank's persistent, knowing and material support of HAMAS from at least the Fall of 2000 through and after Marla's murder by HAMAS on July 31, 2002.

152.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the Plaintiffs to be injured in his or her person, Defendant Arab Bank is liable pursuant to 18 U.S.C. § 2333 for all damages that Plaintiffs have sustained as a result of such injuries arising out of the murder of Marla Ann Bennett.

### COUNT FOUR

### COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B(a)(1)

153.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

154.    By knowingly transferring funds from and to agents of HAMAS, and other terrorist organizations including but not limited to the Holy Land Foundation, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank's New York branch office has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(a)(1).

155.    Based on the defendant's level of sophistication and status as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS and other terrorist organizations but also knew its and their actual designation as a Foreign Terrorist Organization.  A bank that knowingly provides material support, directly or indirectly, to a designated international terror organization such as HAMAS is vicariously liable for all of the foreseeable acts committed by the terror organization.  Arab Bank is therefore vicariously and secondarily liable for the murder of Marla Ann Bennett.  That

murder was committed by HAMAS because of the Bank's persistent, knowing, active, encouragement, aid and material support of HAMAS from at least the Fall of 2000 through and after Marla's murder by HAMAS on July 31, 2002.

156.    By providing material support to a designated Foreign Terrorist Organization and its agents, Arab Bank is liable for the damages to Plaintiffs for their injuries pursuant to 18 U.S.C. § 2333.

## COUNT FIVE

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C

157.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

158.    The financial services that Arab Bank has willfully and unlawfully provided to HAMAS and other terrorist organizations and terrorists and to the other conspirators including but not limited to the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to support and facilitate terrorist acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

159.    The acts committed against the Plaintiffs were intended (a) to intimidate or coerce the civilian population of Israel and of the United States, (b) to influence the policy of the government of Israel and of the United States by intimidation or coercion, and (c) to affect the conduct of the government of Israel and of the United States by mass destruction and murder.

160.    As set forth more fully above, but for the assistance provided by Arab Bank, the funding of the universal coverage death and dismemberment benefits plan and the providing of other financial services for terrorist organizations, for terrorists, for prisoners and the families of

terrorists would have been substantially more difficult to implement.  A bank that knowingly provides material support of this kind, directly or indirectly, to a designated international terror organization such as HAMAS is vicariously liable for all of the foreseeable acts committed by the terror organization.  Arab Bank is therefore vicariously and secondarily liable for the murder of Marla Ann Bennett.  That murder was committed by HAMAS because of the Bank's persistent, knowing, active, encouragement, aid and material support of HAMAS and other terrorist organizations from at least the Fall of 2000 through and after Marla Ann Bennett's murder by HAMAS on July 31, 2002.

161.    Because it has willfully violated 18 U.S.C. § 2339C, Arab Bank is liable to the Plaintiffs, who have suffered injuries to their person by reason of such acts under 18 U.S.C. § 2333.

## PRAYER FOR RELIEF

162.    WHEREFORE, Plaintiffs pray that this Court:

a)  Accept jurisdiction over this action;

b)  Enter judgment against Arab Bank and in favor of Plaintiffs for all compensatory and other damages in such amounts for each named Plaintiff as are  allowed by applicable law and as  shall be determined at trial;

c)  Enter judgment against Arab Bank and in favor of Plaintiffs for treble damages of each amount awarded pursuant to the previous prayer for relief, and pursuant to 18 U.S.C. § 2333;

d)  Enter judgment against Arab Bank and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e)   Enter an Order declaring that Arab Bank has violated, and is continuing to

violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

f)   Grant such other and further relief as the interests of justice may require,

including leave to amend this complaint so as to permit justice to be served on

behalf of Plaintiffs against the Defendant and any other parties as may

hereafter be named in this action.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: November 30, 2005

**SHALOV STONE & BONNER LLP**


By:   /s/ James P. Bonner
        James P. Bonner (JB-0629)
445 Seventh Avenue, Suite 1000
New York, New York 10018
(212) 239-4340

Attorneys for Plaintiffs


Of Counsel:

**SAYLES WERBNER P.C.**
Mark S. Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700


**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
(202) 463-1818

**PERLES LAW FIRM, P.C.**
Steven R. Perles
Edward Macallister
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
 (202) 745-1300

**THE DAVID LAW FIRM, P.C.**
Jonathan David
10655 Six Pines Drive
Suite 260
Woodlands, Texas  77380
(281) 296-9090

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2005, the foregoing document was served in

accordance with the Federal Rules of Civil Procedure and/or the Eastern District's Rules on

Electronic Service upon the following parties and participants:

**<u>Counsel For Defendant Arab Bank, plc. – *Via Electronic Delivery***</u>
Kevin Walsh, Esq. (kwalsh@llgm.com)
Randall Fox (rmfox@llgm.com)
LeBoeuf Lamb Greene & MacRae LLP
125 West 55th Street
New York, New York  10019-5389


  /s/ James P. Bonner
James P. Bonner

(