UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

COURTNEY LINDE, et al.

                              Plaintiffs,

        - v -

ARAB BANK, PLC,

                              Defendant.

--------------------------------------------------------------

CV-04-2799 (NG)(VVP)
and all related cases[1]

# REVISED EXPERT REPORT OF PAUL ALLAN SCHOTT

## PREPARED FOR:

**DEWEY & LEBOEUF LLP**
**1301 Avenue of the Americas**
**New York, N.Y. 10019**
**(212) 259-8000**

**January 31, 2012**

---

[1] *Litle, et al. v. Arab Bank, PLC,* Case No. CV 04-5449 (E.D.N.Y. 2004) (NG) (VVP); *Coulter, et al. v. Arab Bank, PLC* , Case No. CV 05-365 (E.D.N.Y. 2005) (NG) (VVP); *Almog, et al., v. Arab Bank, PLC,* Case No. CV 04-5564 (E.D.N.Y. 2004) (NG) (VVP); *Afriat-Kurtzer, et al., v. Arab Bank, PLC,* Case No. CV 05-388 (E.D.N.Y. 2005) (NG) (VVP); *Bennett, et al. v. Arab Bank, PLC,* Case No. CV 05-3183 (E.D.N.Y. 2005 (NG) (VVP); *Roth, et al. v. Arab Bank, PLC,* Case No. CV 05-3738 (E.D.N.Y. 2005) (NG) (VVP); *Weiss, et al. v. Arab Bank, PLC,* Case No. CV 06-1623 (E.D.N.Y. 2006) (NG) (VVP); *Jesner, et al. v. Arab Bank, PLC,* Case No. CV 06-3689 (E.D.N.Y.) (NG) (VVP); *Lev, et al. v Arab Bank, PLC,* Case No. CV 08-3251 (E.D.N.Y. 2008) (N G) ( VVP); and *Aguerenko, et al ., v. Ara b B ank, PLC,* CV 10-626 (E.D.N.Y. 2010) (NG) (VVP).

**<u>Exhibits</u>**

Curriculum Vitae of Paul Allan Schott.......................................................................A

List of Publications (Prior Ten Years)......................................................................B

List of Expert Testimony (Prior Four Years).............................................................C

List of Documents and Materials Reviewed.............................................................D

# I.

## Statement of Qualifications[2]

I have a bachelor's degree from Kent State University, a Juris Doctor from Boston University School of Law, and an    L L.M. from  Georgetown University Law Center.

I have m  ore than 35 years of ex     perience regulating and representing banks, bank holding com     panies, financia l holding companies, savings and loan associations, savings and loan holding com     panies, and United States branches and agencies of foreign ban ks, as an attorney for th  e federal go vernment, as an attorney in private practice, and as a consultant.

I have served as Chief Counsel to     the Office of the Comptroller of the Currency ("OCC"), Ass istant General Counsel  for Banking and Finance for the Uni   ted States Treasury Departm ent, and Senior At  torney for the  Federa l Re serve Boa rd (the "Fed").  I have also been in private practice,    as an attorney,  and as a consulting partner with the bank regulatory advisory gr     oup of  PricewaterhouseCoopers LLP, and its predecessor, Coopers & Lybrand LLP, wh      ere I was National Director for Bank Regulatory Services.

For the past ten years, I have served  as a consultant for the World Bank in its Fin ancial Mark et In tegrity Dep artment with respec  t to  inte rnational standards  f or fighting m oney laundering and terrorist fina    ncing, and I frequently lecture on these topics.

---

[2]    My full curriculum vitae is annexed hereto as Exhibit A.

I have authored the book, *Reference Guide on Anti-Money Laundering and Combating the Financing of Terrorism,* which is a joint public ation of the W orld Bank and International Monetary Fund. In addition, I have co-authored the book, *Fighting Money Laundering and Terrorist Fi nancing: A Practical Guide for Bank Supervisors,* which is published by the W orld Bank.

2

**II.**

**Scope of Services and Questions Presented**

I have been retained by Dewey & LeBoeuf LLP, counsel for Arab Bank plc, ("Arab Bank" or "Bank") to address the following questions:

- What was the U.S. federal statut ory and regulatory fra mework for anti-money laundering ("AML") and com bating the financing of terrorism ( "CFT"), b oth with regard to civ il co mpliance requirements and crim inal liab ility, tha t was a pplicable to Arab Bank's New York branch ("ABNY") during the tim eframe relevant to this litigation, 1995-2004 ("relevant timeframe")?

- What is the role of the OCC, the Financia l C rimes Enf orcement Network ("FinCEN") and the U.S. Department of Justice ("DOJ") with reg ard to f inancial institut ions and efforts to com bat money laundering and terrorist financi ng, and what are the various regulatory and enforcement authorities they possess and utilize?

- Does the failure of a fin ancial institution to have adequate AML and CFT procedures in place m ean that it engaged in money laundering or terrorist financing activities?

My answers to these q uestions a re provid ed b elow. In r eaching the se conclusions, I have reviewed a number of docum ents from the record in this litiga tion that were provided to me at m y request, as well as other materials that I obtained from

3

public sources.  The documents and materials that I have reviewed are listed in Exhibit D annexed hereto.

The conclusions I have stated regardi ng th is matte r a re as of the date of this report and are based upon the materials I have reviewed as of this date.

I am being compensated at a rate of $600 per hour.  My compensation does not depend in any way on the outcome of this litigation.

4

**III.**
**Summary of Conclusions**

**A.**     During the relevant timeframe in this litigation (1995-2004), the U.S.

federal statutory and regulatory framework for AML and CFT with respect

to financial institutions was evolving and underwent a significant

transformation due to the passage in 2001 of the USA PATRIOT Act and

the subsequent regulatory structure that followed.  As a result, several of

the AML and CFT requirements for banks were in transition, and with

respect to correspondent banking, such requirements were either non-

existent or had not been specified by regulation.

**B.**     The OCC and FinCEN are the U.S. Government agencies tasked with

regulating, supervising and enforcing the civil AML and CFT

requirements for U.S. national banks and federal branches of foreign

banks, while the DOJ is the relevant federal agency charged with

prosecuting criminal violations of money laundering and terrorist

financing.

**C.**     The failure of a financial institution to have adequate AML and CFT

procedures in place does not mean that it engaged in money laundering or

terrorist financing activities.

# IV.
## Discussion

### A.     Arab Bank and ABNY

Arab Bank is a public shareholding com      pany and banking institution headquartered in Amman, Jordan. [3]  As such, it is regulated and supervised under the banking, AML and CFT laws of J  ordan by the  Jordanian Central Bank.  As of 2005, it had approximately 400 branches, of fices and su bsidiaries located in 30 countries, w hich constituted the Arab Banking Group.[4]  This group offers a wide range of banking services to businesses, organizations, institutions      , a  nd i ndividuals i n  the Middle Eas  t and throughout the world, and is a leading provider   of financial services  in the Middle East and North Africa.[5]

During the relev ant tim eframe in this  litigation, ABNY wa s a branch of Arab Bank located in New York, New York.  It  operated as a federal branch of a foreign bank under a license issued by the OCC under federal banking laws, since 1983.      [6]  In 2005, ABNY converted to a federal agency, pu   rsuant to a consent agreem ent with the OCC, continuing to operate under federal banking  laws and a license issued by the OCC. It was, and is, regulated and supervised for AML/CFT purposes primarily by the OCC.

### B.     General Information for Understanding U.S. AML and CFT Compliance Requirements

The curren  t internatio  nal stand  ards and specific U.S. regula       tory requirements for AML and CFT th  at are applicable to  ban ks, their branches and  o ther

---

[3]      Fed. Branch of Arab Bank PLC, 2005-2, Assessment of Civil Money Penalty, (FinCEN, Aug. 17, 2005) ("FinCEN Order") at p. 1.

[4]      *Id.*

[5]      *Id.*

[6]      *Id.* at p. 2.

6

covered f inancial ins titutions in th e Unite d States hav e comm on basic elem ents.  In relevant part, these include:

- conducting custom er identification,  verification and due diligence (often referred to as "Know Your Customer" or "KYC");

- conducting due diligence for cros s-border correspondent banking relationships;

- checking financial transactions against governm      ent lists for criminals or terrorists, blocking transactions and freezing accounts;

- monitoring customer accounts for cons istency of transactions with the customers' stated nature, purpose and use of accounts;

- reporting suspicious transactions to the regulators;

- developing and im  plementing intern al policies, procedures and controls f or assur ing com pliance, includ ing inte rnal a udit or independent testing, designating co mpliance officers, screening of potential employees, and training; and

- maintaining records f or custom er identification and the ab ility to reconstruct transactions.

With the passage of the Bank Secrecy Act ("BSA") in 1970,      [7] the U.S. implemented record keeping and reporting      requirements for financial institutions. However, explicit regulations and guideline     s f or f inancial institu tions to perf   orm proactive AML measures were not formulated in the U.S. until decades thereafter.[8]

---

[7]      31 U.S.C. §§ 5311-5355.
[8]      *E.g.*, 31  C.F.R. §   10 3.18 (1 996) (D epartment o f Tr easury r egulations r equiring r eporting of suspicious activity reports ("SARs")).

In 1989, the G-7 countries form      ed  the Financial Action Task Force ("FATF") as an intergovernmental body.  It is now comprised of more than 30 countries, including the U.S., whose purpose was, and is, to develop international policies to combat money laundering at the individual country      level so that there m    ight be universal standards.  FATF first i ssued its Forty Recommendations on Money Laundering ("FATF 40") in 1990.  Since then, the FATF 40 has been modified in 1996 and in 2003.[9]

In the aftermath of the terrorist at tacks of September 11, 2001, the United States and other countries in   creased their focus on the need      for m easures to com bat terrorist financing specifically, and in      October 2001, FATF expanded its m    ission to include CFT.  At th    at tim e, it is  sued  Eight Special Recomm  endations on Terrorist Financing.  In October 2004, FATF added a ninth Special Recommendation. [10]  Together, these recommendations generally are referred to as the FATF 40+9.

The FATF 40+9, in actua      lity, ar e  not reco mmendations, but rath   er standards that need to be i        mplemented   through legislation, regulation or other enforceable means by e ach country that seek s to abide by these international stand  ards. As a consequence, the specific im  plementation, interpretation and enforcem ent of these standards can, and do, vary a    mong the diffe rent counties according to the approach adopted by each coun  try.  Also as a consequ    ence, in ternational banks, are sub  ject to differing standards depending upon the require         ments of the hom     e (chartering or licensing) country and the host   country (the country where   the bank operates a branch, subsidiary or other entity).  Naturally, any ba nk that operates a branch in another country is obligated to observe the requirem   ents of  that host country.  In  ternational s tandards

---

[9]        FATF 40 (June  20, 2003),  http://www fatf-gafi.org//dataoecd/7/40/34849567.PDF (incorporating the Amendments of Oct. 22, 2004).

[10] FATF          , *Special Recommendations on Terrorist Financing* (Oct. 22, 2004).

dictate that a bank should al so apply its hom e country requi rements in the host country, unless it is prohibited from doing so by the hos t country or unless the requirements of the host country are m ore stringent than the hom e country, in w hich case the host country requirements would apply.[11]

### C. The U. S. Statutory and Regulatory Framework for Banks, Branches and Agencies of Foreign Banks

#### 1. General Statutory and Regulatory Scheme

Banking organizations are am     ong the m    ost highly regulated and supervised business enterprises operating in the United States.  There is a com prehensive statutory structure in place to g      overn bank and holding com     pany operation s and ownership.  Congress has authorized the federal banking agencies,     *i.e.*, the Board of Governors of the Federa l Reserve S ystem ("Federal Res erve Board"), th e OCC, and the Federal Deposit Insurance Corporation ("FDIC"), to implement that statutory structure by promulgating detailed regulati ons.  In addition, each of the federal regu    lators has b een given ex tensive au thority to enforce com   pliance with thes e statut es and regulations. Moreover, all aspects of bank and holding co mpany operations are subject to regular on-site and off-site examination by trained examiners.  Thus, if a banking organization does not comply with applicable statutes or re  gulations, federal regulators can, and do, bring administrative enforcem ent actions agains t th e institution, its directors, officers and/or employees.[12]  Such enforcem ent actions m ay incl ude civil money penalties; cease and desist m andates; rem oval of officers, directors and/or em      ployees; lif etime bans on

---

[11]         *See* FA TF 40, *supra* at re commendation 22; *see als o* Basel Co mmittee on Ban king Su pervision, *Consumer Du e Dilig ence for Banks*, at ¶ 66, (Oct ober 2001), http://www.bis.org/publ/bcbs77.pdf. (where minimum KYC standards o f home and ho st countries di ffer, bra nches and su bsidiaries in *host* countries should apply the higher standard of the two, but stating no requirement that higher standard in host country should be applicable back to home country).
[12]         *See generally* 12 U.S.C. § 1818.

individuals from participation in bank and holding company matters; and ultimately, the closure of the institution.  A more detailed description of such enforcement actions is set forth in Section E below.  In addition, federal law requires that any final, formal enforcement action against a bank or holding company, such as those described above, must be publicly disclosed by the federal regulator charged with the primary supervision of the offending institution.[13]

## 2.      National Bank Supervision and Regulation

A bank in the U. S. may be chartered either by one of the fifty states or the federal government.  This is referred to as the dual banking system.[14]  Federal deposit insurance and accompanying oversight by the FDIC, however, is mandatory for either type of charter.  At the federal level, banks are chartered as national banks under the National Bank Act and are subject to the primary supervision and regulation of the OCC, a bureau of the United States Treasury Department.  The National Bank Act prescribes requirements for, and limitations on, national bank ownership, prior approval requirements for obtaining a charter before the bank is permitted to operate and for opening or closing branch offices, specific powers and privileges of a national bank, and restrictions on operations.  The National Bank Act also authorizes the OCC to promulgate regulations to implement that Act.[15]

Of course, U.S. national banks are subject to numerous other federal statutes and regulations.  Most of these are supervised and enforced by the OCC through

---

[13]      12 U.S.C. § 1818(u).  In addition, FinCEN actions are made publicly available.
[14]      *See generally* U.S. Dep't of Treas., Comptroller of the Currency, *National Banks and the Dual Banking System* (Sept. 2003), *available at* http://www.occ.treas.gov/static/publications/DualBanking.pdf.
[15]      State-chartered banks are subject to similar and, in many cases, identical provisions as national banks, but are also subject to the primary supervision and regulation by the appropriate state regulator. This report does not discuss further the regulation of state-chartered banks because it is not relevant for the purposes of this report.

10

on-site and off-site exam inations by traine d exam iners; others are adm inistered and enforced by the federal agency with jurisdicti on over the statute invo lved.  For exam ple, violations of federal crim inal laws to wh ich national banks are subject are prosecuted by the Department of Justice.  Finally, as with   other corporate entitie s, national banks are also subject to various state and local laws   and regulations, which  are administered and enforced by the state or local authority with appropriate subject matter jurisdiction.

### 3. Branches and Agencies of Foreign Banks

If a foreign bank chooses to establis h a physical presence in the U.S., it may do so by chartering or acquiring a U.S.  subsidiary bank, or by establishing a branch, agency, rep resentative office, or o  ther p ermissible vehicle.  Sim  ilar to establishing a bank, a foreign bank must obtain a charter or li    cense to establish a branch before it is permitted to engage in any banking business in the U.S. [16]  Also similar to establishing a bank, a foreign bank has the opti on of operating under either a  state or federal charter or license.[17]

With respect to a  federal license, there are two levels of powers: a branch, which has all of the product  and service powers of a nationa l bank; o r an agency, which has the same powers as a branch, except that  an agency may not accept deposits and, as a consequence, m ay not engage in clearing and     funds transfer activitie s.  Regardless of which option is chosen, the activities of the entity are subject to the same supervision and regulation by the OCC as if the entity were a national bank.

---

[16]     12 C.F.R. § 28.12 (2008).

[17]     States may differ somewhat as to the scope of permissible activities and operations and may also offer certain li censes with lesser  degrees of  powers than a  branch or  agency, but  state va riations a re not discussed further since they are not relevant for the purposes of this report.

11

A federal branch or agency is subject to all applicable U.S. statutes and regulations within the borders of the U.S. The compliance requirements, or other requirements, applicable to branches and agencies of foreign banks within the U.S. are not applicable to the operations of the foreign bank outside of U.S. borders.[18]

### D.    The U. S. Statutory and Regulatory Framework for AML and CFT

#### 1.    The Relevant Statutes and Regulations

Banks play a crucial role in facilitating international commerce through international funds transfers via safe and secure wire transactions, and foreign exchange utilizing highly complex, yet highly efficient, mechanisms. They have the unique ability to convert cash into value-storing and easily transferable financial instruments. In addition, banks have the ability to transfer funds through wire transfers from, to and through other banks and financial institutions. These necessary and important attributes, however, can be exploited to launder money and, thereby, assist criminals in profiting from their crimes. These same attributes also make banks susceptible to those who finance terrorism. Because of this, financial institutions, and banks in particular, have become the focus of a variety of statutory and regulatory requirements designed to help law enforcement authorities deter and detect money laundering and terrorist financing, as well as to report suspicious transactions or financial activities involving either. These AML and CFT requirements are both civil in nature, *i.e.*, those administered and enforced by federal bank regulators, and criminal in nature, *i.e.*, those enforced by the DOJ through criminal prosecution. The various civil provisions are collectively referred to as

---

[18]    *See, e.g.,* U. S. Dep't of Treas., *Resource Center, OFAC FAQs Question Index,* http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/ques_index.aspx (follow "Who must comply with OFAC regulations?" hyperlink) ("All U.S. persons must comply with OFAC regulations, including all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the United States, all U.S. incorporated entities and their foreign branches.").

the Bank Secrecy Act ("BSA"). [19]   The applicable criminal provisions against money laundering are found at 18 U.S.C. §§ 1956 and 1957.   The applicable criminal provisions against the financing of terrorism are found at 18 U.S.C. § 2339C.

### 2.   What Is Money Laundering?

Money laundering is generally defined as the act of transforming funds gained from illegal or illicit activities into funds that have an appearance of legitimacy. Historically, money laundering has been associated with crimes such as drug trafficking. Money laundering involves the proceeds of criminally derived property, rather than the property involved with the crime itself.  The purpose of concealing and disguising the proceeds of crime is, of course, to separate the criminal and the proceeds from the underlying criminal activity and, ultimately, to legitimize the proceeds so that the criminal may profit from the crime.

A money laundering predicate offense is the underlying criminal activity that generates the proceeds, which, when laundered, results in the offense of money laundering.  The process of money laundering may involve different types of financial institutions; multiple financial transactions; the use of intermediaries, such as shell corporations, trusts, attorneys, accountants and other service providers; transfers to, through and from different countries; and the use of different financial instruments and other types of transferable, value-storing assets, such as precious gems or metals.

The money laundering process may be described in three stages.  The initial stage involves the placement of illegally derived funds into the financial system, usually through a financial institution.  Placement may be accomplished by making a deposit in a bank or securities firm, or by the cash purchase of a security or investment-

---

[19]     31 U.S.C. §§ 5311-5355.

type insurance contract. The s econd stage, referred to as layering, occurs after the illicit funds have entered the financial system . At th is stage, the initial deposit, security or insurance contract is converted to another type of financial instrument and/or transferred to another financial institution. The layeri ng stage may involve multiple instruments and financial institutions. Finally, the th ird stage involves the integration o f funds into the legitimate economy. Integration m ay be acco mplished through the p urchase of assets, such as real estate, investm ent securities or other financial assets, or luxury goods, such as jewelry, antiques and automobiles.

### 3.      What is Terrorist Financing?

The International Convention for S       uppression of the Financing of Terrorism defi nes t error fi nancing as a trans action whereby "[a] person by any m eans, directly or indirectly, unlaw fully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out" an ac t defined by the Convention as terrorism .[20] The USA PATRIOT Act of 2001 am ended 18 U.S.C. § 2339A, which prohibits know ingly or intentionally providing "m aterial support or resources" for te rrorism, to define "m aterial support or resources" as "any property, tangible or intangib le, or service, including currency or m onetary instrum ents or financia l securitie s, f inancial services, lodging, training, expert advice or as sistance, safehouses, false doc umentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation. . . ."[21] Terrorist financing thus i nvolves funds that m ay not have been criminally derived, but their ultimate use is criminal. Those who finance terrorism,

---

[20]       U.N. General Assembly, *International Convention for Suppression of the Financing of Terrorism*, G.A. Res. 54/109, Art. 2(1) (Dec. 9, 1999).

[21]       18 U.S.C. § 2339A(b)(1).

however, may utilize the same techniques as money launderers to conceal the sources and uses of their funds.  As a re sult, the same compliance requirements used as preventative measures are im posed upon financial institutions  to help combat terrorist financing, and in this regard, terrorist financing is a predicate offense for the crime of money laundering.

The key d istinction b etween AML and CFT is that the f ormer seeks  to reveal criminal activity that has already occurred based upon one or more of the predicate offenses for  m oney laundering.  The latt er, on the other hand, seeks to identify transactions that m ay be us ed to fund acts of terrorism , intended acts of terrorism, terrorist groups, or individuals  or groups identified on certai n blacklists, whether or not the funds were derived from criminal activity.  These preventive and detection objectives of CFT present an even greater challenge for banks than AML.

4.     The Basic Elements of the U.S. AML and CFT for Purposes of this Report

The AML/CFT regim e of the United States consists of three major parts: deterrence, detection, and pros ecution.  Banks and other financ ial institutions play a role in the deterrence and/or detection aspects of m oney laundering and terrorist  financing by requiring customer identification and conducting due diligence on customers.  They also monitor accounts for any unusual     transaction(s) or activity   and, if determ ined to be suspicious, f or reportin g such tran saction(s) or activi ty to law enf orcement authorities. Banks and other financial institutions also      assist in th e prosecution o f crim inals by retaining records about custom ers and thei r transactions and m  aking such records available to law enforcem ent authorities.   Beyond these activities,  banks rely on their regulators and law enforcem  ent authorities,  who have the prim  ary responsibility for

15

investigating and prosecuting crim inals, to  inform banks of individuals and entities suspected of criminal activity and for whom banks should not perform services.

By statu te, each of the three federa  l bank ing regulators  is requ ired to promulgate regulations requiri ng each institution under its      respective jurisdiction to establish an d m aintain procedu res rea sonably designed to assure and m      onitor the institution's compliance with the re quirements of the Bank Secrecy Act. [22]  This statute also requires each regulator to make a review of each institution's compliance program as part of the regulator's examination process.[23]  Finally, this statutory scheme also provides that if an institution fails to establish and maintain such a compliance program, or fails to correct a p roblem reported to the in stitution by its r egulator, the regu lator *shall* issu e a cease and desist order against the institution.[24]

The elements of a compliance program on which the U.S. reg ulators focus when exam ining financial ins titutions have lik ewise evolv ed over tim e.  In 1987, for example, the OCC enacted regulations requi ring banks under the OCC's supervision t  o institute a Bank Secrecy Act ("BSA") compliance program, including:[25]

- A system of internal controls to insure compliance;

- Independent testing for compliance;

- A designated individual(s) for      coordinating and m   onitoring compliance; and

- Training for appropriate personnel.

---

[22]     12 U.S.C. § 1818(s).
[23]     *Id.*
[24]     *Id.*
[25]     Rules and Regulations, Dep't of the Treas., 12 C.F.R. § 21.21; 52 Fed. Reg. 2859 (Jan. 1987).

16

Yet the reporting requirem ents of the BSA, as of 1987, cons isted primarily of reporting large currency transactions.  Thus, the compliance program at that time, as dictated by the OCC's regulation, was intended prim  arily  to assure proper reporting of currency transactions.

In addition, the Secretary of the Tre  asury has the authority to determ  ine whether a financial institution ha  s violated the BSA (31 USC § 5311  *et seq* .) a nd t he regulations issued pursuant thereto (31 CFR §    103).  FinCEN is the bureau within the Department of Treasury charged with enforc   ing BSA m atters.  As   a practical matter, FinCEN relies on the federal bank regulator   y ag encies to en force their own AML and CFT statuto ry and reg  ulatory req uirements as well as those of the BSA and its implementing regulations.  Nonetheless, FinCEN does take action on  its own with regard to civil money penalties.

In 1996, the U.S. Departm  ent of Treas ury issued a regulation requiring banks, for the first tim e, to file SARs, begi nning on April 1st of th at year, under certain conditions.[26]  A bank is required to file a SAR fo   r a trans action involvin g (or m ultiple transactions aggregating) at least $5,000.00 whenever it knows, suspects or has reason to suspect that the transaction(s) is su spicious.[27]  In genera l, a tra nsaction is s uspicious if it (1) involves funds derived from illegal activities, or is designed to disguise funds derived from illegal activities; (2) is designed to  evade reporting or record ke eping requirements of the BSA Act or its implementing regulations; or (3) has no business or apparent lawful purpose or is not the sort in which the custom   er would norm ally engage, and the bank knows of no reasonable explanation for the        transaction after exam ining the available

---

[26]        31 C.F.R. § 103.18.   61 Fed. R eg. 4331 (F eb. 5, 1996); as am ended 61 Fed. R eg. 14249 (Apr. 1, 1996) and 61 Fed. Reg. 18250 (April 25, 1996).  Redesignated at 65 Fed. Reg. 13692 (Mar. 14, 2000)
[27]        31 C.F.R. § 103.18.

facts, including the background and possible purpose of the transaction.[28] This requirement, however, did not translate into a practice by banks at that time to monitor correspondent banking transactions for the specific purpose of detecting and reporting suspicious activities. Only with the passage of Section 312 of the Patriot Act, which became effective on July 23, 2002, was there a statutory due diligence requirement with respect to correspondent banking relationships.[29] However, FinCEN did not implement final rulemaking on this statutory provision until February of 2006.[30]

On May 30 2002, FinCEN published for comment a proposed rule to implement Section 312, which became effective on July 23, 2002, whether or not regulations were in place to implement the statute.[31] Because of the complexity of the issues raised by the proposed rule, FinCEN did not promulgate a final rule by the date Section 312 became effective.[32] Rather, it issued a final interim rule that became effective on July 23, 2002.[33] The interim rule largely repeated the statutory requirements of Section 312 and did not provide specifics on how to satisfy the statutory requirements. The interim rule stated, "Treasury acknowledges that, as a practical matter, banks will be unable to craft and implement final comprehensive due diligence policies and procedures pursuant to the dictates of section 5318 (i)(1) until Treasury issues a final rule."[34] The interim rule went on to state, "in the interim, a reasonable due diligence policy, in Treasury's view, is one that comports with existing best practices standards for banks that

---

[28]     *Id*. *See* FinCen Order at 6 and Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (2007) ("Examination Manual") at p. 60, available at http://www.ffiec.gov/bsa_amlinfobase/documents.BSA_AML_Man_2007.pdf.
[29]     31 U.S.C. § 5318(i).
[30]     71 Fed. Reg. 495 (Jan. 4, 2006), effective Feb. 3, 2006.
[31]     67 Fed. Reg. 37736 (May 30, 2002).
[32]     Federal Reserve Board, Supervisory Letter, SR 02-18, July 23, 2002, at 1.
[33]     67 Fed. Reg. 48348 (July 23, 2002).
[34]     *Id*. at 48350.

maintain corresponden t accoun ts for foreign banks,     [35]….”[36]  The Clearing Ho    use Guidelines, which are r eferred to in the inte rim rule as best prac tices, generally do not address the issue of originator s or beneficiaries of wire tr ansfers for a respondent bank through its correspondent accounts.  Therefore, as a consequence, prior to the final rule in 2006, there was no guidance with respect to, or    articulation of the standard for, Section 312 from Treasury or any other regulator with   regard to originators and beneficiaries of wire transfers for noncustom  ers of a res  pondent bank and its correspondent banking relationships.  In fact, even by 2007, bank ex    aminers were not ins tructed to de termine whether a correspondent bank monitors th     e originators and beneficiaries of non-customers of the bank in its correspondent banking relationships.[37]

With regard to funds derived from      illegal activ ities, b anks are n  ot obligated, and, in fact, do not investigate  or confirm the underlying illegal activity ( *e.g.*, money laundering, terrorism  , various types of      fraud).  Investigation is the sole responsibility of law enforcem  ent.  Fina  ncial institutions do, how   ever, assist w  ith investigations by providing copi es of their reco rds and o ther information to appropriate law enforcement authorities.  Moreover, the f iling of a SAR does not require that a bank stop doing business with the custom  er.  Furthe rmore, regulators take the position that a bank's internal con trols for filing s SARs should m inimize risks of disclosure.[38]  In this regard, while the SAR reporting entity within a bank may report the filing of a SAR to its

---

[35]      Here th e in terim ru le h ad a  footnote referring to , am ong o ther th ings, the New Yo rk Clearing House  Association L .L.C., G uidelines f or C ounter  Money La undering P olicies an d P rocedures i n Correspondent Banking (March 2002) at www.nych.org ("Clearing House Guidelines") as an exam ple of best practices.

[36]      67 Fed. Reg. 48348 (July 23, 2002), at 48350.

[37] Exam        ination Manual.

[38]      *Id.* at p. 68-69.

head office or holding company, it should not report the filing of a SAR to the customer, any other person, or even any affiliate of the bank.[39]

There is no "one-size-fits-all" approach to compliance. A financial institution generally has to be able to demonstrate to its regulator that its specific policies and procedures are adequate to achieve AML and CFT objectives, given the institution's size, complexity, location, and types of customer relationships. The duty of banks to comply with the federal civil AML/CFT compliance requirements runs only to the federal government, as supervised and enforced by its appropriate agencies. No duty to any third party is created by the failure to comply fully with such requirements.

**E.** **The Role of the OCC, FinCEN and the DOJ in Connection With AML and CFT**

**1.** **The OCC**

As the former Chief Counsel of the OCC, I am acutely aware of the operations of the OCC, especially with respect to its efforts in AML and CFT. As described earlier, the OCC is a bureau of the U.S. Department of Treasury that regulates and supervises national banks, and branches and agencies of foreign banks, in the U.S. The primary role of the OCC is to:

- Ensure the safety and soundness of the national system of banks and savings associations;
- Foster competition by allowing banks to offer new products and services;
- Improve the efficiency and effectiveness of OCC supervision, including reducing regulatory burden; and
- Ensure fair and equal access to financial services for all Americans.[40]

---

[39]   *Id.* at pp. 68-69, 71.
[40]   *See* "*About The OCC, The OCC's Objectives*," available at http://www.occ.gov/about/what-we-do/mission/index-about.html.

20

In order to achieve th ese goals, the OCC maintains a s taff of bank exam iners who conduct regular on-site exam inations and ove rall supervision of the operations at the financial in stitutions u nder its ju risdiction, w ith th e purpose of ensuring that the institutions are in com pliance with all re levant laws and regulations and are engaging in safe and sound banking practices. [41]   The OCC's supervision continues for as long as the institution is in existence, and the scope of an exam ination depends on any num ber of factors, including th e s ize of the institu tion a nd the complexity of its produ cts and services, but will always include a thorough re view of the financial in stitution's efforts regarding AML and, since 2001, CFT.[42]

Depending on the results of an exam ination, which are issued in a Report of Exa mination, the OCC m ay utilize enforcem ent actions agains t financial institu tions that the OC C finds hav e not sufficiently com plied with law s and/or regulations, or have engaged in unsound banking practices. Norm ally, the OCC has options regarding the type of enforcem ent action it m ay take agai nst any particular in stitution depending upon the se verity of the complianc e m atter and othe r factors, such as re peat offenses or the failure to take correctiv e action. As noted prev iously, in the case of a failure to have an adequate AML/CFT compliance program in place, the OCC is required by statute to issue a cease and desist ord er against the institution. [43]   Cease and desist orders generally are used by the OCC to communicate the OCC's criticism of a bank's operations and to require the bank to take rem edial action. Cr iticisms by the OCC are a norm al part of the supervisory process, and in fact, fr om 1994-2005, the OCC issued 839 enforcem ent actions against financial institutions for a variety of reasons , including cease and d esist

---

[41]    The OCC may also institute targeted examinations in addition to the regular examinations.

[42]    In addition, multi-national banks have examiners on-site on a year round basis.

[43]    12 USC § 1818(s). *See also*, discussion at footnote 24.

orders for failures in AML and CFT procedures.  However, even in the event of such an order, the failure to have adequate AML and CFT procedures in place does not mean that a bank actually engaged in money laundering or terrorist financing.  Indeed, such a finding would be in the province of the DOJ, which could then prosecute the institution for criminal violations.

Because the OCC's supervision is on-going, it does take into account whether a financial institution has failed to take appropriate remedial action after an initial finding requiring corrective measures.  In fact, the OCC specifically checks to see if appropriate remedial action has been taken in accordance with the timeframes specified in the relevant cease and desist order and may complete a targeted examination to ensure compliance has been achieved.  For example, in the case of the New York branch of United Bank for Africa, the OCC issued a cease and desist order on January 18, 2007, requiring certain corrective actions to be taken within specified time frames.[44]  It then imposed a civil money penalty of $500,000 approximately three and one-half months later when adequate and timely action was not taken by the bank.  Later, when a targeted examination revealed that problems continued, the OCC issued a new cease and desist order and followed that with a civil money penalty of $15,000,000.[45]  Notably, the language utilized by OCC in the consent order indicated the severity of the failures at issue: "the Branch recklessly engaged in unsafe or unsound banking practices" and that "violations of law remained pervasive and systematic throughout the branch."[46]

---

[44]     Federal Branch of United Bank for Africa, 2007-03, Consent Order (OCC, January 19, 2007).
[45]     Federal Branch of United Bank for Africa, 2008-007 and 2008-029, Consent Orders (OCC, Feb. 29, 2008, and Apr. 22, 2008, respectively).
[46]     Federal Branch of United Bank for Africa, Consent Order (OCC, April 22, 2008) at p. 2-3.

Another exam ple involved Riggs Ba nk, which in 2003 entered into a consent cease and desist order to correct a num ber of BSA-related deficiencies.[47] Approximately ten m onths later, the defi ciencies were n ot corrected , and the OCC determined that th ere w ere addition al viola tions. As a result, the OCC concluded that Riggs "engaged in system ic violations of law, regulations and a final order and failed to correct those violations."[48] As a consequence, the OCC i mposed a $25,000,000 civil money penalty.[49]

The OCC also has the author ity to re move a m anagement official of a bank or branch of a for eign bank. In the case of the New York Branch of Banco de Chile, whic h had agre ed to a consent orde r with the OCC to correc t BSA-related deficiencies,[50] the OCC later rem oved the gen eral m anager of the branch from office, imposed civil money penalties on the form er manager and imposed a lifetim e ban on his participation with any other insured institution in the U. S.[51]

In addition, the OCC can m ake a crim inal referral to the D OJ. Based on my experience, it is very common for the OCC to make such a referral to the DOJ, which would then decide whether to conduct an independent i nvestigation. After such investigation, the DOJ would m ake a determ ination whether to p ursue a crim inal prosecution against the institution and/or individual(s).

2. **FinCEN**

As noted previously, FinCEN has its own authority to determine whether a

---

[47]     Riggs Bank, 2003-79, Consent Order (July 16, 2003).
[48]     Riggs Bank, 2004-44, Consent Order (May 13, 2004) at p. 7.
[49]     *Id.*
[50]     New York Branch of Banco de Chile, 2005-2, Consent Order (OCC, Feb. 1, 2005).
[51]     Hernan Donoso, former general manager of the New York Branch of Banco de Chile, 2005-42, Consent Orders (OCC, Apr. 14, 2005).

23

financial institution has violated the BSA and what civil money penalty to impose. With regard to banks and U. S. branches of fo reign banks, FinCEN acts in coordination with the appropriate federal bank regulator. [52] The prim ary difference is that FinC EN identifies the deficiencies, based upon its own investigat ion and the findings of the appropriate bank regulator, and issues a civil money penalty, while the regulator uses its authority to im pose spe cific corrective actions to be taken through its cease and desist authority. In each of the OCC cases cited a bove, FinCEN issued its own order regarding the deficiencies involved and imposed a civil money penalty, which wa s to be concurrent with the civil money penalty imposed by the OCC.[53]

At the s ame time, FinCEN also works in conjunction with the DOJ. F or example, in the W achovia cases, the OCC imposed a $50,000,000 ci vil money penalty, while the DOJ and FinCEN each i mposed $110,000,000 civil m oney penalties, which were to run concurrently . Because the OCC penalty was se parate and a dditional to the DOJ's and FinCEN's concurrent penalties, the total amount in penalties paid by Wachovia was $160,000,000. [54]

Similar to the OCC, the language us ed in FinCEN's findings will indicate the severity of the violation at is sue, and may even indica te whether it was willf ul. As evidenced by several of the civ il money penalties issued by FinCEN, it will not h esitate to m ake a finding tha t a viola tion is willf ul. For exam ple, in the Riggs Bank case

---

[52]     The OCC, the Federal Reserve Board and the Federal Deposition Insurance Corporation.

[53]     In the matter of Ne w York Branch o f United Bank for A frica, PLC, No. 2008-3, Assessment of Civil Money Penalty (FinCen, Apr. 22, 2008); In the Matter of Riggs Bank, NA, No. 2004-01, Assessment of Civil Money Penalty (FinCen, May 13, 2004); In the Matter of the New York Branch of Banco de Chile, No. 2005-03 (FinCen, Oct. 12, 2005).

[54]     In the matter of Wachovia Bank, National Association, Charlotte, North Carolina, No. AA-EC-10-16, Consent Order for a Civil Money Penalty (OCC, Mar. 10, 2010); In the Matter of Wachovia Bank, No. 2010-1, Assessment of C ivil M oney Pe nalty (Fi nCEN, March 12, 2010); U nited States of America v. Wachovia Bank, N. A ., U. S. D istrict Court for the Southern District of Florida, Case N o. 10-20165-CR-LENARD, March 16, 2010.

24

discussed above, FinCEN dedicated a separate section of its Assessment of Civil Money Penalty to a ddress th e "willful natu re" of the BSA violatio ns,[55] and concluded that the Riggs Bank:

> willfully vi olated the suspicious activity and currency transaction reporting requirem ents of the BSA and its implementing regulations, and that Riggs has willfully violated th e anti- money launderi ng progra m ("AML program") requirem ent of the BSA and its implem enting regulations.[56]

FinCEN went on to say that that these willful vi olations were systemic – a te rm also used by the OCC.[57] FinCEN also characterized a bank' s behavior as willful when "it demonstrates a reckless disregard for its obligations under la w or regulation." FinCE N found tha t the systematic violations by Riggs and its failure to correct identified deficiencies dem onstrated reckless disregard by Riggs.[58]

Likewise, in the Am South case, Fin CEN conclu ded that Am South Bank 's conduct constituted a willful violation of law. FinCEN found t hat AmSouth Bank "willfully violated the anti-money laundering program and suspicious activity reporting requirements of the Bank Secrecy Act and its implementing regulations."[59]

Involving all of the cases cited above, for both Fin CEN and the OCC, there was no adj udication of the facts. Rather, the parties con sented to the orders without admitting or denying the facts as presented by FinCEN or the OCC.

### 3. DOJ

As noted previously, under the relevant criminal statutes, the DOJ has th e

---

[55] In t he m atter of R iggs B ank, N. A., N o 2 004-01, Asse ssment of C ivil M oney Pe nalty (Fi nCen, May 13, 2004) at p. 8.

[56] *Id.,* at p. 1.

[57] *Id.*, at p. 2.

[58] *Id.*, at p. 8.

[59] In the m atter of Amsouth Bank, No. 2004-02, Assessment of Civil Money Penalty (FinCen, Oct. 12, 2004), at pp.1 and 2.

authority to institute in vestigations or prosecu tions aga inst f inancial institu tions and individuals for m oney laundering and terrorist financing. As discussed above, the DOJ may defer prosecution of a case based upon the institution's cooperation with bank regulators and FinCEN and commit ment to remedy deficiencies within certain timeframes.[60] In such cases, prosecution is not pursued if the conditions and commitments are satisfied in a timely manner.[61]

### 4.    The OCC and FinCEN Orders Regarding Arab Bank

In 2005, after an exam ination and inve stigation, with which ABNY fully cooperated, as noted by the O CC, ABNY entered into consent orders with the OCC and FinCEN which included as a com ponent a $24,000,000 civil m oney penalty. [62] In addition, ABNY agreed with the OCC to take certain remedial actions, including, among others, term inating any further funds cleari ng activities and convert ing to an agency. Neither the OCC nor Fi nCEN included in their consent orders with A BNY language stating a finding of wilfull or system ic viol ations of law or regulations by ABNY, or a failure by A BNY to correct p ast deficiencies ci ted by the regulators. In fact, until 2005, ABNY had no significant supervisory issues wi th the OCC or FinCEN with r egard to AML or CFT. My observation in this rega rd is based upon the fact that all form al enforcement actions by the OCC ar e required to be m ade public and an exa mination of OCC records shows no such enforcement actions had been taken against ABNY.[63]

---

[60]     *See* United St ates of America v. Wachovia Bank, N. A., U. S. Distric t Cou rt f or t he So uthern District of Florida, Case No. 10-20165-CR-LENARD, March 16, 2010.

[61]     *See* United States of American v. Sigue Corp. and Si gue, L.L.C, U .S. District Co urt for the Eastern District of Missouri, Case No. 08 cr. 54, January 28, 2008.

[62]     Fed. Branch of Arab Bank PLC, 200 5-14, Consent Order (OCC, Feb. 24, 2005) at pg. 2; FinCEN Order at pg. 8.

[63]     In August of 1 989, 12 U.S.C. § 181 8(u), w hich estab lished th e pub lication r equirement, w as enacted into law.

Dated: New York, NY
      January 31, 2012

_____
Paul Allan Schott

**EXHIBIT A: CURRICULUM VITAE OF PAUL ALLAN SCHOTT**

Mr. Schott is an attorne y in priv ate practice in Washington, D.C.  He is nationally-recognized exper t in bank regulatory m atters, having served as Chief Counsel of the Office of the Comptroller of the Curre ncy ("OCC"), Assistant General Counsel at the U.S. Treasury Department, and Senior Attorney at the Federal Reserve Board.  He has authored books on anti-m  oney launderi ng ("AML") and bank holding com     panies; published num erous articles; and spoken at   many professional sem inars.  Currently, he works with foreign governments on enhancing AML and bank supervisory programs, as a consultant to the W orld Bank.  He works w ith private clients on AML, bank and holding company powers, capital, privacy and various compliance and supervisory issues.

Mr. Schott has ove     r 35 yea    rs of  f inancial ins titutions regu  latory experience.  From 1994 to 2002, he was a cons ulting partner at PricewaterhouseCoo pers LLP ("PwC") and its predecessor, Coopers     & Lybrand, where he served as National Director for Bank Regulatory Services.  At PwC, he authored "USA Patriot Act Increases Anti-Money Laundering Responsibilities for A ll Financial Institu tions," and worked on bank chartering, enforcem ent, electronic   banking, predatory lending and com   pliance matters.

From 1987-91, he served as Chief     Counsel of the OCC, where he was responsible for all legal determinations at the federal agency that regulates national banks and federal branches and agencies of fore      ign banks.  He reported directly to the Comptroller of the Currency and was involved at   the highest level of the OCC in s enior

A-1

management, policymaking and the development of supervisory strategies.  As Assistant General Counsel at the U.S. Treasury Department from 1979-85, Mr. Schott was responsible for dealing with the savings and loan collapse and drafting legislative initiatives for the deregulation of banks and holding companies.  From 1973-79, he served as a Senior Attorney at the Federal Reserve Board where he dealt with litigation, regulatory issues and bank holding company applications.

In private practice, he represented banks and financial institutions before regulatory agencies and Congress.  From 1985-87, he was a partner with Barnett, Sivon, Schott & Shay; and, from 1991-94, he was a partner with Brown & Wood, both in Washington, D.C.

Mr. Schott authored the books: *Reference Guide to Anti-Money Laundering and Combating the Financing of Terrorism* (1st Ed., 2003; 2nd Ed., 2004 and 2nd Ed. and Supplement, 2006), published jointly by the World Bank and International Monetary Fund; and *Federal Banking Law: Bank Holding Companies* (1987 and update 1988), published by Warren, Gorham & Lamont, Inc.  He co-authored the book, *Preventing Money Laundering and Terrorist Financing, A Practical Guide for Bank Supervisors* (2009), published by the World Bank.   He also wrote numerous published articles, including:

- "New Basle Risk Principles for Electronic Banking," *Electronic Banking Law and Commerce Report*.
- "Predatory Lending:  Where Do Things Stand?" *Banking & Financial Services Policy Report*.
- "FDICIA-Mandated Safety and Soundness Standards Pose Compliance Burden," *Banking Policy Report*.

A-2

- "Derivatives:  A Prim er on Bank Ag ency Actions for Managing Risks," *Banking Policy Report*.

- "Expansion of Products and Services Offe red by Banks in the United S tates," International Monetary Fund.

- "The Audit and Reporting Requirem ents of Section 112 of FDICIA", *The Review of Banking & Financial Services*.

He serves on the Board of Advisors for Boston University School of Law and the Executive Council for the Banking Law Committee of the Federal Bar Association. In addition, he is a member of the Banking Law Committee of the American Bar Association, and previously served as Chair of the Financial Institutions Committee of the District of Columbia Bar Association.

Mr. Schott received his B.A. degree from Kent State University, his J.D. degree from Boston University School of Law and his LL.M. degree from Georgetown University Law Center.

## EXHIBIT B: PUBLICATIONS DURING THE PREVIOUS TEN YEARS

1.      Paul Allan Schott, et al.,   *Preven ting Money Laundering  and Terrorist Financing; A Practical Gu ide for Bank Supervisors* , (The W orld Bank Publications, 2009).

2.      Paul Allan  Schott,   *Reference Guide to An    ti-Money L aundering and Combating the Financing of Terrorism*, (The World Bank Public ations, 1st Edition 2003, 2nd Edition 2004, 2nd Edition and Supplement 2006).

## EXHIBIT C: EXPERT TESTIMONY DURING THE PREVIOUS FOUR YEARS

### PAUL ALLAN SCHOTT
#### EXPERT WITNESS CASES

| NAME OF CASE / COURT | NATURE OF EXPERTISE AND SERVICES PROVIDED |
|---|---|
| **(1)** *Dr. Enrico Bondi, As Extraordinary Commissioner of Parmalat, et al., v. Citigroup, et al.*<br><br>Docket no. BER-L-10902-04.<br><br>Superior Court of New Jersey, Law Division: Bergen County | • Money laundering.<br>• Expert report filed with court on behalf of Defendant.<br>• Deposition taken on behalf of Defendant. |
| **(2)** *Toys "R" Us Delaware, Inc., and Geoffrey, Inc. v. Chase Bank USA, N.A.*<br><br>No. 13-148-02432-08<br><br>Commercial Arbitration American Arbitration Association New York, New York | • Role of supervisory guidance in amending existing contracts between a bank and third party.<br>• Affidavit prepared for testimony at trial on behalf of Plaintiff. |
| **(3)** *Wayne Kirchhoff v. Canton State Bank*<br><br>Case No. 05-RA CV00631<br><br>Circuit Court of Randolph County at Huntsville, Missouri | • Safe and sound banking practices and supervisory guidance in relation to hiring of senior bank management.<br>• Deposition taken.<br>• Testified at trial. |
| **(4)** *Leon v. Leon*<br><br>Case No. BC376704<br><br>Superior Court of the State of California for the County of Los Angeles | • Licensing requirements for money transmitters under various state laws.<br>• Deposition taken. |
| **(5)** | |

*HRB Tax Group Inc., et al., v. HSBC Bank USA, National Association, et al.*

Case No. 10 cv 01946

United States District Court
Eastern District of Missouri
Eastern Division

- Role of supervisory guidance in amending existing contracts between a bank and third party.
- Status of supervisory guidance for enforcement purposes.
- Deposition taken.

**(6)**
Affinion Benefits Group, LLC v. Econ-o-check Corp.
Case No. 3:09-CV-0273

United States District Court
Middle District of Tennessee

- Disclosure of personal information under Federal privacy laws.
- Expert report filed with to the court on behalf of Plaintiff.

**(7)**
Courtney Linde, et al. v.
Arab Bank, PLC
Case No.CV-04-2799(NG)(VVP)
and all related cases

United States District  Court for the Eastern District of New York

- Anti-money and terrorist financing.
- Expert report filed with to the court on behalf of Defendant.

**(8)**
City First Bank of DC, NA v.
The New School for Enterprise and Development public Charter School, et al.
Case No. Civil Action, File No. 0008174-09

Superior Court of the District of Columbia
Civil Division

- Bank practices regarding account access procedures and governance.
- Anti-money laundering
- Deposition taken on behalf of Plaintiff.

**(9)**
Vernon W. Hill II, Shirley Hill and InterArch, Inc., v. Commerce Bancorp, LLC and TD Bank, N.A.
Case No. 1:09-CV-03685 (RBK-JS)

United States District Court for the District of New Jersey

- Golden parachute payments.
- "Troubled" status of banks.
- Affidavits filed with the court on behalf of Plaintiffs.

**(10)**
Henry I. Louis v. Sun Trust Bank and

- Safe and sound banking practices for

George J. Sybert, Sr.
Case No. 03-C-10-010890 CN

Circuit Court for Baltimore County,
Maryland

checking accounts.

- Deposition taken on behalf of Plaintiff.

**EXHIBIT D: LIST OF DOCUMENTS AND MATERIALS REVIEWED**

A.    Statutes/Regulations/Rules

- 31 U.S.C. §§ 5311-5355
- 31 C.F.R. § 103.18
- 12 U.S.C. § 1818
- 12 C.F.R. § 28.12
- 18 U.S.C. § 1956
- 18 U.S.C. § 1957
- 18 U.S.C. § 2339
- 12 C.F.R. § 21.21
- 31 C.F.R. § 103.120
- 52 Fed. Reg. 2858 (Jan. 1987)
- 61 Fed. Reg. 4331 (Feb. 5, 1996)
- 61 Fed. Reg. 14249 (Apr. 1, 1996)
- 61 Fed. Reg. 18250 (April 25, 1996)
- 65 Fed. Reg. 13692 (March 14, 2000)
- 67 Fed. Reg. 48348 (July 23, 2002)
- 67 Fed. Reg. 48350 (July 23, 2002).
- 71 Fed. Reg. 495 (Jan. 4, 2006)
- 67 Fed. Reg. 37736 (May 30, 2002)

B.    Deposition transcripts (and exhibits thereto)

- E. Caravanos
- E. Caravanos 30(b)(6)
- W. Flouty
- T. Pacheco
- B. Billard
- B. Billard 30(b)(6)
- O. Asoli

- N. Barbar
- T. Scholtz

C.     Documents Filed with the Court

- First Amended Complaint, *Linde et al., v. Arab Bank, plc*, No. 04-2799 (E.D.N.Y. Aug. 10, 2004), ECF No. 4.

- Def. Arab Bank, PLC's Mot. for Recons. of the Ct.'s Dec. 13, 2006 Order at Ex. A, *Linde, et al., v. Arab Bank, plc*, No. 04-2799 (and related actions) (E.D.N.Y. Dec. 27, 2006)

- Decl. of A. Howard in Opp. to Pls.' Objections Pursuant to F.R.C.P. 27(a) at Ex. B, *Linde, et al., v. Arab Bank, plc*, No. 04-2799 (and related actions) (and exhibits thereto) (E.D.N.Y. Feb. 12, 2007)

- Decl. of Anne T. Vitale in Supp. of Def. Arab Bank, plc's Mot. for Recons. of the Ct.'s Dec. 13, 2006 Order, *Linde, et al., v. Arab Bank, plc*, No. 04-2799 (and related acti ons) (E.D.N.Y. Dec. 27, 2006)

- Supplemental Resp. and Objections of Def. Arab Bank plc to Pl.'s Second Set of Joint Interrog. Direct ed to Def. Arab Bank plc (Dec. 28, 2010)

D.     Other Public Source Documents

- *Linde, et al., v. Arab Bank, plc*, 384 F. Supp. 2d 571 (E.D.N.Y 2005)(J. Gershon ruling on Bank's motion to dismiss ATCA claims)

- Fed. Branch of Arab Bank PL C, 2005-2, Assessm ent of Civil Money Penalty, (FinCEN, Aug. 17, 2005)

- Fed. Branch of Arab Bank PLC, 2005-14, Consent Order (OCC, Feb. 24, 2005)

- Fed. Branch of Arab Bank PLC, 2005-101, Consent Order f or Civil Money Penalty (OCC, Aug. 17, 2005)

- Financial Action Task Force, *FATF Standards, FATF 40 Recommendations*, (June 20, 2003), http://www.fatf-gafi . org//dataoecd/7/40/34849567.PDF ( incorporating the Am endments of Oct. 22, 2004)

- Financial Action Task Force, *Special Recommendations on Terrorist Financing* (Oct. 22, 2004)

- Federal Financial Institutions Exam ination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* (2007), *available at* http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_ Man_2007.pdf

- Basel Committee on Banking Supervision, *Consumer Due Diligence for Banks*, at ¶ 66, (October 2001), http://www.bis.org/publ/bcbs77.pdf.

- U.S. Dep't of Treas., *Resource Center, OFAC FAQs Question Index*, http://www.Treasury.gov/resour ce-center/faqs/Sanctions/Pages/ques_index.aspx (follow "W ho m ust comply with OFAC regulations?" hyperlink)

- U.S. Dep't of Treas., Com ptroller of the Currency, *National Banks and the Dual Banking System* (Sept. 2003), *available at* http://www.occ.treas.gov/static/publications/DualBanking.pdf.

- U.N. General Assem bly, *International Convention for Suppression of the Financing of Terrorism*, G.A. Res. 54/109, Art. 2(1) (Dec. 9, 1999)

- Federal Reserve Board, Supervisory Letter, S R 02-18, July 23, 2002.

- New York Clearing Hous e Association L. L.C., *Guidelines for Counter Money Laundering Policies and Procedures in Correspondent Banking* (March 2002), at www.nych.org.

- *"About The OCC, Th e OCC's Objectives*," available at http://www.occ.gov/about/what-we-do/mission/index-about.html.

- FinCEN Civil Money Penalties pertaining to the following:

  - In the Matter of Riggs Bank, NA, No. 2004-01 (May 13, 2004).

  - In the Matter of AmSouth Bank, No. 2004-02 (Oct. 12, 2004).

  - In the Matter of Banco de Chile-New York and Banco de Chile-Miami, No. 2005-03 (Oct. 12, 2005).

  - In the Matter of The New York Branch of ABN AMRO Bank, N.V., No. 2005-05 (Dec. 19, 2005).

  - In the Matter of Israel Discount Bank of New York, No. 2006-07 (Oct. 31, 2006).

  - In the Matter of American Express Bank International and American Express Travel Related Services Company, Inc., No. 2007-01 (Aug. 6, 2007).

  - In the Matter of Union Bank of California, N.A., No. 2007-02 (Sept. 17, 2007).

  - In the Matter of NY Branch United Bank for Africa, No. 2008-03 (April 28, 2008).

  - In the Matter of Wachovia Bank, No. 2010-1 (March 12, 2010).

- OCC Consent Orders pertaining to the following:

- o Federal Branch of United Bank for Africa, 2007-03 (OCC, January 19, 2007).

- o Federal Branch of United Bank for Africa, 2008-007 (OCC, Feb. 29, 2008).

- o Federal Branch of United Bank for Africa, 2008-029 (OCC, Apr. 22, 2008).

- o Federal Branch of United Bank for Africa, (OCC, April 22, 2008).

- o Riggs Bank, 2003-79, (July 16, 2003).

- o Riggs Bank, 2004-44, (May 13, 2004).

- o New York Branch of Banco de Chile, 2005-2, (OCC, Feb. 1, 2005).

- o Hernan Donoso, former general manager of the New York Branch of Banco de Chile, 2005-42, (OCC, Apr. 14, 2005).

- Deferred Prosecutions pertaining to the following:

  - o United States of America v. Wachovia Bank, N. A., U. S. District Court for the Southern District of Florida, Case No. 10-20165-CR-LENARD, March 16, 2010.

  - o United States of American v. Sigue Corp. and Sigue, L.L.C, U.S. District Court for the Eastern District of Missouri, Case No. 08 cr. 54, January 28, 2008.

E.   Other Records Produced in Litigation

- ABPLC005847-5915
- ABPLC006306-6347
- ABPLC005922-5936
- ABPLC005982-6007
- ABPLC005358-5423
- ABPLC004284-4505
- ABPLC003957-4026
- ABPLC004106-4127
- ABPLC004992-5229
- ABPLC003908-3918
- ABPLC003920-3929
- ABPLC003863-3899
- ABPLC003900-3907
- ABPLC006357-6402
- ABPLC004509-4745
- ABPLC006161-6234
- ABPLC006435-6511
- ABPLC000720-734
- ABPLC000989-999
- ABPLC001091-1104
- ABPLC001110-1112
- ABPLC001079-1090
- ABPLC001116-1118
- ABPLC001199
- ABPLC001216
- ABPLC000802-808
- ABPLC003691-3754
- ABPLC003833
- ABPLC003834-3845
- ABPLC003919

- ABPLC005786-5846
- ABPLC005916-5921
- ABPLC005923-5929
- ABPLC005930
- ABPLC005932-5936
- ABPLC006288
- ABPLC006512-6807
- ABPLC200682-200701
- ABPLC200702-200715
- ABPLC200716-200720
- ABPLC200732-200739
- ABPLC200740-200747
- ABPLC200748-200755
- ABPLC200756-200763
- ABPLC206185-206208
- ABPLC206209-206210
- ABPLC206211
- ABPLC206212-206227
- ABPLC206309
- ABPLC207333
- ABPLC207334
- ABPLC207335
- ABPLC207339-207399
- ABPLC207459
- ABPLC207461
- ABPLC000989
- ABPLC001000-1008
- ABPLC001091-1104
- ABPLC001105-1107
- ABPLC003691-3754

- ABPLC001194-1195
- ABPLC001198-1199
- ABPLC001119-1120
- ABPLC001121-1122
- ABPLC001123-1124
- ABPLC001125
- ABPLC001196-1197
- ABPLC001200-1204
- ABPLC001205-1215
- ABPLC001218-1219
- ABPLC001223
- ABPLC001225-1236
- ABPLC001237-1252
- ABPLC001374-1375
- ABPLC001405-1406
- ABPLC001419
- ABPLC001426-1427
- ABPLC001428-1433
- ABPLC001434-1435
- ABPLC001436-1437
- ABPLC001438-1439
- ABPLC001453-1454
- ABPLC001455-1456
- ABPLC002055
- ABPLC002056-2067
- ABPLC002068-2077
- ABPLC002078
- ABPLC002126-2140
- ABPLC002141
- ABPLC004508

D-5