# Exhibit 1

# DEWEY & LEBOEUF

Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019-6092

T    +1 212 259 8320
F    +1 212 649 1185
kwalsh@dl.com

January 13, 2012

**Via Electronic Delivery**

Michael Elsner, Esq.
Motley Rice
28 Bridgeside Blvd.
Mount Pleasant, SC 29465

Re: _**Linde v. Arab Bank, PLC,**_ **04 Civ. 2799 (NG)(VVP) and related cases**

Dear Mike:

I write, pursuant to Magistrate Judge Pohorelsky's Order dated December 14, 2011 (ECF No. 776), to identify additional fact witnesses that Arab Bank may call at trial. These witnesses include, but are not limited to, certain of the individuals previously identified by the Bank as expert witnesses, whose proposed expert testimony was objected to by Plaintiffs, those objections largely having been upheld by the Court in response to Plaintiffs' motions to exclude.[1]

The witnesses named below will provide factual testimony at trial, based on personal knowledge, pursuant to Federal Rule of Evidence ("FRE") 401 and, where specified, lay opinion testimony pursuant to FRE 701. Additionally, to the extent that a witness's testimony may arguably raise issues of foreign law, the Bank intends, as also noted below, to adhere to the provisions of Federal Rule of Civil Procedure 44.1.

The factual testimony described in further detail below will respond to allegations of the complaints, as specified, and substantiate the Bank's affirmative defenses. The Bank is mindful of Judge Gershon's caveat that "as this court has stated in the past, that plaintiffs made certain allegations in their complaints does not mean that they will be permitted to prove every such allegation at trial, without regard to relevance."[2]   Nonetheless, in light of Magistrate Judge Pohorelsky's instruction that the parties provide a full and final list of factual witnesses that may be called at trial, the Bank cannot reasonably be

---

[1]     Dec. 6, 2011 Order, _Linde_ ECF No. 773 (the "Dec. 6 Order").
[2]     Dec. 6 Order (citing Tr. of July 22, 2010, 14:7-14:20).

Dewey & LeBoeuf LLP is a New York limited liability partnership.

NEW YORK | LONDON | WASHINGTON, DC | ABU DHABI | ALBANY | ALMATY | BEIJING | BOSTON | BRUSSELS
CHICAGO | DOHA | DUBAI | FRANKFURT | HONG KONG | HOUSTON | JOHANNESBURG (PTY) LTD | LOS ANGELES
MADRID | MILAN | MOSCOW | PARIS | RIYADH AFFILIATED OFFICE | ROME | SAN FRANCISCO | SILICON VALLEY | WARSAW

Michael Elsner, Esq.
January 13, 2012
Page 2

expected to forego testimony intended to rebut Plaintiffs' allegations on the mere hope that the Court will at some point rule such allegations to be irrelevant. Obviously, to the extent that Judge Gershon at some future date rules that certain of Plaintiffs' allegations are irrelevant, the Bank will withdraw any previously proffered testimony intended solely to rebut evidence in support of such allegations.

In addition, we identify below witnesses who may offer testimony in support of the Bank's affirmative defenses. To make clear the relevance of the testimony to be offered by the witnesses identified below, the Bank has grouped them with reference to Plaintiffs' core allegations and the Bank's defenses and affirmative defenses with respect to those allegations.

### Plaintiffs' "Front Organization" Allegations

The Bank may call several fact witnesses to testify with regard to Plaintiffs' "front organization" theory of liability. For example, and as cited by Judge Gershon in her prior decisions, Plaintiffs allege that: [3]

- the structure of HAMAS includes charitable organizations set up by its "political wing [which] supports the so-called 'Dawa' (its social service or humanitarian component)";

- "several purported charitable organizations . . . are in fact front organizations for the terrorist organizations and act as fund-raising apparatuses that raise and launder funds to subsidize the Second Intifada and to bankroll the terrorist organizations";

- "these charitable organizations are in reality agents of HAMAS";

- it was well-known to the "Palestinian population," including Arab Bank, that these charitable organizations are HAMAS fronts;

- "the Bank knows that these organizations are fronts which support HAMAS's terrorist activities, and that the Bank's continued provision of banking services to these groups facilitates their illegal activities"; and

- "despite knowledge that they were affiliated with the various terrorist organizations, Arab Bank maintained accounts and solicited and collected funds for" these charitable organizations.

---

[3] *See, e.g., Almog v. Arab Bank PLC* ("*Almog*"), 471 F. Supp. 2d 257, 261, 290 (E.D.N.Y. 2007); *Linde v. Arab Bank PLC* ("*Linde*"), 384 F. Supp. 2d 571, 576 (E.D.N.Y. 2005); *see also Linde* Am. Compl. ("*Linde* Compl.") ¶¶ 280-82, 343-49; *Litle* [Corrected] Second Am. Compl. ("*Litle* Compl.") ¶¶ 518-24.

Michael Elsner, Esq.
January 13, 2012
Page 3

In response, Arab Bank will establish that contrary to Plaintiffs' contentions, the charities at issue were not publicly known to be fronts for Hamas, but rather were reasonably believed by the Bank to be legitimate charitable organizations addressing, in concert with reputable international aid organizations, an ongoing and severe need for aid. The Bank will also establish its reasonable reliance on the fact that all of the humanitarian charitable organizations and zakat committees at issue were operating under legal licenses issued by Palestinian and/or Israeli authorities. Specifically, the Bank will introduce evidence that:

- these charities were monitored and licensed by local governing authorities and had no apparent link to Hamas, but rather were reasonably believed to be legitimate sources of vital sustenance and other humanitarian assistance in the Palestinian Territories during the period of increased humanitarian crisis at issue;

- the international aid community, including the United States Agency for International Development and CARE International, among others, maintained cooperative relationships with charities in the Palestinian Territories and required them to open and maintain bank accounts so that international monetary assistance could be readily deposited and distributed; and

- Israel monitored and approved the humanitarian assistance at issue.

In support of these defenses, Arab Bank will introduce the following fact testimony:

o   **Brig. Gen. (ret.) Ilan Paz**

Brig. Gen. Paz, an officer of the Israeli Defense Forces ("IDF"), served as a Territorial Brigade Commander in various areas of the West Bank from 1996 through 2002. From 2002 through 2005, Brig. Gen. Paz served as the Head of the Civil Administration in the West Bank area. In this capacity, he was responsible for ensuring the security of Israel by pre-empting terrorist acts and conducting anti-terror combat operations throughout the West Bank. Brig. Gen. Paz coordinated between the IDF and the Palestinian Authority and regularly participated in security meetings with military and intelligence officers during which, as the commanding IDF officer in charge of and responsible for all matters that involved the Palestinian population in the area, he received briefings on all matters related to security. He directed, participated in or oversaw numerous military operations to apprehend individual supporters of terror-related activities

Michael Elsner, Esq.
January 13, 2012
Page 4

and to close businesses and organizations known or suspected to be involved in terror-related activities.

Brig. Gen. Paz's rational perceptions regarding the Bank, based upon his day-to-day work, will be helpful to the jury in determining whether the Bank intended to support violence. He will testify that the IDF was aware of the Bank's extensive operations in the West Bank, that it had the power to close these operations if it found that the Bank was providing support to terrorists of any sort, and that he never did so nor contemplated doing so. In addition, Brig. Gen. Paz will testify that the IDF was familiar with the operations of the West Bank charitable organizations and zakat committees at issue in these actions, that it had the power to close these organizations if it found that any were involved in the support of terrorism or served the terrorist purposes of Hamas, and that he did not do so nor did he contemplate doing so. This testimony will refute Plaintiffs' contention that charities for which the Bank held accounts were alter egos of Hamas and that the Bank was willfully blind to such relationship.

To the extent that Plaintiffs seek to introduce evidence of the seizure in February 2004 of the cash balances in certain accounts at Arab Bank's branch in Ramallah, which took place while Brig. Gen. Paz served as Head of the Civil Administration and which he took part in planning, he will testify about his personal knowledge of this event as well as how this knowledge impacts his understanding of statements later made by the IDF regarding this event.[4] Specifically, Brig. Gen. Paz will testify that this seizure was aimed at specific accountholders, not at Arab Bank. He will explain to the jury that the IDF's sole purpose was to seize and confiscate monies held in various accounts that happened to be located at the Bank, and that this seizure was not conducted in response to any information—whether regarding the accounts which were seized or in general—that the Bank or any of its employees were involved in any way whatsoever in terrorist activities, or funded terrorism.

o   **Lieut. Col. (ret.) Amir Safadi**

Lieut. Col. Safadi served in the IDF for 24 years, including as Head of the District Coordination Liaison in Ramallah, West Bank. The positions

---

[4]     With regard to the February 2004 raid, the Bank will offer in evidence the explanatory statements of the IDF in its letter dated September 2, 2009. If Plaintiffs decline to stipulate to the authenticity of this document, the Bank would expect to call for that purpose Major Harel Weinberg, the author of the letter, Oded Givone, its recipient, and Gadi Shamni, the then General Commander of the West Bank Area, who issued the February 24, 2004 Order of Seizure and on whose behalf the letter was signed.

Michael Elsner, Esq.
January 13, 2012
Page 5

held by Lieut. Col. Safadi afforded him extensive day-to-day contact with the local Palestinian authorities and population, as well as with charitable organizations and businesses operating in the West Bank. One of his primary responsibilities until 1996 was to receive, evaluate and process requests submitted by residents of the West Bank for permits to conduct various domestic businesses and civil activities. After 1996 and until 2003, Lieut. Col. Safadi was responsible for the evaluation of all requests for permits to conduct cross-border businesses and civil activities, whether submitted to him by West Bank residents directly or by the Palestinian Authority on their behalf, and for recommending their acceptance or rejection. Lieut. Col. Safadi regularly monitored financial institutions and transactions and developed extensive familiarity with the ability of Israel to monitor such conduct.

Lieut. Col. Safadi will testify about his experience evaluating and granting a request from Arab Bank in 1994 to conduct banking business in the Palestinian Territories. At the time, Lieut. Col. Safadi was Deputy Governor of the Ramallah District in the West Bank and responsible for processing the request, conducting due diligence on the Bank's planned activities, and collecting all available intelligence information necessary to evaluate whether these proposed operations would pose a security threat to Israel and its citizens. As part of his continuing responsibilities within the Civil Administration until 2004, Lieut. Col. Safadi monitored the activities of Arab Bank and permitted it to operate up to and through the relevant period.

o   **The Honorable Edward G. Abington, Jr.**

Mr. Abington served for more than thirty years in the United States Foreign Service, principally in the Middle East. Among other positions, he has served both as a Central Intelligence Agency analyst and as United States Consul General to Jerusalem.

Mr. Abington will testify with regard to international efforts to establish bank branches, including those of Arab Bank, within the Palestinian Territories to function as a central component of a strong, legitimate and trustworthy financial structure. Mr. Abington's testimony will rebut Plaintiffs' allegations that (i) "the Bank's financial and ideological support for the terrorist Intifada is a matter of public record," (ii) its "participation in diligently implementing the universal terrorist death and dismemberment insurance scheme

Michael Elsner, Esq.
January 13, 2012
Page 6

is knowing and deliberate," and (iii) "[o]ne reason for Arab Bank's willful support of the unlawful scheme was the ideology of the Bank's founders."[5]

In addition, Mr. Abington will testify as to the information he directly received, through regular meetings with officials, regarding the close cooperation between Palestinian and Israeli security agencies to prevent acts of terrorism against Israeli citizens as well as international efforts to address humanitarian need in the Palestinian Territories. He will describe his visits, as United States Consul General, to charities within the Palestinian Territories, including charities at issue, and explain that such visits did not contravene the express United States policy against dealing with Hamas, refuting Plaintiffs' allegations that these charities were well known to be fronts for Hamas. His testimony will also provide the jury with a rational context for the Bank's own understanding that the charitable transfers at issue were legitimate, which testimony is relevant to the Bank's "varying states of mind which plaintiffs must prove," Dec. 6 Order, at 2, as well as a context by which to understand that banks operating in the Palestinian Territories were subject to rigorous scrutiny designed to ensure that only legitimate banking business was conducted.[6]

**Plaintiffs' Allegations Regarding the Saudi Committee**

The Bank may also call several fact witnesses to testify with regard to Plaintiffs' many allegations regarding the Saudi Committee, including their contention that the Bank processed financial transfers initiated by the Committee with knowledge that such aid was actually intended to foster terrorism. As cited by Judge Gershon in this Court's prior decisions, Plaintiffs allege that:[7]

- "[i]n order to further encourage, incite and make possible the second *intifada* – including its campaign of systematic suicide bombings and other murderous attacks – the Kingdom of Saudi Arabia in October 2000 established the Saudi Committee . . . .";

- the Saudi Committee was "created in Saudi Arabia to raise funds to aid in the proliferation of the objectives of HAMAS";

---

[5]     *Litle* Compl. ¶¶ 425, 433; *see also Almog* First Am. Compl. (*Almog* Compl.") ¶ 38 ("since at least the mid 1990s, Arab Bank has been the preferred channel for the transfer of funds from institutional sources into the Palestinian Authority-administered territories and into the hands of terrorists, their front organizations and their dependents.")

[6]     *See Linde*, 384 F. Supp. 2d at 588 (discussing Plaintiffs' contention that "there is nothing 'routine' about the services the Bank is alleged to provide").

[7]     *See, e.g., Almog*, 471 F. Supp. 2d at 261-63); *Linde*, 384 F. Supp. 2d at 576-77, 579; *Linde* Compl. ¶¶ 306, 321; *Almog* Compl. ¶¶ 163-64; *Litle* Compl. ¶¶ 444-45, 448, 475.

Michael Elsner, Esq.
January 13, 2012
Page 7

- "the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Palestinian terror campaign and to bankroll HAMAS";

- the Saudi Committee provided "[b]enefits . . . as incentives and rewards to the terrorists, prisoners and their families . . . .";

- "Arab Bank administered the financial infrastructure by which the Saudi Committee distributed a comprehensive benefit of $5,301.06 to designated families of Palestinian 'martyrs' and those wounded or imprisoned in perpetrating terrorist attacks";

- "this financial support is a key inducement to terror[;] . . . [i]t has encouraged, incited and made possible the terror attacks of the Second Intifada";

- "Arab Bank was intimately aware of and involved with the activities of the Saudi Committee" because Arab Bank's affiliate, Arab National Bank "played a substantial role in collecting funds for the Saudi Committee";

- Arab Bank provided services to the Saudi Committee "by collecting funds, with the knowledge that such funds have been and will be used to facilitate acts intended to cause death or serious bodily injury to civilians";

- "[d]espite its knowledge that the Saudi Committee was distributing this benefit to families of 'martyrs,' Arab Bank essentially served as a 'paymaster' through its branch offices within the West Bank and the Gaza Strip";

- "there is a direct correlation between the number of attacks, including suicide bombings, and the amount of funds held by the . . . Saudi Committee[]"; and

- "[b]y knowingly and actively participating in this process, Arab Bank . . . knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000, including those that have injured, harmed or killed Plaintiffs."

In response, the Bank will establish that, contrary to Plaintiffs' contentions, the Saudi Committee was widely regarded to be a legitimate charitable response to a dire humanitarian crisis, and that the Bank's perception of

Michael Elsner, Esq.
January 13, 2012
Page 8

the Saudi Committee's legitimacy therefore was entirely reasonable. Specifically, the Bank will introduce evidence that:

- Saudi Arabia is not regarded by the United States to be a state sponsor of terrorism and has assisted the United States in its anti-terrorism efforts;

- the Saudi Committee was formed not to encourage or incite terrorism but rather at the urging of the international aid community, including the United States, to address the legitimate and critical humanitarian needs of the Palestinian population and to do so in a fully open and transparent manner; and

- contrary to Plaintiffs' allegations, terrorists, including suicide bombers, generally are not motivated by promises of financial payments, including payments to their survivors.

In support of these defenses, Arab Bank will introduce the following lay witness testimony:

o   **The Honorable David Rundell**

Mr. Rundell is a former Charge d'Affaires and Deputy Chief of Mission at the American Embassy in Riyadh. As Economic Counselor in Riyadh, Mr. Rundell worked with the Saudi Arabian Monetary Agency and the Saudi Ministry of the Interior—headed by Prince Naif, the Chairman of the Saudi Committee—to detect and deter terrorist financing. As Political Counselor, he worked with the Saudi Ministries of Interior and Foreign Affairs to detect and deter terrorist attacks, both in Saudi Arabia and abroad.

Mr. Rundell will testify about the United States government's awareness and support of charitable aid provided by Saudi Arabia, specifically with reference to the Saudi Committee. This testimony will be based on his personal knowledge and participation as a government official. Mr. Rundell will also testify that in his opinion, Saudi Arabia did not seek to incentivize suicide bombings, either through the Saudi Committee or by other means, but rather went to great efforts to combat terrorism and terror financing, efforts to which he was a direct witness.

Mr. Rundell's testimony will refute Plaintiffs allegation that "[i]n order to further encourage, incite and make possible the second *intifada* – including its campaign of systematic suicide bombings and other murderous attacks – the Kingdom of Saudi Arabia in October 2000 established the Saudi

Michael Elsner, Esq.
January 13, 2012
Page 9

Committee," *Almog* Compl. ¶ 163, and many other such statements alleged by Plaintiffs and cited by the Court.[8]  Mr. Rundell's testimony will be rationally based on his own perceptions and day-to-day experience and will be provided in a manner that will be helpful to the jury's understanding of whether the Bank knew of, or was willfully blind to, the Saudi Committee's purported support of terrorism as alleged by Plaintiffs.

   o    **Pinhas Shmilovitch**

        Mr. Shmilovitch served in the Israel Security Agency ("ISA") for 27 years.  He has held various positions in the ISA including as Head of Internal Affairs from 2001 through 2004, during which time he was responsible for the supervision of thousands of ISA interrogations of suspects, including the interrogations of suspected and thwarted suicide bombers

        The Court has repeatedly cited Plaintiffs' allegations regarding the alleged "incentivizing" nature of the Saudi Committee transfers at issue.[9]  Whether or not the Court deems the actual motivation of particular suicide bombers to be independently relevant, Mr. Shmilovitch may properly testify in direct response to Plaintiffs' allegations that the Bank has knowingly incentivized violence, information relevant to the jury's assessment of Plaintiffs' theory regarding the Bank's alleged knowing and "active participation in creating such an incentive," as well as its assessment of causation.  Dec. 6 Order, at 6 n.2 (quoting *Linde*, 384 F. Supp. 2d at 585).  Mr. Shmilovitch will testify, pursuant to FRE 701, that he saw no basis for a claim that the payments incentivized suicide bombers, or that "there is a direct correlation between the number of attacks, including suicide bombings, and the amount of funds held by the . . . Saudi Committee []."  *Almog*, 471 F. Supp. 2d at 263.

---

[8]    *E.g.*, *Linde*, 384 F. Supp. 2d at 576-77 ("the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Palestinian terror campaign and to bankroll HAMAS.")

[9]    *E.g.*, *Linde*, 384 F. Supp. 2d at 577 ("Plaintiffs allege that these payments create an incentive to engage in terrorist acts . . . ."); *id.* at 582 ("the Bank's activities in administering the death and dismemberment benefit plan created an incentive for the commission of the terrorist acts . . . ."); *id.* at 585 ("whether or not it is also a motive in any particular instance," Plaintiffs' "theory is that the death and dismemberment benefit plan, allegedly administered by Arab Bank, creates an incentive for suicide bombings . . . ."); *Almog*, 471 F. Supp. 2d at 263 ("Plaintiffs allege that the payment and promise of payment to families of 'martyrs' incentivized and encouraged potential suicide bombers."); *id.* at 292 ("whether or not it is also a motive in any particular instance," Plaintiffs' "theory is that 'martyr' benefit plan, allegedly administered by Arab Bank, created an incentive for suicide bombings . . . .").

Michael Elsner, Esq.
January 13, 2012
Page 10

**Plaintiffs' Allegations Regarding the
Bank's Purported Support of Terrorism**

Finally, the Bank may call several fact witnesses to testify with
regard to Plaintiffs' allegations that Arab Bank was a "preferred channel" for the
transfer of terrorist funds and that its conduct did not constitute the provision of
"routine banking services" because, among other things, it purportedly failed to
comply with "standards applicable to financial institutions, including Arab Bank,"
such as the following:

- provisions of the Bank Secrecy Act and related "regulations that the
  [United States] Department of Treasury has issued . . . to all financial
  institutions," *e.g.*, *Almog* Compl. ¶¶ 80, 86, 101 (Plaintiffs contend that
  such failure is evidenced by the Consent Order entered into between
  Arab Bank New York and the Office of the Comptroller of the
  Currency ("OCC") in February 2005, *id.*, ¶ 105, *Litle* Compl. ¶ 395);

- "international standards applicable to the financial services industry,"
  including recommendations issued by the Financial Action Task
  Force ("FATF") and the anti-money laundering principles established
  by the Wolfsberg Group, *e.g.*, *Almog* Compl. ¶¶ 82-85, 89-100;

- Know Your Customer ("KYC") requirements, established by the Basel
  Committee in 1998, *e.g.*, *Almog* Compl. ¶ 87-88; and

- formal designations of "Unlawful Organizations" issued by the
  government of Israel, *e.g.*, , *Litle* Compl. ¶¶ 495, 513. [10]

In response, the Bank will establish that with respect to all
transactions at issue, it was engaged in routine—not "extraordinary"—banking
services, as evidenced, for example, by its compliance with applicable regulations
in all of the jurisdictions at issue. Specifically, the Bank will introduce evidence
that:

- anti-money laundering and anti-terrorist financing regulations evolved
  throughout the relevant period of time and became applicable at
  different periods of time in the jurisdictions at issue;

---

[10]      *See also Almog* Compl. ¶ 38 ("Arab Bank has been the preferred channel for the transfer
of funds from institutional sources into the Palestinian Authority-administered territories and into
the hands of terrorists, their front organizations and their dependents."); *Linde*, 384 F. Supp. 2d at
578 ("Count Three alleges that Arab Bank provided material support to terrorists . . . by providing
'extraordinary financial and administrative services . . . .'"); *Almog*, 471 F. Supp. 2d at 291
("Nothing in the amended complaints suggests that Arab Bank is a mere unknowing conduit for
the unlawful acts of others, about whose aims the Bank is ignorant.").

Michael Elsner, Esq.
January 13, 2012
Page 11

- it complied with applicable banking regulations in each of the jurisdictions in which it operated, including the United States, Jordan, Lebanon and the Palestinian Territories;

- its compliance procedures were adequate and in conformity with, or exceeded, those of its peer institutions within the jurisdictions at issue; and

- the compliance practices employed by the Bank's Middle East branches met or exceeded the practices of other Middle Eastern banking institutions, including the leading Israeli banks.

In support of these defenses, Arab Bank will introduce the following fact testimony:

- Middle Eastern Banking Practices

  o **Stephen Timewell**

  Mr. Timewell joined The Banker, a monthly publication of the Financial Times that covers the international banking sector, in 1990 and served as Editor from 1992 through 2003 and as Editor-in-Chief from 2003 through 2008. He is presently Editor Emeritus.

  He will testify about the development and practices of the banking industry in the Middle East to establish a context in which to assess the banking and compliance practices of Arab Bank. Testimony about the Bank's practices, as compared to its peers, is relevant because it will provide a necessary context for the jury's determination as to whether the Bank intended to aid acts of terrorism or knew that it was doing so—as Plaintiffs allege—or rather intended to conduct its affairs in accordance with appropriate banking protocols and procedures—as the Bank contends, *i.e.*, "Arab Bank's state of mind."[11]

  Additionally, to the extent that the Court admits, over the Bank's objection, evidence in support of Plaintiffs' allegations regarding the reputation of the Bank, *see, e.g., Linde* Compl. ¶ 317 (alleging "Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators"), *id.*, ¶ 320 ("the ideology . . . of the Arab Bank is [not] passive or indifferent to the goals of, and means employed by, the terrorists"), Mr. Timewell will testify that Arab Bank is a

---

[11]   Dec. 6 Order, at 3. *See also Linde*, 384 F. Supp. 2d at 588 (stating that "there is nothing 'routine' about the services the Bank is alleged to provide"—allegations against which the Bank clearly is entitled to defend itself).

Michael Elsner, Esq.
January 13, 2012
Page 12

global bank with an exemplary reputation and he will explain to the jury, on the basis of his own extensive experience, his own rational perception of the forces that drive a global bank to steadfastly avoid any association with terrorist activity. Such testimony will aid the jury in weighing the credibility of Plaintiffs' allegations that Arab Bank has become a willing "preferred channel" for terrorists.

- The Bank's Compliance with Regulatory Procedures in the Palestinian Territories

  o **Dr. George T. Abed**

  Dr. Abed served as the Governor and Chairman of the Palestinian Monetary Authority ("PMA") from 2005 through 2007. Prior to his appointment to that position, Dr. Abed served as Director of the Middle East and Central Asia Department of the International Monetary Fund ("IMF") from 2002 through 2003 and as Special Advisor to the Managing Director of the IMF until July 2004.

  Dr. Abed will testify, based upon personal knowledge accrued during his time at the IMF, about the development of the banking sector in the Palestinian Territories and the involvement of the United States government and international organizations like the IMF in creating the PMA. Such evidence will establish that the Bank was subject to rigorous regulatory protocols, developed in connection with technical assistance provided by the United States and recognized authorities on best banking practices, and is thus relevant to show that if the Bank establishes that it complied with such protocols, it was engaged in "routine banking practices" as opposed to acting with the intent to aid acts of terrorism or knowledge that it was doing so. *See Linde*, 384 F. Supp. 2d at 588 ("there is nothing 'routine' about the services the Bank is alleged to provide"). Dr. Abed will also refute Plaintiffs' allegations that Arab Bank was a "preferred channel" for the transfer of terrorist funds. *See, e.g., Almog* Compl. ¶ 38.

  Dr. Abed will also testify, based on personal knowledge accrued as one of Arab Bank's regulators, about the Bank's governance standards, risk management, and compliance procedures in the Palestinian Territories. In particular, he will testify about the Bank's use of blacklists to combat money laundering and terror financing, its designation of a Compliance Officer pursuant to MENA-FATF recommendations, and its "know your customer" ("KYC") procedures. The Bank's implementation of compliance procedures and adherence to applicable regulatory requirements during the relevant time period is relevant to whether it intended to aid acts of terrorism or knew that it was doing so.

Michael Elsner, Esq.
January 13, 2012
Page 13

In addition, the Bank currently intends to give notice, pursuant to Fed. R. Civ. P. 44.1, that it intends to raise issues of Palestinian law through the testimony of Dr. Abed.  In particular, Dr. Abed would be prepared to offer testimony to the Court about the policies and procedures promulgated and applied by the PMA to prevent money laundering, terror financing, and other illicit activity, so that the Court can properly instruct the jury as to these matters.  Such instruction about the Palestinian banking sector is essential to help the jury place into context the Bank's actions and to adjudge whether the Bank intended to aid acts of terrorism or knew that it was doing so.

To the extent that the Court admits, over the Bank's objection, evidence in support of Plaintiffs' allegations regarding the reputation of the Bank's senior management, including its former chairman, Abdel Majeed Shoman, see, e.g., Linde Compl. ¶¶ 317-18, Almog Compl. ¶ 3, Dr. Abed will offer testimony to rebut these allegations, based on his personal familiarity with the individual in question.

- The Bank's Compliance with Regulatory Procedures in Jordan

    o **The Honorable Umayya Toukan**

Governor Toukan is the Minister of Finance of Jordan.  He served as the Chairman and Governor of the Central Bank of Jordan from 2001 through 2011.

Governor Toukan will testify, based on his experience as the Bank's home country regulator, about the Bank's governance standards and risk management practices, as well as the compliance procedures mandated of financial institutions in Jordan by the Central Bank.  In particular, he will testify about audits of the Bank's operations, policies, and procedures conducted by the Bank Supervision Unit of the Central Bank of Jordan.  Governor Toukan will also testify that as the Bank's home country regulator, the Central Bank received copies of examination reports from all of the jurisdictions in which the Bank operated throughout the relevant period of time, including the United States, and that at all relevant times prior to the initiation of Plaintiffs' lawsuit, the Bank received high ratings in these jurisdictions consistent with the high ratings it received in Jordan.  The Bank's implementation of compliance procedures and adherence to applicable regulatory requirements during the relevant time period is directly relevant to whether it intended, as alleged by Plaintiffs, to aid acts of terrorism or knew that it was doing so. Linde, 384 F. Supp. 2d at 588 ("there is nothing 'routine' about the services the Bank is alleged to provide").

Michael Elsner, Esq.
January 13, 2012
Page 14

To the extent that any portion of Governor Toukan's testimony may implicate issues about foreign law, the Bank will provide notice pursuant to Fed. R. Civ. P. 44.1.  In addition, to the extent that the Court admits, over the Bank's objection, evidence in support of Plaintiffs' allegations regarding the reputation of the Bank's senior management, including its former chairman, Abdel Abdel Majeed Shoman, *see*, *e.g.*, *Linde* Compl. ¶¶ 317-18, *Almog* Compl. ¶ 3, Governor Toukan will offer testimony to rebut these allegations, based on his personal familiarity with the individual in question.

Finally, to the extent that the Court, over the Bank's objection, permits Plaintiffs to present evidence concerning the OCC and FinCEN consent orders to place the Bank's compliance record at issue, Governor Toukan will testify about the Bank's compliance record in order to put those documents in perspective and to give the jury a more complete and fair narrative.

o  **The Honorable Edward W. Gnehm, Jr.**

Ambassador Gnehm served for 36 years in the United States Foreign Service, where he was a member of the Senior Foreign Service and held the rank of Career Minister.  He served as United States Ambassador to Jordan from 2001 to 2004.

To the extent that the Court admits, over the Bank's objection, evidence in support of Plaintiffs' allegations regarding the Bank's reputation, including that it "has been the preferred channel for the transfer of funds from institutional sources into the Palestinian Authority-administered territories and into the hands of terrorists, their front organizations and their dependents," *e.g.*, *Almog* Compl. ¶ 38, and the reputation of the its senior management, including its former chairman, Abdel Majeed Shoman, *e.g.*, *Linde* Compl. ¶¶ 317-18, *Almog* Compl. ¶ 3, Ambassador Gnehm will authenticate and describe a cable sent by him on November 24, 2002 to representatives of the United States State Department and the United States Treasury Department, entitled "The Arab Bank's Place in Jordan and the Region."  The communique, a copy of which is attached as Exhibit 1, states, among other conclusions, that:

> For more than seventy years, the Arab Bank has been among the most respected, and even beloved, financial institutions in the region.  Having weathered wars, political and economic unrest, closures, and nationalizations, the Bank has grown into a regional and global player in the banking sector, with a reputation as a transparent, competent, and trustworthy banker and lender.
>
> . . . .

Michael Elsner, Esq.
January 13, 2012
Page 15

> Due to its stature, as well as to the historical relationship between the founding Shoman family and the monarchy, the Arab Bank enjoys an esteemed place in Jordanian society, economically, politically, and actually, and has become the "rock" of financial institutions in Jordan – a "go to" place when times are tough, and a symbol, to Palestinians and Jordanians alike, of the "indomitable" Arab spirit.

Ambassador Gnehm's testimony will be based on his personal knowledge regarding the matters discussed in him in the cable, as well as his rational perceptions concerning Arab Bank as formed during his years as the United States Ambassador in Jordan.

- The Bank's Compliance with Regulatory Procedures in Lebanon

  o **Dr. Marwan Nsouli**

    Dr. Nsouli served as a Vice-Governor of the Central Bank of Lebanon from 1998 through 2008 where, among other duties, he was responsible for the supervision of the Central Bank's legal department.

    The Bank currently intends to give notice, pursuant to Fed. R. Civ. P. 44.1, that it intends to raise issues of Lebanese law through the testimony of Dr. Nsouli. In particular, Dr. Nsouli is prepared to offer testimony to the Court about the obligations imposed upon financial institutions by Lebanese law to report suspicious accounts, and the Bank's obligations thereafter with regard to the disposition of monies held in such accounts. Such instruction about the Bank's obligations under Lebanese law with respect to its Lebanese operations is essential to help the jury place into context the Bank's actions with regard to the closure of a specific account maintained at the Bank's al-Mazra branch, and the return of the accountholder's funds upon closure, in compliance with Lebanese law, a matter that has received considerable attention from Plaintiffs and presumably will be raised by Plaintiffs as an issue at trial.[12]

---

[12]      Transfers to and from the al-Mazra, Beirut Account, its ultimate closure, and communications between the Bank and Lebanon's Special Investigation Committee about the account have been a principal focus of Plaintiffs' deposition inquiries. *See, e.g.*, Bishara Dep. at 537-544, Nov. 13-15, 2010 (inquiring as to the Bank's freezing of the Beirut Account and related communications with the Bank's Lebanese regulators); *id.* at 551-70 (inquiring further as to the Bank's correspondence and compliance with Lebanon's Special Investigation Committee concerning the Beirut Account); Safieddine Dep. at 49-51, 178-82, 224-27, Sept. 26-27, 2007 (exhaustively examining witness concerning the Bank's maintenance of the Beirut Account, the Bank's dealings with the Special Investigation Committee, and the Bank's compliance with Lebanese banking laws); Barbar Dep. at 168-71, Dec. 13-14, 2010 (inquiring as to whether the

Michael Elsner, Esq.
January 13, 2012
Page 16

- The Bank's Compliance with Regulatory Procedures in Israel

  o **Yair Dagan**

Mr. Dagan developed the software utilized by many Israeli banks to screen financial transactions and manages a company that specializes in the prevention of money laundering and terrorist financing through the provision of services and counseling to financial institutes.

Plaintiffs have placed in issue whether the Bank should be deemed to have had knowledge of entities listed by Israel as "Unlawful Organizations."[13] Mr. Dagan's testimony, based on personal knowledge and experience, that even Israeli banks did not have ready access to or screen transactions against these lists during the relevant period of time will provide important context to the jury to judge the credibility of Plaintiffs' allegations of the Bank's purported knowledge of, or willful blindness regarding, the content of these lists, as well as the credibility of the Bank's contention that it was unaware of the content of these lists.

In addition, the Bank currently intends to give notice, pursuant to Fed. R. Civ. P. 44.1, that Mr. Dagan will offer testimony to the Court about Israeli AML and CFT laws and regulations, and the very recent implementation by Israeli banks of OFAC screening systems, so that the Court can properly instruct the jury as to the timing and content of those laws. This will provide context for the jury to determine whether the Bank's own compliance policies, and the timing of its implementation of OFAC screening and other compliance protocols were

---

Bank conducted any "analysis" of the Beirut Account leading to its closure). Plaintiffs have, moreover, questioned the Bank's witnesses about their general compliance with Lebanese banking laws. *See, e.g.*, Dabbour Dep. at 55:5-8, 302:9-18, Nov. 8-11, 2010 (inquiring as to the requirements of Lebanese banking laws and regulations and the Bank's compliance or failure to comply with those laws and regulations); Billard Dep. at 334:14-335:12, Nov. 8-9, 2007 (asking deponent whether he knew about the regulatory framework in Lebanon to protect against the anti-money laundering transactions in Lebanese banks"); *see also* Safieddine Dep. at 55:21-56:18, 65:2-66:7, Sept. 26-27, 2007 (similarly inquiring as to the Bank's compliance with Lebanese banking laws and regulations, as well as the Bank's understanding of the content of those laws and regulations).

[13]     *See, e.g.*, *Litle* Compl. at ¶ 495 ("The Tulkarem, Ramallah and Jenin Charitable Committees, the Islamic Charity Society of Hebron and Al-Tadhamun were all designated as 'Unlawful Organizations' by the government of Israel in February 2002 because of their connection to HAMAS, a fact which either was known or but for its willful blindness would have been known to Defendant Arab Bank."); *see also id.* at ¶ 513 (alleging that the Bank "has facilitated the transfer of significant sums to Tulkarem Charitable Committee, despite the fact that in some cases both the 'donor' of the funds as well as the recipient had been previously formally designated as 'Unlawful Organizations' by the government of Israel.").

Michael Elsner, Esq.
January 13, 2012
Page 17


comparable, if not superior, to, those of other financial institutions in the region within which it operated.   The Bank's implementation of such compliance procedures during the relevant time period is relevant to the jury's consideration of "Arab Bank's conduct and state of mind." Dec. 6 Order, at 3. *See also Linde*, 384 F. Supp. 2d at 588 (Arab Bank is certainly entitled to rebut the Plaintiffs' contention that "there is nothing 'routine' about the services the Bank is alleged to provide").

As soon as we are in receipt of Plaintiffs' list of additional fact witnesses, we can begin to coordinate the scheduling of depositions as directed by the Court.   Additionally, in light of the fact that the Bank has not had the benefit of prior receipt of Plaintiffs' list of additional fact witnesses due today, the Bank reserves the right to supplement its own list of fact witnesses to respond to any additional issues that may be raised by Plaintiffs' list.

Sincerely,

Kevin Walsh


Att.

cc:  All Counsel on Attached Service List

## SERVICE LIST

**BY ELECTRONIC DELIVERY:**

IN *LITLE, ET AL. V. ARAB BANK, PLC,* CV 04-5449 & *BENNETT, ET AL. V. ARAB BANK, PLC,* CV 05-3183 & *ROTH, ET AL. V. ARAB BANK, PLC, CV 05-3738 & WEISS, ET. AL. V. ARAB BANK, PLC, CV 06-1623 & JESNER, ET. AL. V. ARAB BANK, PLC, CV 06-3869*

**Liaison Counsel for *Litle, Bennett, Roth, Weiss, and Jesner* Plaintiffs:**
James P. Bonner, Esq (jbonner@lawssb.com)
STONE BONNER & ROCCO LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone: (212) 239-4340
Facsimile: (212) 239-4310

**Co-Counsel for *Litle, Bennett, Roth, Weiss, and Jesner* Plaintiffs:**
Mark S. Werbner, Esq. (mwerbner@swtriallaw.com)
SAYLES WERBNER
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone: (214) 939-8711
Facsimile: (214) 939-8787

**Co-Counsel for *Litle, Bennett, Roth, and Weiss* Plaintiffs:**
Richard D. Heideman, Esq. (rdheideman@hnklaw.com)
HEIDEMAN NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone: (202) 462-8990
Facsimile: (202) 462-8995

Steven R. Perles, Esq. (sperles@perleslaw.com)
PERLES LAW FIRM, P.C.
1146 19th Street, NW
Washington, D.C. 20036
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

**Co-Counsel for *Jesner* Plaintiffs:**
Jonathan David, Esq. (jonathan@thedavidlawfirm.com)
THE DAVID LAW FIRM, P.C.
10655 Six Pines Drive
Suite 260
The Woodlands, TX 77380
Telephone: (281) 296-9090
Facsimile: (281) 296-9494


**IN *LINDE, ET AL. v. ARAB BANK, PLC*, CV 04-2799 & *COULTER, ET AL. v. ARAB BANK, PLC*, CV 05-365**

**Liaison Counsel for *Linde* Plaintiffs; Co-counsel for the *Coulter* Plaintiffs**:
Andrew D. Friedman, Esq. (afriedman@gbgfriedman.com) *
GLANCY BINKOW & GOLDBERG LLP
430 Park Avenue, Suite 702
New York, New York 10022
Telephone: (212) 308-6300
Fax: (212) 308-6570

**Counsel for the *Coulter* Plaintiffs; Co-Counsel for *Linde* Plaintiffs:**
Gary M. Osen, Esq. (gmo@osen.us)
Peter Raven-Hansen (praven@law.gwu.edu)
OSEN LLC
2 University Plaza, Suite 201
Hackensack, NJ 07601
Telephone: (201) 265 6400

Steven M. Steingard, Esq. (ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
Facsimile: (215) 238-1968


**IN *ALMOG, ET AL. v. ARAB BANK, PLC*, CV 04-5564 & *AFRIAT-KURTZER, ET AL. V. ARAB BANK, PLC*, CV 05-388 & *LEV, ET AL. V. ARAB BANK, PLC*, CV 08-3251**

**Counsel for *Almog, Afriat-Kurtzer & Lev* Plaintiffs**
Ronald L. Motley, Esq. (rmotley@motleyrice.com)
John M. Eubanks, Esq. (jeubanks@motleyrice.com)
Michael Elsner, Esq. (melsner@motleyrice.com)
MOTLEY RICE LLC
28 Bridgeside Boulevard

P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**Counsel for *Almog & Afriat-Kurtzer* Plaintiffs**
Gaveriel Mairone, Esq.
MM~LAW LLC
Rehov HaMered 25
Trade Tower, Suite 3000
Tel-Aviv, 61501, Israel
Telephone: +972-3-517-00-88

**Co-Counsel for *Almog & Lev* Plaintiffs**
Allan Gerson, Esq. (ag@ag-il.com)
AG INTERNATIONAL LAW, PLLC
2131 S. Street NW
Washington, D.C. 20008
Telephone: (202) 234-9717

**Additional Counsel for *Almog* Plaintiffs**
Gregory P. Joseph, Esq. (gjoseph@josephnyc.com)
GREGORY P. JOSEPH LAW OFFICES LLC
805 Third Avenue
31st Floor
New York, NY 10022
Telephone: (212) 407-1200
Facsimile: (212) 407-1299

**IN *AGURENKO, ET AL. v. ARAB BANK, PLC*, CV 10-626**

**Counsel for *Agurenko* Plaintiffs**
David S. Stone (dstone@stonemagnalaw.com)
Stone & Magnanini, LLP
150 JFK Parkway
4th Floor
Short Hills, NJ 07078
973-218-1111
Fax: 973-218-1106