# Exhibit 2-B
# Abington Transcript

*COURTNEY LINDE, et al. VS.*
*ARAB BANK, PLC*

*EDWARD ABINGTON*
*March 23, 2012*
*CONFIDENTIAL*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 99887.txt*
*Min-U-Script® with Word Index*

```
 1   UNITED STATES DISTRICT COURT

 2   EASTERN DISTRICT OF NEW YORK
     ------------------------------------------X
 3   COURTNEY LINDE, et al.,

 4                        Plaintiffs,

 5        - against -

 6   ARAB BANK, PLC,

 7                        Defendant.

 8   CASE NO.: CV 04 2799
     ------------------------------------------X
 9

10        * * * C O N F I D E N T I A L * * *

11

12                        1301 Avenue of the Americas
                          New York, New York
13
                          March 23, 2012
14                        9:44 a.m.

15

16             CONTINUED VIDEOTAPED TRIAL

17   DEPOSITION of Expert Witness, EDWARD ABINGTON,

18   before Melissa Gilmore, a Notary Public of the

19   State of New York.

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24                New York, New York 10022
                       212-750-6434
25                    REF: 99887
```

```
 1            ABINGTON - CONFIDENTIAL
 2            MR. KOLKER:  Objection, calls for
 3       hearsay.
 4       A.   I do.
 5       Q.   Please tell me what you know about
 6  those activities.
 7       A.   In meetings with USAID officials and
 8  consular officials at the consulate general in
 9  Jerusalem, I asked about how these needs were
10  being met during this period of disruption, and
11  they outlined various measures that they were
12  taking, including giving additional money to
13  the World Food Program for ration distribution,
14  arrangements that they had made with zakat
15  committees also for food distribution and for
16  the distribution of health supply -- of medical
17  supplies.
18  MO        MR. KOLKER:  Objection, and I move
19       to strike his answer as based on hearsay.
20       Q.   During your tenure as consul
21  general, Mr. Abington, did you form the
22  understanding that those individuals who
23  received assistance from zakat committees
24  thought that Hamas was responsible for what
25  they were receiving?
```

```
 1                ABINGTON - CONFIDENTIAL
 2           MR. KOLKER:  Objection to leading.
 3       A.     That was not my impression at all.
 4  For example, we would have these signing
 5  ceremonies, or if food was distributed, there
 6  was the logo of the United States Agency for
 7  International Development on it.
 8                There would be signs that would be
 9  posted that a project had been funded by the
10  government of the United States through the
11  Agency for National Development.
12                So, if anything, I think that the
13  recipients of this assistance, through the
14  zakat committees, credited the United States
15  for the aid, not Hamas.
16       Q.     Are you personally familiar with the
17  al-Razi Hospital in Jenin?
18       A.     I am.
19       Q.     Do you know who runs the hospital?
20       A.     It's run by the Jenin Zakat
21  Committee.
22       Q.     Do you know, from your personal
23  experience as consul general, whether USAID
24  provided medical supplies to the al-Razi
25  Hospital?
```

```
 1                ABINGTON - CONFIDENTIAL
 2   1973 War sort of intruded on that.
 3         Q.    So you never gained any kind of
 4   fluency in Hebrew, did you?
 5         A.    No, I did not.
 6         Q.    And you remained in your post in
 7   the -- in Jerusalem until 1996, correct?
 8         A.    1997.
 9         Q.    Excuse me, 1997.
10               And when was it in that period that
11   you were transferred to -- back to the US?
12         A.    I believe I left at the beginning of
13   August of 1997.
14         Q.    All right.  Now, did there come a
15   time, in 1997, when you received a call from
16   the state department reflecting concerns about
17   your statements that you had given to a New
18   York Times reporter?
19         A.    Yes.
20         Q.    Would you tell us what happened,
21   please?
22         A.    The executive director -- I'm trying
23   to remember the precise title.
24               I will stick with the executive
25   director, although I'm not sure that's
```

```
 1              ABINGTON - CONFIDENTIAL
 2    precisely it, called me up to say that
 3    Secretary of State Albright had read a comment
 4    that I had made to a reporter concerning a
 5    leaked CIA report on Israeli settlement
 6    activity, and that she was very upset that I
 7    had made the comment and was considering
 8    whether I should stay at my post.
 9         Q.   And why was she upset that you had
10    made the comment?
11         A.   I think because -- well, first of
12    all, she was relatively new as secretary of
13    state.  She had only been in her position a
14    couple of months, and she felt strongly that
15    comments on sensitive issues, foreign policy
16    issues should be made in Washington, rather
17    than in the field, so there was no confusion.
18         Q.   And did you apologize to her for
19    having made the comment that you did?
20         A.   I did.
21         Q.   And was part of her concern, as you
22    understood it, that you were demonstrating a
23    level of -- a greater level of sympathy for the
24    Palestinian interests than was coincident with
25    the interest that the US then had?
```

1        ABINGTON - CONFIDENTIAL
2            MR. WALSH: Objection, vague.
3        A.    No, I don't think that was the case.
4    I was reflecting concern that I heard President
5    Clinton express in the oval office during a
6    meeting I attended with Chairman Arafat, and he
7    expressed concern about Israeli settlement
8    activity, and that reflected statements by
9    state department -- public statements by state
10   department officials as well.
11       Q.    As a result of the comments that you
12   heard from Secretary Albright, was there an
13   effect on your position as consul general?
14       A.    There was not.
15       Q.    When was it that you heard those
16   comments from Secretary Albright?
17       A.    I believe --
18            MR. WALSH: Objection, assumes facts
19       not in evidence.
20       A.    I believe it was in May of 1997. I
21   don't remember the precise date.
22       Q.    Okay. And then just three months
23   later, you were transferred back to Washington,
24   right?
25       A.    That's correct.

```
 1              ABINGTON - CONFIDENTIAL
 2        Q.    Okay.  When you were transferred
 3   back to Washington, what was your assignment?
 4        A.    I was assigned, with the approval
 5   of -- the specific approval of Secretary
 6   Albright, to be the number two intelligence
 7   officer in the state department, senior deputy
 8   assistant secretary for intelligence and
 9   research.
10        Q.    And did that concentrate on Middle
11   East issues or on a different menu of issues?
12        A.    It was a wide range of issues, but
13   much of our preoccupation was Iraq, as well as
14   the situation in the former Yugoslavia.
15        Q.    So is it fair to say that, from 1997
16   until you retired, which was 1999; is that
17   right?
18        A.    Yes.
19        Q.    Okay.  During that period, the focus
20   of your work was no longer concentrated on the
21   Palestinian area; is that fair to say?
22        A.    That's correct.
23        Q.    Okay.  And you were never posted to
24   Israel as a diplomat, that is to say, apart
25   from the fact that your office was located in
```

```
 1              ABINGTON - CONFIDENTIAL
 2   Jerusalem, you didn't serve as the diplomat to
 3   Israel; am I correct?
 4        A.    No, you're not correct.
 5        Q.    I'm not?
 6        A.    No.
 7        Q.    Tell me what your position was with
 8   Israel.
 9        A.    I spent three years as a political
10   officer, assigned to the US embassy in Tel
11   Aviv, from 1972 to 1975.
12        Q.    Okay.  So if we move forward from
13   1975 to the mid 1990s, when you were in the
14   position that you have testified about as
15   consul general, is it fair to say that you
16   didn't have any further diplomatic work on
17   behalf of the United States, representing the
18   United States' interests with respect to
19   Israel?
20        A.    That's not correct.
21        Q.    Tell me how you did that, then.
22        A.    I was the acting director and the
23   deputy director of the Office of Israeli and
24   Arab/Israeli Affairs from 1982 to 1985 in the
25   Department of State.
```

```
 1                ABINGTON - CONFIDENTIAL
 2        Q.    Okay.  When you left the Department
 3   of State in 1999, what did you do?
 4        A.    I joined a consulting firm in
 5   Washington, DC.
 6        Q.    And the name of that firm, please?
 7        A.    Bannerman & Associates.
 8        Q.    And what was the focus of your work
 9   at Bannerman & Associates?
10        A.    It was primarily dealing with our
11   client, the Palestinian Authority, although on
12   occasion I worked on other matters as well.
13        Q.    But the bulk of your work was on
14   behalf of the Palestinian Authority; is that
15   right?
16        A.    That's correct.
17        Q.    And what did you do for the
18   Palestinian Authority during the period you
19   were associated with Bannerman & Associates?
20        A.    I interacted with members of the
21   administration, state department and the NSC,
22   National Security Council.
23              The state department, after one
24   year.  I was subject to a cooling-off period
25   where I was not to initiate contact with state
```

```
 1                ABINGTON - CONFIDENTIAL
 2    department officials, although they could
 3    contact me.
 4              I would hold discussions about US
 5    policy and events.  I would meet with members
 6    of congress and staff and discuss the
 7    Israeli/Palestinian issue, assistance --
 8    assistance programs that were being considered
 9    by congress.
10              I would write reports of my
11    conversations and analyses to provide to
12    Palestinian officials, and I would arrange
13    schedules for visiting Palestinian officials
14    who came to Washington.
15              In general, those were the kind of
16    duties I did.
17        Q.    Fair to say you were a
18    representative of the Palestinian Authority
19    with respect to the US government during that
20    period?
21        A.    No.
22        Q.    Did you represent their interests?
23        A.    There was a PLO mission in
24    Washington that was the representative of the
25    Palestinian Authority.
```

```
 1                ABINGTON - CONFIDENTIAL
 2         Q.    Were you a lobbyist for the
 3    Palestinian Authority?
 4         A.    I was registered with the Department
 5    of Justice as a lobbyist for the Palestinian
 6    Authority, as well as for Egypt.
 7         Q.    Okay.  Let's just speak about the
 8    Palestinian Authority for a moment.
 9               You were registered as a lobbyist
10    because the law requires that registration for
11    people who have certain activities; is that
12    right?
13               MR. WALSH:  Objection, calls for a
14         legal conclusion.
15         Q.    If you know.
16         A.    These were the procedures that
17    Dr. Bannerman put in place, longstanding
18    procedures for his employees, and I registered
19    according to his procedures.
20         Q.    And you're registered as a lobbyist?
21               MR. WALSH:  Asked and answered.
22         Q.    Right?
23         A.    Correct.
24         Q.    For which of the years that you did
25    work for the Palestinian Authority?
```

```
 1              ABINGTON - CONFIDENTIAL
 2    affect your view as to whether the Saudi
 3    Committee's objectives were limited to
 4    humanitarian aid?
 5        A.    As I said, the payments appear to be
 6    made to family members of people who had been
 7    killed.
 8        Q.    So your answer to my question is
 9    what?
10        A.    Is humanitarian assistance.
11        Q.    Okay.  Do you have any knowledge of
12    what steps Arab Bank took, in the period 2000
13    to 2004, to screen accounts to determine
14    whether the beneficiaries were on any terrorist
15    list?
16              MR. WALSH:  Objection, vague.
17        A.    I don't have specific knowledge.
18        Q.    Okay.
19              MR. KOLKER:  Where are we with the
20        time?
21              THE VIDEOGRAPHER:  We have 25
22        minutes left.
23        Q.    When did you first learn of the Holy
24    Land Foundation?
25        A.    When I was serving as consul general
```

```
 1                ABINGTON - CONFIDENTIAL
 2              Do you understand what I'm referring
 3    to now?
 4         A.    I do.
 5         Q.    All right.  Are there any of these
 6    zakats that you visited during the period 2000
 7    to 2004?
 8         A.    The Nablus Zakat Committee.
 9         Q.    And are you sure you visited that or
10    you -- or that's just a maybe?
11         A.    I'm pretty sure I visited it during
12    a visit to Nablus in 2002.
13         Q.    So other than that one, okay, and
14    there are -- it looks to me like there are 12
15    on the list, does that seem about right?  You
16    can count them up.
17         A.    Let's see.  One, two, three, four --
18    actually, there are only four zakat committees
19    on this list.
20         Q.    What are the others?
21         A.    The others are -- they have a
22    different name.  They're not zakat committees,
23    according to the Arabic.
24         Q.    All right.  So what are they?
25              MR. WALSH:  Objection.
```

```
 1                 ABINGTON - CONFIDENTIAL
 2        Q.    If you know?
 3        A.    Well, I mean, I could translate the
 4   Arabic, but they are referred to as charitable
 5   societies, a women's society.  For example, a
 6   women's society is not a zakat committee.
 7        Q.    But let me ask the question a little
 8   differently, then, or in a broader way.
 9              Looking at the list of charitable
10   societies, women societies and zakats that's in
11   front of you as Exhibit 3.
12        A.    Yes.
13        Q.    Am I correct that the only one among
14   that list that you may have visited, you think
15   you visited, was the Nablus Zakat Committee?
16              MR. WALSH:  After 2000.
17        Q.    After 2000, correct.
18        A.    That is correct.
19        Q.    Okay.  And that Nablus Zakat
20   Committee, you think you may have visited
21   during a visit that you made to Nablus after --
22        A.    In 2002.
23        Q.    In 2002?
24        A.    Yes, that is right.
25        Q.    And that's the only one, right?
```

```
 1          ABINGTON - CONFIDENTIAL
 2          MR. WALSH:  Asked and answered.
 3     A.   Yes.
 4     Q.   Okay.  And do you have any knowledge
 5  of the activities of any of these committees
 6  that's based -- that's based on your personal
 7  knowledge during the period 2000 to 2004?
 8     A.   My personal knowledge in discussing
 9  with AID officials and aid contractors was
10  that --
11     Q.   No, not --
12          MR. WALSH:  No, no, don't interrupt,
13     please.
14          MR. KOLKER:  No, because I've
15     asked -- because -- well, I'm just afraid
16     that he doesn't understand the term
17     "personal knowledge."
18          Personal knowledge, as Mr. Ungar
19     defined it for him yesterday, is knowledge
20     gained from his own five senses, not from
21     what other people told him, which is
22     hearsay knowledge.
23          MR. WALSH:  I'm sorry.  You asked a
24     question.  You were in the process of
25     getting an answer before you rudely and
```

```
 1                C E R T I F I C A T E
 2
 3   STATE OF NEW YORK )
 4                    :ss
 5   COUNTY OF RICHMOND)
 6
 7            I, MELISSA GILMORE, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify:
10            That EDWARD ABINGTON, the witness
11   whose deposition is hereinbefore set forth, was
12   duly sworn by me and that such deposition is a
13   true record of the testimony given by such
14   witness.
15            I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19            IN WITNESS WHEREOF, I have hereunto
20   set my hand this 2nd day of April, 2012.
21
22
23   *Melissa Gilmore* (signature)
24   _____
25   MELISSA GILMORE
```