# Exhibit 2-D

## Abed Transcript

*COURTNEY LINDE, et al. VS.*
*ARAB BANK, PLC*

*GEORGE ABED*
*March 9, 2012*



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 99849.TXT*
Min-U-Script® with Word Index

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK
     ----------------------------------------X
3    COURTNEY LINDE, et al.,

4                        Plaintiffs,
     - against -
5
     ARAB BANK, PLC,
6
                         Defendant.
7
     CASE NO.: CV 042799
8    ----------------------------------------X
     PHILIP LITLE, et al.,
9
                         Plaintiffs,
10   - against -

11   ARAB BANK, PLC,

12                       Defendant.

13   CASE NO.: CV 045449
     ----------------------------------------X
14   (Caption continues on next page)

15
                         1301 Broadway
16                       New York, New York

17                       March 9, 2012
                         9:08 a.m.
18

19        VIDEOTAPED DEPOSITION of GEORGE ABED,

20   before Sophie Nolan, a Notary Public of the

21   State of New York.

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                     212-750-6434
25                   REF: 99849

```
1    (Caption cont'd)
     ------------------------------------------X
2    ORAN ALMOG, et al.,

3                    Plaintiffs

4        - against -

5    ARAB BANK, PLC,

6                    Defendant.

7    CASE NO.: CV 04 55647
     ------------------------------------------X
8    ROBERT L. COULTER, SR., et al.,

9                    Plaintiffs,

10       - against -

11   ARAB BANK, PLC,

12                   Defendant.

13   CASE NO.: CV 05365
     ------------------------------------------X
14   GILA AFRIAT-KURTZER, et al.,

15                   Plaintiffs,

16       - against -

17   ARAB BANK, PLC,

18                   Defendant.
     CASE NO.: CV 05 38818
19   ------------------------------------------X
     (Caption continues on next page)
20

21

22

23

24

25
```

```
1    (Caption cont'd)
     ---------------------------------------X
2    MICHAEL BENNETT, et al.,

3                   Plaintiffs,

4         - against -

5    ARAB BANK, PLC,

6                   Defendant.

7    CASE NO.: CV 053183
     ---------------------------------------X
8    VIKTORIA AGURENKO et al.,

9                   Plaintiffs,

10        - against -

11   ARAB BANK, PLC,

12        Defendant.

13   CASE NO.: CV 10 006267
     ---------------------------------------x
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   A P P E A R A N C E S:

2

3   MOTLEY RICE LLC

4   Attorneys for Plaintiff

5          28 Bridgeside Boulevard, P.O. Box 1792

6          Mt. Pleasant, South Carolina  29465

7   BY:   MICHAEL E. ELSNER, ESQ.

8          PHONE    843-216-9250

9          FAX      843-216-9450

10         E-MAIL   melsner@motleyrice.com

11

12  DEWEY & LeBOEUF LLP

13  Attorneys for Defendant Arab Bank

14         1301 Avenue of the Americas

15         New York, New York 10019-6092

16  BY:   KEVIN WALSH, ESQ.

17         JOSEPH S. ALONZO, ESQ.

18         PHONE 212-259-7153

19         FAX 212-649-1146

20         E-MAIL kwalsh@dl.com

21

22  ALSO PRESENT:

23         VINCEZO PETULA, Legal Videographer

24

25
```

5

```
1     ------------------- I N D E X -------------------
2     WITNESS                 EXAMINATION BY           PAGE
3     GEORGE ABED             MR. WALSH                   7
4
5
6     MOTIONS: + 219, 220, 220, 228
7
8
9     --------------- E X H I B I T S ---------------
10    DEFENDANT'S      DESCRIPTION             FOR I.D.
11    Exhibit 1        Protocol                     56
12    Exhibit 2        Circular                    159
13    Exhibit 3        Circular                    159
14
15
16            (EXHIBITS TO BE PRODUCED)
17
18
19
20
21
22
23
24
25
```

```
 1            P R O C E E D I N G S

 2            THE VIDEOGRAPHER:  This is tape

 3     one.  We are now on the record at 9:08

 4     a.m. on Friday, March 9, 2012.

 5            This is the deposition of George

 6     Abed in the matter of Courtney Linde et

 7     al versus Arab Bank PLC.  This deposition

 8     is being held at the offices of Dewey &

 9     LeBoeuf located at 1301 Sixth Avenue, New

10     York, New York.

11            The court reporter is Sophie Nolan

12     with Ellen Grauer Court Reporting.  I am

13     the legal videographer, Vincenzo Petula,

14     also with Ellen Grauer Court Reporting.

15            Would counsel please introduce

16     themselves.

17            MR. WALSH:  Good morning.  My name

18     is Kevin Walsh.  I represent Arab Bank

19     and the witness today, Dr. Abed and I

20     will be joined by my colleague Joseph

21     Alonzo.

22            MR. ELSNER:  My name is Michael

23     Elsner from the law firm of Motley Rice

24     on behalf of plaintiffs.  With me today

25     is Graham Maiden from my office as well
```

1        as Anjana Joshi from my office.

2                THE VIDEOGRAPHER:  Will the court

3        reporter please swear in the witness.

4  G E O R G E   A B E D, called as a witness,

5        having been first duly sworn, was

6        examined and testified as follows:

7

8  EXAMINATION BY

9  MR. WALSH:

10       Q.     Good morning.

11       A.     Good morning.

12       Q.     Please state your full name.

13       A.     George Tewfic Abed.

14       Q.     When were you born, sir?

15       A.     December 18, 1938.

16       Q.     And where were you born?

17       A.      In Jifna in the District of

18  Ramallah in what was then Palestine in 1938 and

19  it's now the West Bank.

20       Q.     Where do you live now?

21       A.      In Bethesda, Maryland.

22       Q.     Are you employed?

23       A.     Yes, I am.

24       Q.     By whom are you employed, sir?

25       A.     The Institute of International

```
1                        ABED
2        Q.    And what happened in 1985?
3        A.    I left the IMF to help establish
4  and manage a newly created humanitarian
5  foundation established in Geneva Switzerland by
6  wealthy private individuals from the Middle
7  East.
8        Q.    What was the name of that
9  organization?
10        A.    The Welfare ASSOCIATION.
11        Q.    And did you have a title at the
12  Welfare Association?
13        A.    Yes.
14        Q.    What was your title?
15        A.    I was appointed director general of
16  the Welfare Association.
17        Q.    And what were your responsibilities
18  as director general?
19        A.    As director general I would direct
20  the staff of the association and I would attend
21  all the meetings of the board of trustees and
22  the executive committee.  I would participate
23  or lead in the preparation of the agenda and
24  I'd oversee the financial activities of the
25  Welfare Association, whether administrative or
```

```
 1                          ABED
 2    in a -- in the approval process for grants
 3    requested by the beneficiary institutions.
 4           Q.     What did the Welfare Association
 5    do?
 6                  MR. ELSNER:  Objection.
 7           A.     The Welfare Association focused on
 8    providing financial support to civic societies
 9    and organizations in the Palestinian
10    territories and in Lebanon, in the Palestinian
11    community in Lebanon, to meet the education,
12    health and cultural needs of those communities.
13                  And the assistance was provided
14    through grants that followed a certain
15    procedure for them to be approved and disbursed
16    and monitored.
17           Q.     Were you familiar as director
18    general with what educational health and
19    cultural needs existed --
20           A.     Yes.
21           Q.     -- to which the Welfare Association
22    responded?
23                  MR. ELSNER:  Objection.
24           A.     Yes, I am.
25           Q.     What were those needs at the time
```

```
 1                        ABED
 2    you were director general?
 3               MR. ELSNER:  Objection.
 4          A.    I had been visiting the Palestinian
 5    territories for some time, almost every year
 6    when I was at the IMF and when I took over the
 7    Welfare Association I also visited the
 8    territories specifically to speak with
 9    community leaders and people engaged in the
10    health sector and the educational sector.  We
11    also commissioned studies on the needs of the
12    Palestinian communities.  And these studies
13    helps us formulate strategies to address these
14    needs.
15          Q.    What were those needs?
16               MR. ELSNER:  Objection.
17          A.    The needs were extensive.  The
18    needs for medicine, the need for ambulances,
19    the need for teaching material such as
20    computers.  The need for training centers to
21    employ trainers, to employ individuals that
22    would help the -- meet those needs in the
23    education and health area.
24          Q.    How did the Welfare Association
25    choose recipients of its aid?
```

1          ABED

2          A.    I visited quite a few charitable

3     organizations, both in West Bank and Gaza.

4          Q.    How often would you say?

5          A.    I would go there once or twice a

6     year for several years and occasionally I would

7     not go for a year.  My staff, as I mentioned

8     earlier, would be there fairly frequently.

9               MR. ELSNER:  Can I just make a

10              quick comment?  If you don't mind pausing

11              a quick second so I can issue my

12              objection, sir, so at the end of the day

13              we have a clean record and we're not

14              speaking over one another.  I'm sorry,

15              you may continue.

16         Q.    Are you able to tell us how many

17    charitable organizations were operating in Gaza

18    and the West Bank during your tenure as the

19    director general of the Welfare Association?

20              MR. ELSNER:  Objection.

21         A.    We made a census at one point which

22    I believe was not even complete, which

23    included, by the way, charitable organizations

24    in the Palestinian community in Israel as well

25    and the ones registered in Jerusalem and the

```
 1              ABED
 2  West Bank and Gaza and I believe that number
 3  came to well over a thousand, maybe 1,200.
 4         Q.    Do you know why there were so many?
 5              MR. ELSNER:  Objection.
 6         A.    As I mentioned earlier, the
 7  population of the West Bank and Gaza then was
 8  about 3 million.  Now it's close to 5 million.
 9  My recollection of the budget of the civil
10  administration, even in the year that I began
11  to study that in 1993 when we looked at the
12  budget of the civil administration from the
13  IMF, the total revenue was around 850 million
14  shekels which at the time was about $250
15  million and the expenditures were about the
16  same.
17              For a population of 3 million plus,
18  the budget of 250 million obviously is not
19  adequate to meet the needs of the population.
20  As a result, many communities had to raise
21  money on their own and fill the gap that was
22  left by the services of the official sector and
23  they were able to finance themselves, locally
24  plus from Palestinian expatriates and
25  international organizations outside Palestine;
```

```
 1                    ABED

 2    the central bank sets capital requirements for

 3    banks, that is the capital that's supposed to

 4    be contributed by shareholders to protect the

 5    risk -- the bank from any major risks or

 6    mishappenings.

 7              And the solvency of a bank is

 8    maintained by ensuring that there is adequate

 9    capital to address any risk that might occur.

10    If a loan goes bad, that the bank has the

11    ability from that capital and from its own

12    reserves to provision for that loan and,

13    therefore, not incur large losses.

14              When a bank loses most of its

15    capital where the level becomes inadequate to

16    support the work -- the functioning of the

17    bank, then that bank will be approaching

18    insolvency and normally it would be taken over

19    by the regulator or sent into bankruptcy.

20         Q.    Finally there's a reference in this

21    sentence to "liquidity."  Do you have any

22    understanding as to what liquidity means as

23    used in this context?

24         A.    Yes.

25              MR. ELSNER:  Objection.
```

```
 1              ABED
 2        Q.    What's your understanding?
 3              MR. ELSNER:   Objection.
 4        A.    The liquidity of banks is important
 5   because a typical banking system depends on
 6   depositors to deposit their money or lenders to
 7   lend the bank money and the liquidity requires
 8   that a bank should be able to meet its cash
 9   obligations any time these -- the owners
10   request their cash or request their funds from
11   the bank.
12              A liquid bank is one who's able to
13   meet those demands.  Let's say if depositors
14   want to withdraw their deposits or if
15   bondholders want to cash in their bonds, that
16   the bank is capable of meeting those
17   requirements from its own liquid assets, its
18   own cash.  Its own access to liquidity.
19              That bank is then liquid and it's
20   important to have the bank remain liquid and
21   all banks remain liquid to sustain the trust of
22   the population in the banking system and,
23   therefore, reinforce financial stability.
24        Q.    Let's take a look at the following
25   paragraph in section seven.  There's one
```

ABED

'98 very high rates of growth were achieved by

the Palestinian economy in the West Bank and

Gaza.

        Q.    Okay.  Did the growth of the

banking sector in the Palestinian territories

after 1993 result in any economic changes to

the Palestinian economy?

                MR. ELSNER:  Objection.

        A.    The banks were instrumental in

financing a whole range of major projects, plus

providing credit for small businesses and

enterprises.  The new electricity generation

station was built in Gaza at a cost -- I

believe it was $200 million or so.  A new

telecom system with all the infrastructure was

introduced.  A number of others building

projects were financed, housing, government

buildings, infrastructure and so on and most of

that was financed by the banking system.

        Q.    Did the development of the banking

sector after 1993 influence the economic

behavior of the people who lived in Gaza and

the West Bank?

                MR. ELSNER:  Objection.

1                        ABED

2          A.     '94 to '96 I believe the first two

3   or three years of the development was a period

4   of rising standards of living, of high rates of

5   growth, of open exchange with Israel, tens of

6   thousands of workers from the Gaza Strip and

7   from the West Bank worked in Israel on a daily

8   basis, trade with Jordan was open to a larger

9   extent than before and investment money came

10  in, donor money came in so it was, economically

11  at least, a very promising period, yes.

12         Q.     Had you have heard the phrase, cash

13  economy, at any time, Dr. Abed?

14         A.     Yes, we use it a lot in our work as

15  economists.

16         Q.     What does that phrase mean to you?

17                MR. ELSNER:   Objection.

18         A.     Cash economy is when the population

19  and businesses in any particular country rely

20  mostly on cash to effect payments and to pay

21  for transactions, small or big, avoiding the

22  use of banks, let's call it.

23                If the preponderance --

24  preponderance of transactions are settled in

25  cash rather than through the banking system,

ABED

that would be characterized as predominantly a

cash economy.

      Q.   Would you characterize the economy

of the Palestinian territories before the

creation of the Palestinian Authority as a cash

economy?

            MR. ELSNER:  Objection.

      A.   By and large, yes, because there

were only, I believe, 30 or 40 branches of the

Israeli banks in the territories serving more

than 3 million people.  Money changers were

active who dealt in cash.

      Q.   What's a money changer, by the way?

            MR. ELSNER:  Objection.

      A.   A money changer in the

territories -- sorry, a money changer in the

territories would be one who provides

particular currency in exchange for another

currency.  Because we had, in the Palestinian

territories, at least four currencies in

circulation or at least three, I should say,

the shekel, the dinar and the dollar, money

changers did good business and that was all

cash.

```
 1                    ABED
 2    I think you mentioned that you did a moment
 3    ago.
 4              MR. ELSNER:  Objection.
 5         A.    The bank supervision and other
 6    matters that were concerned -- of concern to
 7    the PMA, his efforts to establish a payment
 8    system.  He had a working group on a payment
 9    system.  He, I believe, was expecting an expert
10    from the Bank of England, et cetera, et cetera.
11              I mean, some things as to what he
12    was doing at the PMA essentially.  That was the
13    purpose of my visit; to sort of get a briefing
14    from him on the technical assistance, on the
15    IMF work with the PMA and the present
16    conditions for the work of the PMA in a very
17    difficult, conflicted situation.
18         Q.    Have you heard, in your years at
19    the IMF and the PMA, the word "compliance"
20    used?
21         A.    Yes.
22         Q.    Does compliance, to your knowledge,
23    have a particular meaning when used in
24    connection with the banking industry?
25              MR. ELSNER:  Objection.
```

```
 1                         ABED
 2         A.     Yes.
 3         Q.     What does it mean to you?
 4                MR. ELSNER:  Objection.
 5         Q.     In that context?
 6                MR. ELSNER:  Objection.
 7         A.     Compliance is governed by rules and
 8  regulations that raise expectations of the
 9  bank's behavior and the bank's conduct.
10  Foremost among these are what we call know your
11  customer, KYC, which requires banks to
12  ascertain not just the identity of the person
13  or persons or business or organizations opening
14  an account with a bank or transacting with the
15  bank, but also the purpose of having an
16  account, the lack of -- the absence of any
17  encumberments to opening an account.
18                For example, if the purpose or the
19  firm or the business has any criminal record or
20  has been in violation of laws or has been
21  convicted of a crime, the bank is required to
22  ensure that individuals or businesses
23  transacting with the bank are proper, are
24  within the law, have a business establishment
25  if they're a business.  They conduct legitimate
```

ABED

1
2  business.   They have full disclosure of their

3  operations to the bank and they provide

4  references, all kinds of identification

5  requirements and so on.

6          The know your customer procedures,

7  KYC, are an important element of the compliance

8  program.   There are also compliance

9  requirements with respect to corporate

10  governance, with respect to signature authority

11  and a number of other regulations that banks

12  are supposed to adhere to.

13      Q.    During your meeting with governor

14  Haddad when you were director of the Middle

15  Eastern Department, did you discuss with him

16  whether the PMA had systems in place to ensure

17  that the banks it regulated were compliant with

18  the requirements made of them?

19          MR. ELSNER:   Objection.

20      A.    Yes, I did.

21      Q.    Did he tell you anything about what

22  systems, if any, the PMA had with respect to

23  compliance?

24      A.    Yes, for example -- well, the know

25  your customer was in place.   And they had a

```
 1                   ABED
 2    Exchange and a few others I don't recall.
 3             We debated the membership
 4    extensively when I, as governor, was working on
 5    the draft with my colleagues and with experts.
 6    The list is there in the law and it's available
 7    to the public.
 8         Q.    Why, if you know, was a separate
 9    committee on anti-money laundering created in
10    2007?
11             MR. ELSNER:  Objection.
12         A.    I think it was confirmation of the
13    PMA and the national authority generally to
14    give special importance to preserving the
15    integrity of the banking system and to
16    combatting any illicit or illegal use of the
17    banking system for money laundering or for
18    financing of criminal activities.
19         Q.    You told us that an anti-money
20    laundering law was passed in 2005.  We looked a
21    moment ago at Exhibit 2 dated 2001 which
22    referenced efforts by the PMA to combat money
23    laundering.
24             Why, if you know, was a law needed
25    with respect to the subject of anti-money
```

```
 1                       ABED
 2    laundering?
 3              MR. ELSNER:  Objection.
 4        A.    A law was needed to give full
 5    authority to the task of anti-money laundering.
 6    It was to give greater independence and
 7    autonomy to a national body responsible for
 8    that and it was to give the capacity and the
 9    means to the staff of that committee to carry
10    out the functions more comprehensively, to
11    coordinate with other ministries more fully and
12    to cover the field of anti-money laundering
13    more comprehensively, I would say, than was
14    being done by the FFU until then.
15        Q.    Were you involved in any way in
16    either the drafting or the passage of the
17    anti-money laundering law?
18        A.    Yes, I initiated the effort.  I
19    inquired as to who could provide assistance to
20    us in this area.  I spoke with representatives
21    of the U.S. consulate, the British consulate
22    and with the IMF and in the end we did receive
23    a mission possibly late 2005, I don't recall,
24    consisting of a legal expert from the IMF and
25    an anti-money laundering, anti-terrorist
```

ABED

financing expert from the U.K. who worked with me and with the FFU to agree on the basic concepts behind the law and to start drafting articles of the law, and I was involved intimately in all of these discussions.

Q.    Did you, for want of a better word, spearhead that initiative to procure passage of the anti-money laundering law?

A.    I would say yes.  I don't want to take too much credit for myself, but it was one of my projects.

Q.    And did you encounter any resistance in attempting to secure the enactment of this law?

A.    No.  I found the banks very cooperative.  We found officials in the Palestinian Authority cooperative and specifically we held two outreach events. These are public events where we invited a large number of businessman and women, heads of banks, others in the private sector as well as officials who might be involved in this effort. It was an open meeting.  We had over 100, 150 people.

```
 1                    ABED

 2   system.

 3              They would check the names against

 4   the lists that were at their disposal.  These

 5   would be the U.S. OFAC list, the UN Security

 6   Council list and other lists that banking

 7   systems around the world use for designated

 8   individuals or organizations.

 9         Q.    Now, you became governor in 2005;

10   correct?

11         A.    Correct.

12         Q.    How do you know, as you just

13   testified, that this screening requirement of

14   banks was in place before your arrival?

15         A.    I don't have personal knowledge

16   that they were there, but when I was there they

17   already were installed so I presume at least

18   five minutes before I arrived they were there.

19         Q.    And what was the OFAC list to which

20   you referred a moment ago?

21               MR. ELSNER:  Objection.

22         A.    This is a list developed and

23   published by the Office of Foreign Assets

24   Control designating individuals, organizations,

25   businesses with which U.S. banks were
```

1                           ABED

2          A.      It came to my attention.  The

3    letter of transmission was signed by me.

4          Q.      Did you have the opportunity,

5    Dr. Abed, to familiarize yourself while

6    governor of the PMA with the risk management

7    practices of Arab Bank?

8                  MR. ELSNER:  Objection.

9          A.      Yes.

10         Q.      What, by the way, does that phrase

11   "risk management practices" mean to you?

12                 MR. ELSNER:  Objection.

13         A.      Risk management practices are the

14   practices followed by different business units

15   within the bank whether it is treasury, human

16   resources, developing compensation systems, the

17   department providing credit to corporates or to

18   individuals, the departments overseeing the

19   credit cards management or financing.

20                 All of these business units must

21   have in place, according to a, let's say, risk

22   management system, must have in place

23   procedures to protect the bank's assets against

24   possible risk that might arise.

25                 Now, not protecting the operation

```
1                        ABED
2    as against all risk, but that risk to the
3    extent it's taken should be measured and should
4    be matched by your reward that exceeds the
5    risk.  So it's balancing the risks and rewards
6    of all bank operations, all bank transactions,
7    all bank trades, but at the same time staying
8    within a -- the broad limits set by the board
9    and by management.
10          Q.    What conclusions, if any, did you
11   reach about the risk management practices of
12   Arab Bank during your tenure as governor?
13          MR. ELSNER:  Objection.
14          A.    It was fairly robust.  I knew about
15   the risk management at headquarters in Amman.
16   There was a group risk officer, chief risk
17   officer, who I think was recruited from abroad
18   around the time before I got there whom I met
19   when I visited the Arab Bank in Amman when I
20   was governor and he told me somewhat about the
21   risk management that had been put in place.
22               I later got to know him much better
23   through the IIF.  He has been one of our, what
24   should I say, main speakers at conferences that
25   we hold, regional conferences at the IIF.
```

ABED

1

2   of management of the Arab Bank during the

3   period when I was not governor; although, as I

4   say, all indications point to fairly competent

5   management.

6          Q.    Was it of concern to you, Dr. Abed,

7   as governor of the PMA if a bank, subject to

8   your supervision, was involved in the financing

9   of terrorist activities?

10         A.    It would be of great concern, yes.

11         Q.    Why was it a matter of great

12  concern to you?

13              MR. ELSNER:   Objection.

14         A.    It would violate the integrity of

15  the banking system and would undermine the

16  stability of the banking system.  It would be a

17  source of serious objection and condemnation on

18  the part of the PMA.

19         Q.    Have you heard of an organization

20  named HAMAS, Dr. Abed?

21         A.    Yes.

22         Q.    Do you consider HAMAS to be a

23  terrorist organization?

24         A.    Yes.

25         Q.    During your tenure as governor did

```
 1                      ABED
 2    you communicate anything to the banking
 3    community in the Palestinian territories about
 4    dealings with HAMAS?
 5              MR. ELSNER:  Objection.
 6         A.    Yes.  In the implementation of
 7    regulations governing the registration and bank
 8    transactions with charities, none of the
 9    charities had the HAMAS name on them.  To the
10    extent any were listed on some kind of a list
11    like an OFAC list for being affiliated with
12    HAMAS, these charities were prevented from
13    dealing with the banking system.
14              When HAMAS list in 2006, the HAMAS
15    list, won the plurality of the elections or the
16    majority, I'm not sure, and formed the
17    government, then I as governor instructed the
18    banks not to transact with any official
19    appointed to that government or anyone elected
20    on the HAMAS list in the legislature.
21              So we -- these are some of the
22    measures we took and continued to maintain that
23    position through 2006 and 2007.
24         Q.    And just for clarity sake,
25    Dr. Abed, when you refer to the HAMAS list as
```

ABED

1

2    you just did, you're referring to the electoral

3    slate that ran in the Palestinian territories

4    in 2006; is that right?

5          A.     Yes, the election in 2006.

6          Q.     How did you communicate to the

7    banks the information you've just described to

8    them; that they were prohibited from dealing

9    with HAMAS or individuals elected on the HAMAS

10   electoral slate?

11               MR. ELSNER:   Objection.

12         A.     In person, at a meeting of the

13   heads of all banks.  Banks themselves had

14   already been quite cautious and some, before I

15   even could meet with them, had already frozen

16   the accounts that, let's say, the minister of

17   finance would have access to or --

18         Q.     And you're referring to government

19   accounts of the Palestinian Authority?

20         A.     Yes, government accounts of

21   Palestinian or individuals who were elected on

22   the election list of HAMAS to the legislature.

23   Banks were already taking measures to freeze

24   those accounts.  And I, in my meeting with them

25   shortly after the election, emphasized to them

```
 1                      ABED

 2   the fact that they could not do this and if

 3   they did, they would be sanctioned.  And this

 4   was understood by everybody and, in fact, put

 5   into effect.

 6          Q.    What, if anything, did the PMA do

 7   during your tenure as governor to detect

 8   whether the banks it regulated were involved in

 9   terror financing?

10                MR. ELSNER:  Objection.

11          A.    Well, I think the system in place

12   that I described earlier in terms of

13   compliance, the inspections, the stream of data

14   that came to the Bank Supervision Department,

15   conversations with bank officers, visits to the

16   bank branches by qualified inspectors convinced

17   me that banks during my tenure and according to

18   all the information I have did not engage in

19   the financing of terrorism or any other

20   criminal activity.

21          Q.    What did the PMA do if it found

22   that a bank was engaged in terror financing?

23                MR. ELSNER:  Objection.

24          A.    It would be violating one or more

25   of the PMA instructions and would be told
```

```
 1                      ABED
 2        Q.    Let me rephrase it.  It was a
 3   cumbersome question, Dr. Abed.
 4              Did any of the U.S. authorities
 5   with whom you met ask you as governor of the
 6   PMA to do anything specific with regard to the
 7   prevention of terror financing?
 8              MR. ELSNER:  Objection.
 9        A.    No.  As I said, I received no
10   specific information that on the basis of which
11   I could act against any of the banks on any
12   specific transaction or activity.
13        Q.    Had you been provided with such
14   information, what would you have done?
15              MR. ELSNER:  Objection,
16        speculation, relevance.
17        A.    I would use existing regulations
18   and laws to intervene.
19        Q.    Okay.  Have you ever met an
20   individual name Abdul Majeed Shoman, Dr. Abed?
21        A.    Yes.
22        Q.    Who was he?
23        A.    He was chairman of the Arab Bank
24   for many years.  He was also, during the time I
25   was with Welfare Association, chairman of the
```

1                          ABED

2    board of trustees of the Welfare Association.

3         Q.    And how frequent were your dealings

4    with him?

5         A.    From '85 to '93 when I was director

6    general of the Welfare Association, I would see

7    him at meetings and occasional visits to Amman

8    to his office about five or six times a year.

9         Q.    How well would you say you knew

10   him?

11        A.    I knew him fairly well from what I

12   knew at the time.  He was older than I was and

13   I honestly did not know much about his earlier

14   life, so he's not the person I could say I grew

15   up with and know all about him.  I knew him

16   only from the late '70s when I met him with

17   very infrequent contacts until I went to manage

18   the Welfare Association.  After I left the

19   Welfare Association, I would see him once or

20   twice a year, usually in the company of others.

21        Q.    What impressions did you form of

22   him?

23             MR. ELSNER:  Objection.

24        A.    He was well-known and confirmed to

25   me through personal relations and working

*COURTNEY LINDE, et al. VS.*
*ARAB BANK, PLC*

---

*GEORGE ABED*
*April 27, 2012*

---



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 100256.TXT*
*Min-U-Script® with Word Index*

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF NEW YORK
   ----------------------------------------X
3  COURTNEY LINDE, et al.,

4                         Plaintiffs,
   - against -
5
   ARAB BANK, PLC,
6
                         Defendant.
7
   CASE NO.: CV 042799
8  ----------------------------------------X
   PHILIP LITLE, et al.,
9
                         Plaintiffs,
10 - against -

11 ARAB BANK, PLC,

12                        Defendant.

13 CASE NO.: CV 045449
   ----------------------------------------X
14 (Caption continues on next page)

15
                         1301 Broadway
16                       New York, New York

17                       April 27, 2012
                         9:35 a.m.
18

19         Videotaped Deposition of GEORGE

20 ABED, before Shari Cohen, a Notary Public

21 of the State of New York.

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24            New York, New York 10022
                   212-750-6434
25                  REF: 100256

```
 1   (Caption cont'd)
     ----------------------------------------X
 2   ORAN ALMOG, et al.,

 3                Plaintiffs

 4       - against -

 5   ARAB BANK, PLC,

 6                Defendant.

 7   CASE NO.: CV 04 55647
     ----------------------------------------X
 8   ROBERT L. COULTER, SR., et al.,

 9                Plaintiffs,

10       - against -

11   ARAB BANK, PLC,

12                Defendant.

13   CASE NO.: CV 05365
     ----------------------------------------X
14   GILA AFRIAT-KURTZER, et al.,

15                Plaintiffs,

16       - against -

17   ARAB BANK, PLC,

18                Defendant.
     CASE NO.: CV 05 38818
19   ----------------------------------------X
     (Caption continues on next page)
20

21

22

23

24

25
```

```
1    (Caption cont'd)
     ----------------------------------------X
2    MICHAEL BENNETT, et al.,

3                  Plaintiffs,

4         - against -

5    ARAB BANK, PLC,

6                  Defendant.

7    CASE NO.: CV 053183
     ----------------------------------------X
8    VIKTORIA AGURENKO et al.,

9                  Plaintiffs,

10        - against -

11   ARAB BANK, PLC,

12        Defendant.

13   CASE NO.: CV 10 006267
     ----------------------------------------x
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1   A P P E A R A N C E S:

2


3   MOTLEY RICE LLC

4   Attorneys for Plaintiff

5        28 Bridgeside Boulevard, P.O. Box 1792

6        Mt. Pleasant, South Carolina  29465

7   BY:   MICHAEL E. ELSNER, ESQ.

8         PHONE   843-216-9250

9         FAX     843-216-9450

10        E-MAIL   melsner@motleyrice.com

11

12  DEWEY & LeBOEUF LLP

13  Attorneys for Defendant Arab Bank

14        1301 Avenue of the Americas

15        New York, New York 10019-6092

16  BY:   KEVIN WALSH, ESQ.

17        JOSEPH S. ALONZO, ESQ.

18        PHONE 212-259-7153

19        FAX 212-649-1146

20        E-MAIL kwalsh@dl.com

21

22

23  ALSO PRESENT:

24  GEOFF BOWLER, Legal Videographer

25  ANJANA JOSHI
```

```
 1    ------------------- I N D E X -------------------
 2    WITNESS                 EXAMINATION BY        PAGE
 3    GEORGE ABED             MR. ELSNER          247, 437
 4                            MR. WALSH              404
 5
 6
 7    --------------- E X H I B I T S ----------------
 8    ABED              DESCRIPTION            FOR I.D.
 9    Exhibit 4         Evaluation               267
10    Exhibit 5         Document                 277
11    Exhibit 6         Document                 289
12    Exhibit 7         Deposition Transcript    298
13    Exhibit 8         Document                 300
14    Exhibit 9         Document                 303
15    Exhibit 10        Document                 308
16    Exhibit 11        Pakestine Monetary       315
17                      Authority Final Report
18    Exhibit 12        Document                 339
19    Exhibit 13        Payment                  341
20    Exhibit 14        Payment                  349
21    Exhibit 15        Photograph               356
22    Exhibit 16        Photograph               358
23    Exhibit 17        Wire Transfer            358
24    Exhibit 18        Document                 363
25    Exhibit 19        Document                 368
```

```
 1    ------------ E X H I B I T S (Cont'd)------------

 2    ABED                 DESCRIPTION               FOR I.D.

 3    Exhibit 20           Document                     395

 4    Exhibit 21           Document                     397

 5    Exhibit 22           Document                     402

 6    Exhibit 23           Document                     437

 7

 8

 9         (EXHIBITS RETAINED BY COURT REPORTER)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        S T I P U L A T I O N S

2

3          IT IS HEREBY STIPULATED AND AGREED by

4    and between the attorneys for the respective

5    parties herein, that the filing, and sealing

6    of the within deposition be waived.

7          IT IS FURTHER STIPULATED AND AGREED

8    that all objections, except as to the form of

9    the question, shall be reserved to the time

10   of the trial.

11         IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn to

13   and signed before any officer authorized to

14   administer an oath with the same force and

15   effect as if signed and sworn to before the

16   Court.

17

18

19                    -oOo-

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER: This is tape

3     one.   We are now on the record at 9:34

4     a.m., Friday, April 27, 2012.   This is

5     the continuation of the deposition of

6     George Abed in the matter of Linde, et

7     al. verses Arab Bank.

8              This deposition is being held

9     at the offices of Dewey & LeBoeuf

10    located at 1301 Avenue of the

11    Americas, New York, New York.

12             The court reporter is Shari

13    Cohen with Ellen Grauer Court

14    Reporting.   I'm the legal videographer

15    Geoff Bowler also with Ellen Grauer

16    Court Reporting.   Will counsel please

17    introduce themselves.

18             MR. ELSNER: Michael Elsner on

19    behalf of the plaintiffs. With me

20    today is Anjana Joshi from my office.

21             MR. WALSH: Kevin Walsh on

22    behalf of Arab Bank and the witness

23    Dr. Abed. I'm joined by my colleague

24    Joseph Alonzo.

25             THE VIDEOGRAPHER: Will the

```
1              court reporter please swear in the
2              witness.
3    G E O R G E   A B E D, called as a witness,
4              having been duly sworn by the Notary
5              Public, was examined and testified as
6              follows:
7
8    EXAMINATION BY
9    MR. ELSNER:
10             Q.    Good morning.
11             A.    Good morning.
12             Q.    Mr. Abed, you've never worked
13   in a retail bank, have you?
14             A.    No.
15             Q.    You would not call yourself a
16   banker, would you?
17             A.    No.
18             Q.    You are an economist, right?
19             A.    By training.
20             Q.    You have a degree in economics?
21             A.    Yes.
22             Q.    You've taught the subject?
23             A.    Yes.
24             Q.    You worked as an economist for
25   21 years for the International Monetary Fund?
```

```
 1                      ABED
 2   system.
 3               MR. ELSNER: Objection, move to
 4        strike after directly.
 5        Q.    While working at the IMF
 6   through July of 2004 you never personally
 7   reviewed Arab Bank's compliance system, did
 8   you?
 9               MR. WALSH: Objection.
10        A.    I personally received reports
11   about the development of the banking system.
12   I was in touch with experts with our resident
13   representatives.  I was familiar with what
14   compliance procedures the banks were
15   introducing, what risk management procedures
16   they were introducing.  I remained familiar
17   with what is happening in the banking system
18   in the West Bank and Gaza.
19               MR. ELSNER: Objection, move to
20        strike.
21        Q.    You personally never reviewed
22   Arab Bank's specific compliance system, did
23   you?
24               MR. WALSH: Asked and answered.
25        A.    I did not.
```

ABED

1

2      Q.     Prior to 2004, right?

3      A.     Yes.

4      Q.     From 2000 to 2004 you did not

5   review any Arab Bank's account records, did

6   you?

7      A.     No, I did not.

8      Q.     Aside from on this trip in late

9   2002 or 2003 where you met the former Prime

10  Minister, you also testified that you met

11  with the governor of the PMA; is that right?

12     A.     Yes.

13     Q.     What was his name?

14     A.     Amin Haddad.

15     Q.     Are you aware that Governor

16  Haddad was actually fired by the Palestinian

17  Legislative Council?

18            MR. WALSH: Objection,

19       foundation.

20     A.     He was not fired that I know

21  of.

22     Q.     Are you aware that there was a

23  report prepared by the legislature in the

24  Palestinian territories on corruption

25  mismanagement in 2004?

```
1                        ABED
2    the manual by which the bank supervision
3    department operated.
4         Q.    You became the governor and
5    chairman of the board of the Palestinian
6    Monetary Authority on April 2, 2005; is that
7    right?
8         A.    Correct.
9         Q.    That was after the intifada had
10   ended in 2004, correct?
11        A.    Correct.
12             MR. WALSH: Move to strike.
13        Q.    Any information you obtained
14   about Arab Bank's compliance system prior to
15   your arrive in 2005 was information that was
16   told to you by somebody else or that you read
17   from a report that someone else prepared,
18   correct?
19        A.    That's correct.
20        Q.    You didn't have personal
21   involvement in Arab Bank's compliance issues
22   prior to 2005, correct?
23             MR. WALSH: Objection.
24        A.    I believe I testified about my
25   different contacts at the Arab Bank that
```

```
                         ABED
 1
 2   Intifada Fund, did I read that correctly?
 3              MR. WALSH: Objection, hearsay,
 4         foundation.
 5         A.    Yes, you read what's in the
 6   document correctly.
 7         Q.    The document also says your
 8   donations are being received at various
 9   branches of the Arab Bank in the Hashimite
10   Kingdom of Jordan, correct?
11              MR. WALSH: Objection, hearsay,
12         foundation.
13         A.    That's what this document reads
14   in English, yes.
15         Q.    Were you aware, sir, that the
16   Welfare Association was collecting donations
17   for the Al-Aqsa Intifada Fund?
18              MR. WALSH: Objection, hearsay,
19         foundation.
20         Q.    Through Arab Bank branches?
21              MR. WALSH: Same objection.
22         A.    I was not engaged with the
23   Welfare Association in 2000. I was not aware
24   and this is what this advertisement says,
25   then one would have to look into the details
```

```
 1                          ABED
 2    of this.  I'm not sure exactly what the
 3    circumstances leading to this and how the
 4    money was raised if the money was raised and
 5    where it went and so I cannot make any
 6    judgment about that.
 7              MR. WALSH: Move to strike.
 8              MR. ELSNER: Thank you, sir. I
 9        have no further questions.
10              MR. WALSH: Let's take two
11        minutes.
12              THE VIDEOGRAPHER: We are now
13        off the record at 2:23 p.m.
14              (Recess taken.)
15              THE VIDEOGRAPHER: We are now
16        on the record at 2:28 p.m., April 27,
17        2012.
18    EXAMINATION BY
19    MR. WALSH:
20        Q.   Good afternoon, Dr. Abed. I
21    have just a few additional questions for you.
22    Earlier today Mr. Elsner showed you Exhibit 5
23    and I'd like you to place that document
24    before you.  It's the document with the
25    heading centralbanking.com.  Do you have
```