

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
www.dlapiper.com

Shand S. Stephens
shand.stephens@dlapiper.com
T   212.335.4594

August 14, 2013
VIA ECF

The Hon. Brian M. Cogan, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: *Linde, et al. v. Arab Bank, PLC*, No. 04-CV-2799 (BMC) (VVP) *and related cases*

Dear Judge Cogan:

  We represent Arab Bank plc ("Arab Bank" or the "Bank") and write in response to Plaintiffs' letter of August 7, 2012 ("Aug. 7 Ltr.") in support of their motions *in limine* to exclude certain fact and expert testimony and their request for permission to introduce evidence relating to consent orders entered into between the Bank's New York branch and the OCC and FinCEN.  For the reasons stated herein, the fact and expert testimony that Plaintiffs seek to exclude is qualified, highly relevant and not foreclosed by prior orders of this Court.  Nor have Plaintiffs offered any credible basis, or established any need, to introduce administrative consent orders; this type of evidence is routinely excluded by courts as a settlement (Fed. R. Evid. 408), and because of its low probative value and considerable prejudicial effect.

**I. The Bank's Fact Witnesses Offer Relevant Testimony.**

  The fact testimony that the Bank seeks to introduce is not "irrelevant," "character" or "hearsay" evidence, as the Plaintiffs' contend.  Aug. 7 Ltr. at 1-8.  In addition to its general relevance, this testimony responds to the following allegations that the Plaintiffs will attempt to prove at trial through testimony offered by Matthew Levitt, Arieh Dan Spitzen, Ronni Shaked, and Nelson Everhardt:

- Palestinian charities, including the Nablus Zakat Committee, Ramallah – Al-Bireh Zakat Committee, Tulkarem Zakat Committee, Jenin Zakat Committee, Al-Islah Charitable Society – Ramallah & Al-Bireh, and the Islamic Charitable Society – Hebron, were part of a "*da'wa*" social infrastructure that operated as a well-known "front" for Hamas during the relevant time period.  See Levitt Rpt. at 4-101, Spitzen Rpt. at 1-204.

- The Saudi Committee was established by Royal Decree of the Kingdom of Saudi Arabia on 16 October 2000 to serve "the goals of Hamas and to support its affiliated organizations."  *See* Spitzen Rpt. 207-274.

- Saudi Committee payments "provide[d] a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of 'popular resistance.'"  *See, e.g.*, *Linde* Am. Compl. ¶¶ 304, 316; Shaked Rpt. at 25-26; Spitzen Rpt. at 26.



August 14, 2013
Page Two

- The Muslim Brotherhood and Hamas have been permitted to operate freely by the Jordanian government, and the Jordanian press promoted the activities of the Saudi Committee. *See, e.g.*, Spitzen Rpt. 13-16, 23, 225-56.

- Common industry practice during the relevant time period was for banks operating across multiple jurisdictions to adopt the most stringent regulations promulgated by any of its regulators as the policy for its global operations. *See, e.g.*, Everhardt Rpt. at 26.

Using testimony from Levitt, Spitzen, Shaked and Everhardt, Plaintiffs will seek to establish that it is reasonable for a juror to infer that: (1) the Bank knew of, or was willfully blind to, the status of Palestinian zakat committees and charities as Hamas "fronts"; (2) payments initiated by the Saudi Committee were a substantial and foreseeable cause of suicide bombings and other acts of terrorism; (3) a Jordanian bank, such as Arab Bank, would not have a problem supporting Hamas because such support is viewed favorably by Jordan; and (4) the absence of OFAC screening at the Bank's foreign branches prior to 2004 is evidence of the Bank's willful blindness to terrorism financing.

Each of the Bank's witnesses offers fact testimony that responds to the assertions of Plaintiffs' witnesses, and each more than adequately satisfies the test for relevancy.[1] Moreover, testimony that provides relevant context is not "character" evidence, as Plaintiffs' attempt to argue;[2] nor is testimony based on first-hand observation "hearsay." In any event, these motions are premature; any decision as to the relevance of the Bank's fact witnesses should await questioning at trial and the presentation of Plaintiffs' case-in-chief.[3]

### A.     The Hon. Edward M. Abington

Ambassador Abington served as the United States Consul General in Jerusalem from 1993 to 1997. He will testify about his numerous visits to zakat committees and other charitable organizations in the West Bank and Gaza, including to the alleged Hamas "fronts" at issue. Abington Tr. (Ex. 1) at 45-46; 47-48.[4] Ambassador Abington will testify that he visited most if not all "of the zakat committees in the West Bank," specifically in "Jenin, Tulkarem, Qalqilya,

---

[1] "Evidence is relevant if: a) it has any tendency to make a fact more or less probable than it would be without the evidence; and b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Any evidence that makes a material fact "even the least bit more probable or less probable than it would be without the evidence" should be admitted. *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 193 (S.D.N.Y. 2008) (citation omitted); *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) ("[T]he standard of relevance established by the Federal Rules of Evidence is not high.") (citation omitted).

[2] *Cf. Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 248 (2d Cir. 2009) (assessing liability of defendant requires understanding of background of hostilities in the Sudan and the extent and nature of defendant's alleged connection to those hostilities); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1119-21 (E.D. Cal. 2004) (relying on testimony to provide factual background of hostilities in El Salvador as predicate for determining defendant's alleged complicity in supporting those hostilities); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322 (N.D. Ga. 2002) (relying on testimony to provide background of the inter-ethnic conflict that engulfed Yugoslavia in the early 1990s in assessing defendant's alleged liability).

[3] *Cf. AUSA Life Ins. Co. v. Dwyer*, 899 F. Supp. 1200 (S.D.N.Y. 1995) ("the validity of plaintiffs' objections to much of the challenged expert testimony will become apparent only at trial, when the evidence is presented in context"); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) (cautioning against early elimination of witnesses "when the record is not adequate to the task").

[4] Transcript citations herein are intended to serve as a general reference with regard to the subject matters that the Bank's fact witnesses can attest to; they are not intended to reflect the exact testimony that the Bank plans to elicit from these witnesses at trial.



Nablus, Ramallah, Bethlehem, Hebron," and a number in Gaza City, as well as institutions purportedly run by the alleged "fronts" at issue, such as the Al-Razi Hospital and the Islamic University of Gaza.[5] *Id*. at 51; 77.

Ambassador Abington will further testify that the United States promoted its support for these charities, including through ribbon-cutting ceremonies in the West Bank and Gaza that he attended, that these charities played an important role in providing essential services in the West Bank and Gaza, that based upon his personal observation of these charities and their activities, he considered them to be "honest, having integrity" with a "track record of providing assistance to needy Palestinians," and that his visits to these organizations did not contravene U.S. policy against dealing with Hamas. *Id*. at 50-51. In addition, Ambassador Abington will testify that, as U.S. Consul General, no representative of either the U.S. or Israeli governments ever advised during regular security briefings that the zakat committees at issue in this case were "fronts" for Hamas. *Id*. at 82.[6]

Ambassador Abington was permitted to testify with regard to substantially similar topics in the federal prosecution of the Holy Land Foundation.[7] His testimony should not be excluded here.

### B. Brig. General (Ret.) Ilan Paz

Perhaps no witness has more relevant first-hand knowledge about many of the facts in dispute in this litigation than General Paz. General Paz served in the IDF for 28 years. From 1996 through 1998 he served as Territorial Brigade Commander in Jenin; from 2001 to 2002 he served as Territorial Brigade Commander in Ramallah (the location of the Bank's Palestinian headquarters), and from 2002 through 2005 he served as the Head of Israel's Civil Administration for the West Bank.

During his tenure as Head of the Civil Administration, General Paz was the highest ranking Israeli official in the West Bank, with responsibility for "all matters that involved the Palestinian population in the West Bank to the extent of the jurisdiction of the government of Israel following Oslo." Paz Tr. (Ex. 3) at 52. In this capacity, General Paz was involved in "all matters relating to security in the West Bank," *id.* at 41-47, 57-58, and personally commanded security operations in the West Bank, took control of cities and towns in the West Bank, and enforced road closures and curfews within the West Bank, among other security-related operations, *id.* at 66-68. His experience in this regard is highly relevant to the Plaintiffs'

---

[5] Ambassador Abington will also testify that prior to visiting the zakat committees, he ensured that he was not dealing with individuals affiliated with Hamas by having staff members run background checks for derogatory information on those with whom he was meeting. *Id*. at 82.

[6] This testimony is not irrelevant "historical narrative," as Plaintiffs contend. Rather it is highly relevant fact testimony that refutes the opinions offered by Levitt and Spitzen. *Cf*. Feb. 6 Order (*Linde* ECF No. 917) at 8 (testimony regarding alleged affiliation between Hamas and charities three years *after* relevant time period is probative of potential affiliations during relevant time period).

[7] Testimony of Ambassador Abington, *United States v. Holy Land Foundation for Relief and Dev.*, Cr. Action No. 3:04-CR-240-G, Nov. 6, 2008 (Ex. 2 (10: "I visited zakat committees in Hebron, I think in Bethlehem, in Ramallah, Jenin, Tulkarem, Qalqiya, and in Gaza City"; 10-11; 18: he was never "told in any United States government briefing that any of the zakat committees at issue in this case were actually controlled by Hamas," nor was he told "not to deal" with Al-Razi Hospital "because it was controlled by Hamas.").



August 14, 2013
Page Four

allegations, which focus on conditions, and terrorist activity in particular, in the West Bank during this very time period.

General Paz can also testify about his participation in the planning and execution of an IDF confiscation and seizure of accounts at the Bank's Ramallah branch in 2004, *id.* at 96, 143, 191-202; his knowledge of the facts referenced in an IDF letter clearing the Bank of any wrongdoing in connection with the 2004 confiscation and seizure, *see* Ex. 4; and his role in surveilling the zakat committees and other charitable organizations that were operating in the West Bank (and, in particular, the role of Civil Administration in permitting the shipment of goods across Israeli-Palestinian borders to these zakat committees), *id* at 101-02. He can also testify (1) that despite the placement of certain Palestinian charities on Israeli prohibited lists, which Plaintiffs' experts repeatedly rely upon, those lists were never communicated to the Civil Administration so that it might implement a permanent closure of those charities or block them from receiving shipments from abroad, *id.* at 103-04, 121-22; (2) that his participation in military operations against Palestinian charities within the West Bank was aimed at targeted individuals, and permitted those charities to continue operating, *id.* at 106, 140, 175; and (3) that the zakat committees and charities operating in the West Bank addressed humanitarian needs and contributed to the survival of the Palestinian people during the Second Intifada.

### C. The Hon. David Rundell

Mr. Rundell is a former Charge d'Affaires and Deputy Chief of Mission at the American Embassy in Riyadh, Saudi Arabia. While holding these positions, he worked side-by-side with senior Saudi officials tasked with combatting terrorism, including those at the Saudi Arabian Monetary Agency ("SAMA"), the Ministry of the Interior, the Ministry of Finance and the Ministry of Foreign Affairs. Rundell Tr. (Ex. 5) at 25-26. Based on his personal observations and knowledge accrued during this time, Mr. Rundell will testify about the measures employed by the Saudi Government that he witnessed to detect and deter terrorism and terrorist financing during the relevant time period, including: (1) working extensively with U.S. officials to combat terrorism and terrorist financing, *id.* at 30; (2) seeking out training from U.S. officials on ways in which to combat terrorism and terrorist financing, *id.* at 31-32; (3) seeking out assistance from U.S. officials on how to write laws to combat terrorism and terrorist financing, *id.* at 32; (4) adopting and implementing policies to inspect cash couriers, *id.* at 28; (5) educating the Saudi public on the dangers of terrorism, *id.* at 33; (6) restricting the bank accounts of those identified as terrorists or terrorist financiers, *id.* at 37; (7) prohibiting the sending of private charitable contributions abroad, *id.* at 39-40; and (8) developing programs aimed at rehabilitating terrorists, *id.* at 67-75.

In addition, based on his working relationship with Prince Naif, the Chairman of the Saudi Committee and, as Minister of the Interior, the chief counter-terrorism official in Saudi Arabia, and the U.S. Embassy's own monitoring of Saudi aid initiatives, Mr. Rundell will testify to facts tending to show the Saudi Committee to be a humanitarian organization, rather than one that, as Plaintiffs contend, 'incentivized' terrorism or served the goals of Hamas. *Id.* at 35-36; 56-57. Mr. Rundell will testify that both the U.S. embassy in Saudi Arabia and the U.S. government, moreover, supported the activities of the Saudi Committee because they believed that reducing economic hardship amongst the Palestinian people would reduce terrorism and make a peaceful solution to the Israeli-Palestinian conflict more likely. *Id.* at 54-55. Despite Plaintiffs' claims to the contrary, none of this proposed testimony contravenes Judge Gershon's



August 14, 2013
Page Five

December 6, 2011 Order regarding testimony as to the opinion or motive of the Saudi Committee. Rather, Mr. Rundell intends to testify about actions that he saw the Saudi Government undertake—testimony particularly relevant since the Ministry of Finance and Economy of Saudi Arabia sits on the Board of Arab Bank. In his own words, "I was there. I saw it." *Id.* at 75.

### D. Pinhas Shmilovitch

Mr. Shmilovitch served in the Israel Security Agency ("ISA") for 27 years. He has held various positions in the ISA, including Head of Internal Affairs from 2001 through 2004, where his responsibilities included the oversight of ISA interrogations of terror suspects. During his service in the ISA, Mr. Shmilovitch was involved in constructing and analyzing profiles of suicide bombers and potential terrorists. According to Mr. Shmilovitch, based on his extensive first-hand experience in dealing with terror suspects and monitoring the effectiveness of Israel's policy of demolishing the family homes of suicide terrorists after they committed their attacks, monetary rewards did not provide a significant incentive to Palestinians to commit suicide bombings and other violent acts during the Second Intifada. Based on his experience, conditions such as religious fundamentalism, political extremism, and disappointment and despair were the root causes of the suicide bombing phenomenon.

Plaintiffs seek to exclude Mr. Shmilovitch from offering testimony with regard to his personal knowledge about whether monetary "rewards" provided a substantial incentive to potential suicide bombers, and other terrorists, to commit acts of violence during the Second Intifada. Aug. 7 Ltr. at 6-7.[8] Yet plaintiffs have made this a central theme of their case. *See supra* at 1. Despite the plain relevance of Mr. Schmilovitch's testimony, Plaintiffs seek to exclude it because he purportedly "confirmed that he has no personal knowledge of the motivation of any at-issue Hamas operative, or the impact of the Saudi Committee upon the decision-making of Hamas or its members." Aug. 7 Ltr. at 6-7. This argument is surprising—not only because Mr. Shmilovitch has never made any such concession, but also because Plaintiffs intend to argue to the jury that the Saudi Committee payments provided a "general" incentive to potential terrorists—whether or not they incentivized any of the terrorists that caused their injuries. *Linde*, 384 F. Supp. 2d 571, 585 (E.D.N.Y. 2005). If the Plaintiffs are permitted to call Spitzen and Shaked to offer opinion testimony in support of their "incentivization" theory of liability, the Bank should be permitted to offer fact testimony that calls those opinions into question.

### E. The Hon. Edward W. Gnehm, Jr.

Ambassador Gnehm served for 36 years in the U.S. Foreign Service and held the rank of Career Minister. He served as U.S. Ambassador to Jordan from 2001 to 2004, Deputy Chief of Mission to Jordan from 1984 to 1987, and Deputy Assistant Secretary of Defense for the Near East and South Asia from 1987 to 1989. Upon his retirement in 2004, he received the Secretary of State's Distinguished Service Award for his service as U.S. Ambassador to Jordan.[9]

---

[8] Plaintiffs have not challenged Mr. Shmilovitch's testimony as a fact witness on other topics for which he has been proffered: "the Israel Securities Authority, its counterterrorism agenda, and the alleged Hamas 'da'wa.'" Pre-Trial Order at 28.

[9] Plaintiffs seek to exclude Ambassador Gnehm's fact testimony on the basis of Judge Gershon's decision to preclude him from testifying as an expert with regard to "'the strategic relationship between the U.S. and Jordan (a topic of no relevance to this case) and whether he believes that Jordan or Israel would allow misconduct on the part



August 14, 2013
Page Six

      During his service as Ambassador to Jordan, which coincides with the time period relevant to this litigation, Ambassador Gnehm specifically investigated allegations appearing on an Israeli website that funds were being sent through Arab Bank to family members of terrorists—the very same allegations as Plaintiffs assert here. Ex. 7 at 77-78. In response to these allegations, Ambassador Gnehm decided to draft a report about what the U.S. Embassy in Amman knew about Arab Bank for the State Department in Washington. *Id.* at 78-79, 81-83. The purpose of the report was to provide the State Department with the information that the Embassy "had about the [B]ank." *Id.* at 79. This report took the form of a nine-page diplomatic cable that was prepared at Ambassador Gnehm's direction and with his participation; he can authenticate it and provide factual testimony concerning the investigative efforts that preceded its drafting. *Id.* at 83-90. The resulting cable—which was cleared by the U.S. Consulate in Jerusalem, *id.* at 113-14—is a government record that is subject to the hearsay exception.[10]

      Ambassador Gnehm's first-hand knowledge of the Jordanian government's commitment to combatting terrorism and supporting the Israeli-Palestinian peace process is particularly relevant because the Kingdom of Jordan's Social Security Corporation is one of the largest shareholders of the Bank *Id.* at 97. As Ambassador Gnehm testified, if allegations that the Bank was engaged in the knowing and intentional financing of terrorism were true, "it quite clearly would be easy to extrapolate that the [Jordanian] government itself was involved, and that would be completely counter to the policies of the government" that he personally witnessed being implemented and took part in shaping. *Id.* at 98-110.[11]

### F. Yair Dagan

      Mr. Dagan developed the software utilized by almost all Israeli banks to screen financial transactions. He manages a company, Amnet Ltd., that specializes in the prevention of money laundering and terrorist financing. Based on this experience and his own personal knowledge,

---

of the Bank.'" Aug. 7 Ltr. at 3 (quoting Dec. 6 Order at 3). Plaintiffs additionally argue that because Ambassador Gnehm did not inspect the Bank's foreign branches or files, he should be excluded from offering testimony about a diplomatic reporting cable that he and his staff prepared about the Bank for the State Department. Aug. 7 Ltr. at 3; *see also* Diplomatic Cable from Ambassador Gnehm to Secretary of State Powell, Nov. 24, 2002 (Ex. 6). As this Court noted at the last hearing, fact witnesses generally are permitted to testify about what they did on a particular date and a particular time, so long as that testimony is relevant and does not constitute hearsay without an exception. *See* Hr'g Tr. at 71, July 30, 2013 ("July 30 Hr'g Tr."). During his service in Amman during the Second Intifada, Ambassador Gnehm's "responsibility was to represent the United States of America, both the President personally and the government, to the King of Jordan and to the Jordanian government, and obviously to the community." Gnehm Tr. (Ex. 7) at 45-46. In connection with those duties, Ambassador Gnehm met with the King of Jordan 400-500 times, *id.* at 54, assessed the Jordanian government's cooperation in U.S. counter-terrorism efforts, *id.* at 61-63, and regularly interfaced with Jordan's intelligence agency (the "GID") with regard to counter-terrorism initiatives, *id.* at 64-65. He personally witnessed the King's repudiation of terrorist groups, *id.* at 67, and initiatives undertaken by Jordan to further the peace process between Israel and the Palestinians, *id.* at 68.

[10]     Plaintiffs concede the admissibility of such public records, Aug. 7 Ltr. at 10, although, as demonstrated *infra* at 10, they misconstrue this rule of evidence in an attempt to introduce an administrative settlement between the OCC and FinCEN and the Bank's New York branch. *See also* Fed. Rule Evid. 803(8) (identifying "a record or statement of a public office" as an exception to the hearsay rule).

[11]     Ambassador Gnehm can also testify about the common practice throughout the region by which employees of corporations, institutions and governments voluntarily donate a percentage of their monthly salaries to Palestinian relief efforts. *Id.* at 111. This testimony is essential to rebut the Plaintiffs' allegations that the donation by Bank employees of a portion of one month's salary in some way indicates support for Palestinian terrorism.



Mr. Dagan will testify about the standards and practices of Israeli banks with regard to the screening of transactions against blacklists.

Judge Gershon previously ruled that, despite the sanctions order issued against the Bank, it is entitled to present evidence of banking industry standards and practices: "[s]ince it appears that plaintiffs may proffer evidence of the Bank's conduct regarding the use of automated tools to detect suspicious accounts, Know Your Customer ('KYC') procedures, and the use of 'blacklists' to screen account applications and financial transactions, the Bank is entitled to counter the inferences plaintiffs seek to draw as to the Bank's mental state with evidence regarding banking industry standards or practices on these subjects." May 24, 2013 Order (ECF No. 954) at 6-7.[12]

Mr. Dagan's testimony is based on his personal knowledge and fits within the parameters of Judge Gershon's orders. Specifically, Mr. Dagan can testify that banks operating within Israel: (1) did not, as a matter of custom and practice, screen their transactions against the U.S. OFAC list until 2009, when the list was added to Mr. Dagan's CNET software, Dagan Tr. (Ex. 8) at 112-113; (2) did not, as a matter of custom and practice, screen their transactions against any blacklists before 2005, *id.* at 90; and (3) began in 2005 to screen their transactions against the Israeli blacklist for the first time, and all but one did so using Mr. Dagan's CNET software, *id.* at 108-109; 110. As discussed *supra* at 2, this testimony, and that of Mr. Abed, provides facts that rebut the opinions offered by Mr. Everhardt.

### G. George Abed

Dr. Abed's proffered fact witness testimony is proper and will enable a jury to apprehend critical facts in this case with respect to the customs and practices of Palestinian banks during the relevant time period, the regulatory environment in which Arab Bank conducted its business in the Palestinian Territories, and the operations and activities of the Welfare Association. As former Governor of the Palestine Monetary Authority ("PMA"), Dr. Abed can provide testimony about the agency that regulated Arab Bank—including the scope of its regulatory jurisdiction, its administrative obligations, and its decision-making policies, which include, among other topics, its procedures in imposing and rescinding restrictions on the provision of banking services to entities designated by it, including charitable institutions at issue in this litigation. Abed Tr. (Ex. 9) at 86-89; 147-150; 150-151; 156-158.[13]

---

[12] Judge Gershon also permitted the following testimony: "[T]he Bank may proffer Ms. Vitale's testimony that, for banks operating in foreign countries, 'it was not the custom and practice of banks to perform extensive KYC concerning background and source of funds in retail and correspondent banking prior to 2001;' that industry standards adhered around four KYC principles after 2001; and that 'developing KYC guidance' recommended that banks review applications for accounts from charities more closely and check for official governmental charity licenses. Ms. Vitale also offers testimony regarding the lack of a common industry standard in 2004 for foreign banks outside of the U.S. to screen against the Office of Foreign Assets Control ('OFAC') list. Ms. Vitale's testimony as to the state of industry standards or practices in 2004 may be admissible so long as her opinion is based on her knowledge of banking industry standards or practices." *Id.*

[13] Plaintiffs' claim that Dr. Abed's testimony is irrelevant because he served as the head of the PMA after the 2000 to 2004 time period is spurious. He took up his position just one year later, in 2005. And in assuming his position, he fully familiarized himself with the workings of the agency by undertaking, among other tasks, extensive efforts to understand the resources available to it to supervise the safety and soundness of institutions under its jurisdiction. *See, e.g., id.* 136; 145-146; 197; 202-204. Dr. Abed's work for the International Monetary Fund



August 14, 2013
Page Eight

Dr. Abed also can testify about the Welfare Association, a Geneva-based charitable organization that he helped to found in 1983 and for which he served as Director General for eight years.[14]  Notwithstanding the fact that Dr. Abed ceased to be associated with the Welfare Association in the nineties, as a founding member and its first Director General, he is clearly able to provided testimony that will assist the jury in understanding the  organization's creation, mission, purpose, operations and activities. [15]

## II. Bank Expert Beverly Milton-Edwards Should Be Permitted To Testify As To Palestinian Perceptions About Zakat Committees.

The Feb. 6, 2013 Order clearly allows Professor Milton-Edwards to provide generalized testimony about zakat committees and other local charitable organizations in the Palestinian Territories.  Pursuant to that Order, Ms. Milton-Edwards may testify: "*generally as to the nature*

---

("IMF") for more than twenty years, moreover, afforded him direct involvement in the development of the economic and monetary regulatory structure in the Palestinian Territories.  Between 1993 and 1996, for instance, Dr. Abed headed IMF missions to advise the Palestinian Authority on its creation of a modern financial and monetary system for the Palestinian Territories.  *Id*. 39-40.  From 1996 through 2003, Dr. Abed worked in various leadership positions with the IMF, and from 2002 to 2003 served as Director of its Middle Eastern Department.  *See, e.g.*, *id.* 260; 263. He was thus fully familiar with the bank supervisory regime that was in place in the Palestinian Territories before he became Governor of the PMA.

[14]  Plaintiffs have challenged the Bank's processing of 173 payments for the benefit of the Welfare Association through its  New York branch (payments which Plaintiffs' expert Wayne Geisser calculates to have a total value of more than $43 million).  They have further questioned the Bank's witnesses, including Mr. Shukry Bishara, Arab Bank's former Chief Banking Officer, about the Welfare Associations' activities and the Bank's provision of services to it.  Moreover, Plaintiffs have designated as trial exhibits several documents that they may assert refer to the Welfare Association's donor activities to charitable organizations in the Palestinian Territories.  Pre-Trial Order at Ex. G-1, Pls.' Exs. 15, 1844, 1845, 1846, and 2029.

[15]  In addition to attacking the relevance of the testimony offered by the Bank's fact witnesses, Plaintiffs claim that these witnesses should be excluded because they continued to be paid at their expert rates after the Court's December 6, 2011 order barred them from testifying as experts.  Aug. 7 Ltr. at 2.  This claim is meritless.  First, fees incurred prior to the December 6 Order were paid to experts who had been designated as such by the Bank; the statute Plaintiffs rely on specifically states that it does not apply "in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying."  18 U.S.C. § 201(d).  Second, for fees paid after the December 6 Order, courts have held that it is proper to pay fees to fact witnesses as well as experts for the time they spend preparing to testify, testifying, and providing litigation consulting services; each of these individuals had contracted to provide such services to the Bank, in agreements that were provided to the Plaintiffs.  Compensation paid to "a fact witness [who] has been retained to act as a litigation consultant does not, in and of itself, appear to be improper."  *Prasad v. MML Investors Servs., Inc.*, 04 Civ. 380 (RWS), 2004 U.S. Dist. LEXIS 9289, at *19 (S.D.N.Y. May 27, 2004) (holding that it is lawful to compensate a fact witness for consulting services).  "A witness may be compensated for the time spent preparing to testify or otherwise consulting on a litigation matter in addition to the time spent providing testimony in a deposition or at trial."  *Id*. at *17; *see also, e.g.*, *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679-80 (D. Kan. 2000) (concluding that a fact witness was properly and reasonably compensated for, among other things, the time spent to "review documents produced in the litigation, and otherwise consult with [a party] and its counsel on matters related to the litigation"); ABA Comm. On Ethics & Prof'l Responsibility, Formal Op. 96-402 (1996) ("The Committee is further of the view that the witness may also be compensated for time spent in reviewing and researching records that are germane to his or her testimony").  "The mere fact of payments, even seemingly large payments," does not implicate 18 U.S.C. § 201(d), the statute relied on by Plaintiffs.  *Fund of Funds Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1369-70 & n.28 (S.D.N.Y. 1982) (rejecting relevance of 18 U.S.C. § 201(d) to fee paid to non-expert witness).  Cross-examination on the fees is fully adequate protection for any concern about their amount.  *Id*. at 1370.  The criminal case under 18 U.S.C. § 201(d) cited by Plaintiffs (*United States v. Blaszak*, 349 F.3d 881 (6th Cir. 2003)) does not concern anything like payment of legitimate consulting fees for services.



*of zakat committees and other local charitable organizations* and their historical origins[.]" Feb. 6 Order at 10-11 (emphasis supplied). Reliable data regarding public perceptions of the trustworthiness and legitimacy of zakat committees relates to the "nature" of these organizations and the charitable activities they carry out in the Palestinian Territories. Professor Milton-Edwards has been permitted to offer testimony that will enable jurors to understand the value and trust placed by Palestinians in zakat committees and other charities operating in the Palestinian Territories, so that they can make an educated determination about whether Arab Bank turned a blind eye to the alleged fact that these zakats were notorious "fronts" for Hamas. To the extent that Plaintiffs seek from Professor Milton-Edwards an opinion about a specific charitable organization, they may solicit it on cross examination. Plaintiffs' effort to foreclose Professor Milton-Edwards' reliance upon the opinion polls referenced in her case-in-chief expert report is therefore misguided.

### III. Plaintiffs' Proposed Stipulation Regarding The OCC And FinCEN Is Unnecessary And Inherently Prejudicial And The Consent Order And Assessment Are Inadmissible.

Plaintiffs fail to explain why their proposed stipulation, Aug. 7 Ltr. at Ex. 5, has any probative value—let alone sufficient probative value to overcome the "danger of an unduly prejudicial impact" acknowledged by this Court. July 30 Hr'g Tr. at 134. For that reason alone, it should be rejected.

It is undisputed that *prior* to the completion of the OCC's examination of the New York branch that led to the 2005 Consent Order and FinCEN's "Assessment of Civil Money Penalty," Aug. 7 Ltr. at Ex. 6, the Bank closed the dormant Hamdan account and subsequently notified Lebanese authorities of its action in this regard. It did so as the result of information alleged in Plaintiffs' complaint. Also undisputed is that the Bank returned the $8,677 in funds held in the account at the time of its closure to the accountholder after failing to receive instructions to the contrary from these authorities. Plaintiffs have not established, and cannot establish, that the OCC's entry into a consent order with the Bank is related in any way to the Hamdan account.

The proposed stipulation invites the inference that the OCC took action because of the entities listed in Paragraph 2, an inference that can be rebutted only by reference to the content of the inadmissible Consent Order and Assessment and related communications. The disputed deficiencies identified by the OCC and FinCEN concerned the branch's automated systems for *retrospectively* monitoring electronic funds transfers originated by customers of the Bank's customers. The Order and Assessment contain no determination of the knowing or intentional provision of financial services to Hamas, the issue now before this Court.[16]

---

[16] The OCC itself has addressed whether the Order and Assessment are relevant to these litigations in its denial of Plaintiffs' request for the documents it had reviewed in connection with its examination of the Bank. (Ltr. from Timothy W. Long, Sr. Deputy Comptroller, OCC, to Michael Elsner, Esq., Aug. 3, 2005 (ECF No. 128-1) ("The relevancy of the non-public documents you seek . . . can also be questioned. It is not clear that the transactions reviewed by the OCC . . . are relevant to the transactions on which plaintiffs' litigation is focused."). Similarly, addressing virtually the same OCC issue in the recently concluded *Gill* litigation, Judge Weinstein held that "[t]he probative value of these findings as to the Bank's mental state is slight and, combined with the lack of any additional evidence demonstrating an improper state of mind, provides no support for inferring the Bank acted recklessly both before and after 2004 . . . ." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 566 (E.D.N.Y. 2012).



August 14, 2013
Page Ten

Nor, as Judge Weinstein ruled, is any of this evidence admissible. *See id.* ("This evidence would not even support a finding of negligence, since it is inadmissible. *See* Fed. R. Evid. 408(a) . . . . [such] evidence . . . is inadmissible on behalf of any party—*either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction*") (emphasis supplied). Plaintiffs' argument that "Fed. R. Evid. 803(8)(iii) (formerly, Rule 803(8)(C)) excludes from the hearsay rule '*factual findings* from a legally authorized investigation'" (Aug. 7 Ltr. at 10 (citations omitted) (emphasis supplied)) misses the point, as this Court has already noted *See* July 30 Hr'g Tr. at 127 ("*but they are not facts*, if the bank doesn't agree they are true"; "I don't think it's fair to let the jury think that because some agency has thought a certain thing, therefore you can hold that against this defendant"; "I'm pretty confident you are not going to find a way around Rule 408 and Rule 403 as to that one") (emphasis supplied).[17]

The case law cited by Plaintiffs is either inapposite or affirms the Bank's position. *See* Pls.' Br. at 10. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) upheld the admission of an investigative report in a suit against an aircraft manufacturer; the use of findings comprising a settlement was *not* at issue. Similarly, the court in *Bridgeway Corp. v. Citibank*, 201 F.3d 134 (2d Cir. 2000), merely upheld the admission of portions of a State Department Country Report. Finally, in *S.E.C. v. Pentagon Capital Management*, 08-CV-3324, 2010 U.S. WL 985205 (Mar. 17, 2010 S.D.N.Y.), Judge Sweet acknowledged the general rule against admission of matters pertaining to settlement orders, but held that an exception was warranted where the settling defendants sought admission, rather than the plaintiff: "Defendants are not trying to use the settlements to establish liability against the parties who settled *but to offer evidence as a shield* because the SEC's findings that others were aware of, and facilitated, market timing and late trading tend to negate the Commission's allegation that the defendants in this action deceived those parties." *Id.* at *4 (emphasis supplied). Here, where Plaintiffs seek to use this evidence *as a sword, rather than a shield*, the long standing rule against admission plainly applies. Plaintiffs have proffered no argument to the contrary and their request should be denied.

For the reasons stated herein, Plaintiffs' motions should be denied.

Very truly yours,

**DLA Piper LLP (US)**


/s/ Shand S. Stephens

cc:   Magistrate Judge Viktor V. Pohorelsky (by hand delivery)
      All counsel of record (by email)

---

[17]   *See also, e.g.*, *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1982); *New York City Dep't of Fin. v. Twin Rivers, Inc.*, Nos. 98-7488, 98-7444, 182 F.3d 900, 1999 WL 385737, at *3 (2d Cir. June 8, 1999); *Dodson v. CBS*, 423 F. Supp. 2d 331, 334 (S.D.N.Y. 2006); *In re Blech Secs. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, *11 (S.D.N.Y. March 26, 2003) (excluding SEC consent orders under FRE 408).